**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

STATE OF MARYLAND
200 Saint Paul Pl
Baltimore, MD 21202

STATE OF CALIFORNIA,
300 South Spring Street, Suite 1702
Los Angeles, CA 90013

STATE OF ILLINOIS
115 South LaSalle Street, 35th Floor
Chicago, IL 60603

STATE OF COLORADO
1300 Broadway
Denver, CO 80203

STATE OF CONNECTICUT
165 Capitol Ave
Hartford, CT 06106

DISTRICT OF COLUMBIA
400 Sixth Street NW
Washington, D.C. 20001

STATE OF HAWAI‘I
425 Queen Street
Honolulu, HI 96813

STATE OF MAINE
6 State House Station
Augusta, ME 04333

COMMONWEALTH OF
MASSACHUSETTS
1 Ashburton Place
Boston, MA 02108

STATE OF MICHIGAN
525 W. Ottawa St.
Lansing, MI 48906

STATE OF MINNESOTA
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101

Case No: 1:26-cv-02322

STATE OF NEVADA
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

STATE OF NEW JERSEY
124 Halsey Street, 5th Floor
Newark, NJ 07101

STATE OF NEW MEXICO
408 Galisteo Street
Santa Fe, NM 87501

STATE OF OREGON
100 SW Market Street
Portland, OR 97201

STATE OF RHODE ISLAND
150 South Main Street
Providence, RI 02903

STATE OF VERMONT
109 State Street
Montpelier, VT 05609

COMMONWEALTH OF VIRGINIA
202 North Ninth Street
Richmond, Virginia 23219

STATE OF WASHINGTON
800 Fifth Avenue, Ste. 2000
P.O. Box TB-14
Seattle, WA 98104-3188

STATE OF WISCONSIN
17 West Main Street
Madison, WI 53703

                    Plaintiffs

            v.

PETE HEGSETH, Secretary of Defense
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

2

DOUGLAS A. COLLINS, Secretary of
Veterans Affairs
U.S. Department of Veterans Affairs
810 Vermont Ave., NW
Washington, DC 20420

CHRIS WRIGHT, Secretary of Energy
U.S. Department of Energy
1000 Independence Ave., SW
Washington, DC 20585

MARKWAYNE MULLIN, Secretary of
Homeland Security
U.S. Department of Homeland Security
Washington, DC 20528

ROBERT F. KENNEDY, JR., Secretary of
Health and Human Services
U.S. Department of Health and Human
Services
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201

EDWARD C. FORST, Administrator,
General Services Administration
1800 F St NW
Washington DC 20006

JARED ISAACMAN, Administrator,
National Aeronautics and Space
Administration
Mary W. Jackson NASA Headquarters
300 E. Street SW, Suite 5R30
Washington, DC 20546

SEAN DUFFY, Secretary of Transportation
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

MARCO RUBIO, Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

3

BROOKE L. ROLLINS, Secretary of
Agriculture
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

TODD BLANCHE, Acting Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington DC 20530

LINDA E. MCMAHON, Secretary of
Education
U.S. Department of Education
Lyndon Baines Johnson (LBJ)
Department of Education Building
400 Maryland Ave, SW
Washington, DC 20202

DOUG BURGUM, Secretary of the Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington DC 20240

HOWARD LUTNICK, Secretary of
Commerce
U.S. Department of Commerce
1401 Constitution Ave NW
Washington, DC 20230

SCOTT TURNER, Secretary of Housing and
Urban Development
U.S. Department of Housing and Urban
Development
The Robert C. Weaver Federal Building
451 Seventh Street, SW
Washington, DC 20410

KEITH E. SONDERLING, Acting Secretary
of Labor
U.S. Department of Labor
200 Constitution Ave NW
Washington, DC 20210

4

LEE ZELDIN, Administrator, Environmental
Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

BRIAN STONE, NSF Chief of Staff,
performing the duties of the NSF Director
National Science Foundation
Randolph Building
401 Dulany Street
Alexandria, VA 22314

HO K. NIEH, Chairman, Nuclear Regulatory
Commission
One White Flint North
11555 Rockville Pike
Rockville, MD 20852-2738

FRANK J. BISIGNANO, Commissioner,
Social Security Administration
6401 Security Blvd.
Baltimore, MD 21235

TULSI GABBARD, Director of National
Intelligence
Office of the Director of National
Intelligence
Washington, DC 20511

CHRISTOPHER LANDAU, Acting Director,
Peace Corps
1275 First Street NE
Washington, DC 20526

PETER A. FELDMAN, Acting Chairman,
Consumer Product Safety Commission
4330 East West Highway
Bethesda, MD 20814

KEITH E. SONDERLING, Acting Director,
Institute of Museum and Library Services
200 Constitution Ave. NW, Suite N-3627
Washington, DC 20210

KEVIN R. RHODES, Administrator for
Federal Procurement Policy, Office of
Management and Budget
Washington, DC 20503

JOHN M. TENAGLIA, Principal Director,
Defense Pricing, Contracting, and
Acquisition Policy, U.S. Department of
Defense
3060 Defense Pentagon, Room 3B938
Washington, DC 20301-3060

JEFFREY A. KOSES, Senior Procurement
Executive and Deputy Chief Acquisition
Officer, Office of Acquisition Policy, U.S.
General Services Administration
1800 F Street
Washington, DC 20503

MARVIN L. HORNE, Acting Senior
Procurement Executive, Deputy Chief
Acquisition Officer, and Assistant
Administrator for Procurement, National
Aeronautics and Space Administration
300 E Street SW
Washington, DC 20548

U.S. DEPARTMENT OF DEFENSE
1000 Defense Pentagon
Washington, DC 20301-1000

U.S. DEPARTMENT OF VETERANS
AFFAIRS
810 Vermont Ave., NW
Washington, DC 20420

U.S. DEPARTMENT OF ENERGY
1000 Independence Ave., SW
Washington, DC 20585

U.S. DEPARTMENT OF HOMELAND
SECURITY
Washington, DC 20528

6

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201

GENERAL SERVICES ADMINISTRATION
1800 F St NW
Washington DC 20006

NATIONAL AERONAUTICS AND SPACE
ADMINISTRATION
Mary W. Jackson NASA Headquarters
300 E. Street SW, Suite 5R30
Washington, DC 20546

U.S. DEPARTMENT OF
TRANSPORTATION
1200 New Jersey Ave, SE
Washington, DC 20590

U.S. DEPARTMENT OF STATE
2201 C Street NW
Washington, DC 20520

U.S. DEPARTMENT OF AGRICULTURE
1400 Independence Ave., S.W.
Washington, DC 20250

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington DC 20530

U.S. DEPARTMENT OF EDUCATION
Lyndon Baines Johnson (LBJ)
Department of Education Building
400 Maryland Ave, SW
Washington, DC 20202

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street, N.W.
Washington DC 20240

U.S. DEPARTMENT OF COMMERCE
1401 Constitution Ave NW
Washington, DC 20230

7

U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT
The Robert C. Weaver Federal Building
451 Seventh Street, SW
Washington, DC 20410

U.S. DEPARTMENT OF LABOR
200 Constitution Ave NW
Washington, DC 20210

ENVIRONMENTAL PROTECTION
AGENCY
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

NATIONAL SCIENCE FOUNDATION
Randolph Building
401 Dulany Street
Alexandria, VA 22314

NUCLEAR REGULATORY COMMISSION
One White Flint North
11555 Rockville Pike
Rockville, MD 20852-2738

SOCIAL SECURITY ADMINISTRATION
6401 Security Blvd.
Baltimore, MD 21235

OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE
Washington, DC 20511

PEACE CORPS
1275 First Street NE
Washington, DC 20526

CONSUMER PRODUCT SAFETY
COMMISSION
4330 East West Highway
Bethesda, MD 20814

INSTITUTE OF MUSEUM AND LIBRARY
SERVICES
200 Constitution Ave. NW, Suite N-3627
Washington, DC 20210

FEDERAL ACQUISITION REGULATORY
COUNCIL
c/o Kevin R. Rhodes, Administrator for
Federal Procurement Policy
Office of Management and Budget
Washington, DC 20503

UNITED STATES
950 Pennsylvania Avenue NW
Washington DC 20530

           Defendants.

## COMPLAINT

## INTRODUCTION

1.     The U.S. government spends hundreds of billions of dollars each year procuring goods and services for its own use, making it the largest purchaser in the world.

2.     On March 26, 2026, President Trump issued a new Executive Order with the stated purpose of deterring "diversity, equity, and inclusion" (DEI) activities by persons and organizations that contract with the federal government. Exec. Order No. 14398, Addressing DEI Discrimination by Federal Contractors, 91 Fed. Reg. 16147 (Mar. 26, 2026). The Executive Order declares that DEI activities are "unethical and often illegal" and directs federal agencies to include terms in all their contracts, subcontracts, and "contract-like instruments" barring contractors from "engag[ing] in any racially discriminatory DEI activities," defined as "disparate treatment based on race or ethnicity in . . . recruitment, employment . . . , contracting . . . , program participation, or allocation or deployment of an entity's resources." *Id.* §§ 1–3.

3.     The plaintiff States oppose racial discrimination and comply with all existing state and federal laws against discrimination. They also have a strong interest in preventing, detecting, and remedying racial discrimination both within their own operations and more broadly. But the Executive Order, as federal agencies have implemented it, impedes the States' efforts because the

prescribed contract term is unclear and does not provide sufficient explanation of what it prohibits. The definition of "racially discriminatory DEI activities" echoes existing prohibitions of discrimination based on race or ethnicity, but neither the Executive Order nor agency actions implementing it have provided any useful explanation of whether or how the contract term imposes requirements different from existing provisions of law.

4.      The contract term is especially confusing considering the history leading up to Executive Order No. 14398. For 60 years before President Trump's second term, Executive Order No. 11246,[1] issued by President Johnson in 1965, had required contract terms prohibiting racial discrimination by federal contractors. Immediately after he took office in January 2025, President Trump issued Executive Order No. 14173,[2] which rescinded Executive Order No. 11246 and prescribed new contract terms prohibiting DEI programs that violate federal antidiscrimination law. The latest Executive Order, Executive Order No. 14398, provides no explanation of how its requirements differ from those of either the longstanding Executive Order No. 11246 or the more recent Executive Order No. 14173.

5.      Executive Order No. 14398 threatens severe penalties for failure to comply with the new contract terms, including cancellation of contracts and debarment from all future federal contracts. The Executive Order also threatens contractors with lawsuits under the False Claims Act.

6.      As directed by Executive Order No. 14398, federal agencies have taken rapid steps to adopt the new contract term and add it to new and existing federal contracts.

---

[1] Exec. Order No. 11246, Equal Employment Opportunity, 3 C.F.R. 339 (1964–1965).
[2] Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity 90 Fed. Reg. 8633 (Jan. 21, 2025).

7.      The actions taken by the Federal Acquisition Regulatory Council (FAR Council) and other federal agencies to implement the Executive Order are unlawful under the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–556, 701–706. The agencies' implementing actions exceed the authority granted to the FAR Council under 41 U.S.C. § 1303 and violate various procedural requirements and substantive limits specified in statutes and regulations that govern federal procurement policy, including a statutory requirement for notice and comment before adoption of federal procurement policies with significant impact.

8.      The agencies' actions are also arbitrary and capricious under the APA. The FAR Council and other federal agencies have not adequately explained their reasons for adopting the new contract terms, nor have they explained what the contract terms mean or require from contractors, or how they differ from other antidiscrimination requirements previously and currently applicable to federal contractors. Given the lack of clarity, the contract terms sow confusion, increase compliance costs, and disrupt lawful and necessary efforts by federal contractors to prevent, detect, and remedy unlawful racial discrimination in their activities.

9.      The agencies' actions also fail to consider federal contractors' reliance on federal statutes and controlling decisional law to determine what is and is not unlawful discrimination. Federal contractors have designed their employment, subcontracting, and compliance policies and practices based on these sources.

10.      The plaintiff States, through their agencies and instrumentalities, routinely work as federal contractors. They have numerous existing federal contracts and regularly and continuously compete for and are awarded new contracts with the federal government. Each year, their federal contracting activities amount to hundreds of contracts worth billions of dollars. The States have made earnest efforts to interpret the new contract terms, but the abrupt and

unlawful rollout of Executive Order No. 14398 and its implementation threatens grave and irreparable harm to the States' economic interests and their ability to serve the public. The States are bringing this action to stop implementation of the Executive Order and stem that harm.

## JURISDICTION AND VENUE

11. Jurisdiction in this Court is proper under 28 U.S.C. §§ 1331 and 1361.

12. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because plaintiff Maryland and its Attorney General reside in this District, and a substantial part of the acts or omissions giving rise to this action occurred in this District.

## PARTIES

13. Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

14. Plaintiff State of California is a sovereign state of the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

15. Plaintiff State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign state of the United States of America. Attorney General Raoul is the chief legal officer for the State of Illinois and is authorized to pursue this action under Illinois law. *See* 15 ILCS 205/4.

16. Plaintiff State of Colorado is a sovereign state in the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

12

17. Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

18. Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District. D.C. Code. § 1-301.81.

19. Plaintiff State of Hawai'i is a sovereign state of the United States of America. Hawai'i is represented by Attorney General Anne E. Lopez, Hawai'i's chief legal officer and chief law enforcement officer, who is authorized by Hawai'i Revised Statutes § 28-1 to pursue this action.

20. Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

21. Plaintiff the Commonwealth of Massachusetts is a sovereign State of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

22. Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

13

23.     Plaintiff State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 801.

24.     Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

25.     Plaintiff State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Jennifer Davenport, the Attorney General of New Jersey, who is the chief law enforcement officer of New Jersey and authorized to sue on the State's behalf.

26.     Plaintiff the State of New Mexico, represented by and through its Attorney General Raúl Torrez, is a sovereign state of the United States of America. As the State's chief law enforcement officer, the Attorney General is authorized to act on behalf of the State of New Mexico in this matter.

27.     Plaintiff the State of Oregon is a sovereign state of the United States of America. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

28.     Plaintiff State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

29.     Plaintiff State of Vermont is a sovereign state of the United States. Vermont is represented by its Attorney General, Charity Clark, who is the chief legal officer of Vermont and has authority to represent the State in this matter.

30.     Plaintiff Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

31.     Plaintiff State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Chapter 43.10 RCW.

32.     Plaintiff State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

33.     The United States is named as defendant in this action.

34.     Defendant Federal Acquisition Regulatory Council is an agency of the United States. Defendant Kevin R. Rhodes is sued in his official capacity as Administrator for Federal Procurement Policy, Office of Management and Budget, and member of the FAR Council. Defendant John M. Tenaglia is sued in his official capacity as Principal Director, Defense Pricing, Contracting, and Acquisition Policy, Department of Defense, and member by designation of the FAR Council. Defendant Jeffrey A. Koses is sued in his official capacity as Senior Procurement Executive and Deputy Chief Acquisition Officer, Office of Acquisition

15

Policy, U.S. General Services Administration, and member by designation of the FAR Council. Defendant Marvin L. Horne is sued in his official capacity as Acting Senior Procurement Executive, Deputy Chief Acquisition Officer, and Assistant Administrator for Procurement, National Aeronautics and Space Administration, and member by designation of the FAR Council.

35. Defendant U.S. Department of Defense is an agency of the United States. Defendant Pete Hegseth is sued in his official capacity as Secretary of Defense.

36. Defendant U.S. Department of Veterans Affairs is an agency of the United States. Defendant Douglas A. Collins is sued in his official capacity as Secretary of Veterans Affairs.

37. Defendant U.S. Department of Energy is an agency of the United States. Defendant Chris Wright is sued in his official capacity as Secretary of Energy.

38. Defendant U.S. Department of Homeland Security is an agency of the United States. Defendant Markwayne Mullin is sued in his official capacity as Secretary of Homeland Security.

39. Defendant U.S. Department of Health and Human Services is an agency of the United States. Defendant Robert F. Kennedy, Jr., is sued in his official capacity as Secretary of Health and Human Services.

40. Defendant General Services Administration is an agency of the United States. Defendant Edward C. Forst is sued in his official capacity as Administrator, General Services Administration.

41. Defendant National Aeronautics and Space Administration is an agency of the United States. Defendant Jared Isaacman is sued in his official capacity as Administrator, National Aeronautics and Space Administration.

42.    Defendant U.S. Department of Transportation is an agency of the United States. Defendant Sean Duffy is sued in his official capacity as Secretary of Transportation.

43.    Defendant U.S. Department of State is an agency of the United States. Defendant Marco Rubio is sued in his official capacity as Secretary of State.

44.    Defendant U.S. Department of Agriculture is an agency of the United States. Defendant Brooke L. Rollins is sued in her official capacity as Secretary of Agriculture.

45.    Defendant U.S. Department of Justice is an agency of the United States. Defendant Todd Blanche is sued in his official capacity as Acting Attorney General.

46.    Defendant U.S. Department of Education is an agency of the United States. Defendant Linda E. McMahon is sued in her official capacity as Secretary of Education.

47.    Defendant U.S. Department of the Interior is an agency of the United States. Defendant Doug Burgum is sued in his official capacity as Secretary of the Interior.

48.    Defendant U.S. Department of Commerce is an agency of the United States. Defendant Howard Lutnick is sued in his official capacity as Secretary of Commerce.

49.    Defendant U.S. Department of Housing and Urban Development is an agency of the United States. Defendant Scott Turner is sued in his official capacity as Secretary of Housing and Urban Development.

50.    Defendant U.S. Department of Labor is an agency of the United States. Defendant Keith E. Sonderling is sued in his official capacity as Acting Secretary of Labor.

51.    Defendant Environmental Protection Agency is an agency of the United States. Defendant Lee Zeldin is sued in his official capacity as Administrator, Environmental Protection Agency.

17

52.    Defendant National Science Foundation is an agency of the United States. Defendant Brian Stone is sued in his official capacity as NSF Chief of Staff, performing the duties of the NSF Director.

53.    Defendant Nuclear Regulatory Commission is an agency of the United States. Defendant Ho K. Nieh is sued in his official capacity as Chairman, Nuclear Regulatory Commission.

54.    Defendant Social Security Administration is an agency of the United States. Defendant Frank J. Bisignano is sued in his official capacity as Commissioner, Social Security Administration.

55.    Defendant Office of the Director of National Intelligence is an agency of the United States. Defendant Tulsi Gabbard is sued in her official capacity as Director of National Intelligence.

56.    Defendant Peace Corps is an agency of the United States. Defendant Christopher Landau is sued in his official capacity as Acting Director, Peace Corps.

57.    Defendant Consumer Product Safety Commission is an agency of the United States. Defendant Peter A. Feldman is sued in his official capacity as Acting Chairman, Consumer Product Safety Commission.

58.    Defendant Institute of Museum and Library Services is an agency of the United States. Defendant Keith E. Sonderling is sued in his official capacity as Acting Director, Institute of Museum and Library Services.

**FACTUAL ALLEGATIONS**

I.    **Statutory and Regulatory Background**

A.    **Federal Property and Administrative Services Act**

59.    "[T]he Government enjoys the unrestricted power . . . to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). The authority to determine the policies that govern those purchases resides with Congress. *See id.* at 130.

60.    Through the Federal Property and Administrative Services Act (FPASA) (also known as the "Property Act" or the "Procurement Act"), Congress has delegated authority to the President to "prescribe policies and directives that the President considers necessary to carry out" the provisions of FPASA. 40 U.S.C. § 121(a).

B.    **The Federal Acquisition Regulation and the FAR Council**

61.    The federal government maintains a "single Government-wide procurement regulation," 41 U.S.C. § 1303(a)(1), known as the Federal Acquisition Regulation (FAR) and codified in Title 48, part 1 of the Code of Federal Regulations. 48 C.F.R. pt. 1. A body called the Federal Acquisition Regulatory Council (FAR Council), established under 41 U.S.C. § 1302(a), coordinates the maintenance of the FAR. *See id.* § 1303(d) (specifying that the FAR Council "shall manage, coordinate, control, and monitor the maintenance of, issuance of, and changes in, the Federal Acquisition Regulation").

62.    Amendments to the FAR, as well as other changes to federal procurement policies, are subject to procedural requirements set forth in 41 U.S.C. § 1707.

63.    Under § 1707, any "procurement policy, regulation, procedure, or form" that "relates to the expenditure of appropriated funds" and "has a significant effect beyond the internal operating procedures of the agency issuing the policy, regulation, procedure, or form; or

19

. . . has a significant cost or administrative impact on contractors or offerors" generally must be published for public comment in the Federal Register at least 60 days before it takes effect, and at least 30 days must be permitted for comment. *Id.* § 1707(a)(1), (b).

64.    The statute permits waiver of some of these requirements, but only in "urgent and compelling circumstances," and only if the responsible agency publishes proper notice and provides for a 30-day comment period. *See id.* § 1707(d)–(e).

65.    Subpart 1.5 of the FAR specifies notice-and-comment requirements for "significant revisions" to federal acquisition policies. *See* 48 C.F.R. § 1.501-2.

66.    Subpart 1.4 of the FAR provides for agencies to adopt "deviations" from the FAR "when necessary to meet the specific needs and requirements of each agency." 48 C.F.R. § 1.402. This includes "class deviations" that affect multiple contracts. *Id.* § 1.404. But "[w]hen an agency knows that it will require a class deviation on a permanent basis, it should propose a FAR revision, if appropriate." *Id.*

67.    The FAR provisions allowing for agency deviations do not override the requirements of 41 U.S.C. § 1707 where they are applicable. Accordingly, use of deviations does not permit agencies to dispense with notice and comment when making significant changes to procurement policies, and deviations that implement such significant changes may themselves require notice and comment.

## II.    Factual Background

### A.    Executive Order No. 14398

68.    On March 26, 2026, President Trump issued Executive Order No. 14398, Addressing DEI Discrimination by Federal Contractors, 91 Fed. Reg. 16147 (Mar. 26, 2026). A copy of the Executive Order is attached as Exhibit 1.

69.     The order invokes the President's authority under "the Federal Property and Administrative Services Act (40 U.S.C. 101 *et seq.*) (FPASA)." *Id.*

70.     Section 1 of the order states that it was intended to curtail "'diversity, equity, and inclusion' (DEI) activities in which employees, applicants, or contracting parties are treated differently, separated, or singled out based on their race or ethnicity, rather than treated equally and objectively based on their merit and without regard to their immutable characteristics." *Id.* § 1. Such activities, the order states, "are not only unethical and often illegal, but also cause inefficiencies, waste, and abuse within entities that engage in such practices. . . . These costs are inevitably passed on to the Federal Government when it contracts with companies who engage in racially discriminatory DEI activities, or who use subcontractors who do so." *Id.* Accordingly, the order establishes that "[i]t is therefore the policy of the United States to promote economy and efficiency in Federal contracting by preventing racial discrimination." *Id.*.

71.     Section 2 of the order defines two terms:

> **Sec. 2**. *Definitions*. (a) For the purposes of this order, "racially discriminatory DEI activities" means disparate treatment based on race or ethnicity in the recruitment, employment (*e.g.,* hiring, promotions), contracting (*e.g.,* vendor agreements), program participation, or allocation or deployment of an entity's resources.
>
>      (b) "Program participation" means membership or participation in, or access or admission to: training, mentoring, or leadership development programs; educational opportunities; clubs; associations; or similar opportunities that are sponsored or established by the contractor or subcontractor.

*Id.* § 2.

72.     Section 3 of the order specifies new contract terms for all federal agencies to add to their contracts within 30 days of the order, requiring contractors to refrain from "racially discriminatory DEI activities" as defined in the order and imposing certain ancillary requirements:

**Sec. 3**. *Requirements for Federal Contractors.* Within 30 days of the date of this order, executive departments and agencies, including independent establishments subject to FPASA, 40 U.S.C. 102(4)(A) (agencies), shall, to the extent permitted by law, ensure that contracts and contract-like instruments, including contractors' subcontracts and subcontractors' lower-tier subcontracts, include the following clause:

"In connection with the performance of work under this contract, [the contractor/appropriate party (contractor)] agrees as follows:

1. The contractor will not engage in any racially discriminatory DEI activities, as defined in section 2 of the Executive Order of March 26, 2026 (Addressing DEI Discrimination by Federal Contractors);

2. The contractor will furnish all information and reports, including providing access to books, records, and accounts, as required by the contracting agency pursuant to the Executive Order of March 26, 2026 (Addressing DEI Discrimination by Federal Contractors), for purposes of ascertaining compliance with this clause;

3. In the event of the contractor's or a subcontractor's noncompliance with this clause, this contract may be canceled, terminated, or suspended in whole or in part, and the contractor or subcontractor may be declared ineligible for further Government contracts;

4. The contractor will report any subcontractor's known or reasonably knowable conduct that may violate this clause to the contracting department or agency and take any appropriate remedial actions directed by the contracting department or agency;

5. The contractor will inform the contracting department or agency if a subcontractor sues the contractor and the suit puts at issue, in any way, the validity of this clause; and

6. The contractor recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code (False Claims Act).".

*Id.* § 3.

73.     President Trump had issued an earlier order addressing DEI in federal contracting at the beginning of his second term. Executive Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025), directed federal agencies to require every federal contractor to certify that it "does not operate any programs

promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(b)(iv)(B). Through the reference to "applicable Federal anti-discrimination laws," Executive Order No. 14173 expressly trains its focus on activities that violate existing federal law. In contrast to that earlier Executive Order, Executive Order No. 14398 does not contain similarly targeted language. *Compare* Exec. Order No. 14173, § 3(b) *with* Exec. Order No. 14398, § 3.

74.     Section 4 of Executive Order No. 14398 threatens harsh penalties for violations of the prescribed contract terms. The order directs that, in accordance with guidance to be issued by the Office of Management and Budget, agencies "shall . . . cancel, terminate, [or] suspend . . . any contract" if the contractor violates the prescribed terms, and "take appropriate action to suspend and debar" contractors that violate the terms. Exec. Order No. 14398, § 4(a).

75.     Section 5 addresses implementation of the Executive Order. It directs the FAR Council to make amendments to the FAR to implement the terms of the order. *Id.* § 5(a). Before those amendments are completed, the order directs the FAR Council to "issue deviation and interim guidance under subpart 1.4 of the Federal Acquisition Regulation" within 60 days of the order "regarding agency implementation of the clause described in section 3 of this order before completion of the amendments under subsection (a) of this section." *Id.* § 5(b).

76.     The Executive Order directs that any implementation actions by the FAR Council and federal agencies must comply with, and are subject to, applicable law. *See id.* § 3 (directing federal agencies to use the prescribed contract term "to the extent permitted by law"); *id.* § 5 (directing the FAR Council to take action "to the extent permitted by law" and "consistent with applicable law"); *id.* § 7(b) ("This order shall be implemented consistent with applicable law . . . .").

**B.     Actions Taken by the Defendants to Implement Executive Order No. 14398**

1.     FAR Council Memorandum

77.     On or about April 20, 2026, the FAR Council issued a memorandum (dated April 17, 2026) to agency procurement officers with instructions on how to implement Executive Order 14398. Memorandum from Fed. Acquisition Regul. Council, Agency Implementation of Executive Order 14398, Addressing DEI Discrimination by Federal Contractors (Apr. 17, 2026), https://perma.cc/KF7L-HJUZ. A copy of the memorandum is attached as Exhibit 2.

78.     Many federal agencies had previously issued class deviations under FAR subpart 1.4 as part of a broader initiative by the Trump Administration concerning federal procurement, which the Administration has touted as a "Revolutionary FAR Overhaul." *See* Exec. Order No. 14275, Restoring Common Sense to Federal Procurement, 90 Fed. Reg. 16447 (Apr. 15, 2025); White House, White House Announces Revolutionary Federal Procurement Overhaul (Apr. 16, 2025), https://perma.cc/MB6A-Z6B8. The April 2026 FAR Council memorandum directed agencies, by April 27, 2026, to revise those earlier-issued deviations to incorporate the contract terms and other requirements of Executive Order No. 14398. *See* Ex. 2 at 2.

79.     The FAR Council provided model text for agencies to use in their revised deviations. *See* Ex. 2 at 5–10. The FAR Council stated that "[a]gencies that adopt the model deviation text . . . are not required to coordinate with the Council," but absent contrary statutory requirements, "agencies must request approval from the Council before adopting FAR text that differs from the Council's model deviation text." Ex. 2 at 2. The FAR Council has also incorporated the model deviation text into the "Revolutionary FAR Overhaul" materials published on its website. Fed. Acquisition Regul. Council, Revolutionary FAR Overhaul—FAR Parts and Agency Deviations, https://perma.cc/KKE7-38K7. Other federal agencies have

incorporated those materials by reference into their own procurement policies. *See, e.g., infra* ¶ 87.

80.     The FAR Council admitted that it had not yet conducted notice and comment or completed amendments to the FAR, stating, "The FAR Council intends to conduct rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707. Agencies are encouraged to make their class deviations effective until implemented in the FAR." Ex. 2 at 3.

81.     The FAR Council directed agencies to start using the contract terms prescribed by Executive Order No. 14398 in new contracts by April 24. Ex. 2 at 2.

82.     For existing contracts, the FAR Council directed that "contracting officers must make every effort to bilaterally modify existing contracts by July 24, 2026." A bilateral modification under the FAR is a modification approved by the contractor. *See* 48 C.F.R. § 43.103(a). The FAR Council specified that "[i]f a contractor refuses to agree to a bilateral modification, the contracting officer should consider whether, absent the modification, the contract no longer meets the agency's needs and should therefore be terminated for convenience." Ex. 2 at 2.

83.     On May 6, 2026, the FAR Council published a notice in the Federal Register inviting comment on the reporting and recordkeeping requirements of the new contract terms in connection with the Paperwork Reduction Act, 44 U.S.C. §§ 3501–3521. Information Collection; Addressing DEI Discrimination by Federal Contractors, 91 Fed. Reg. 24544 (May 6, 2026). The notice called for comments by July 6, 2026. Even though the FAR Council had not yet completed the procedural steps required under the Paperwork Reduction Act, the FAR Council's April 2026 memorandum directed federal agencies to implement the new contract terms in new contracts by April 24, 2026, and in existing contracts by July 24, 2026. Ex. 2 at 2. The FAR Council

memorandum further instructed federal agencies to "expect that contractors will alert the appropriate contracting officer of potential violations of the clause or lawsuits relating to the clause." Ex. 2 at 3.

84.    The FAR Council has estimated that as many as 640,000 contracts and subcontracts, including more than 160,000 contracts with more than 34,000 unique vendors, would be subject to Executive Order No. 14398. *See* Fed. Acquisition Regul. Council, Federal Acquisition Regulation (FAR): Addressing DEI Discrimination by Federal Contractors (E.O. 14398), OMB Control No. 9000-XXXX, Justification—Part A Supporting Statement at 3 (2026).

2.    Agency Implementation

85.    The other defendant agencies have taken action to implement Executive Order No. 14398 and the April 2026 FAR Council memorandum.

86.    The defendant agencies have issued class deviations to implement Executive Order No. 14398 and have instructed their contracting officers to incorporate the new contract term into new and existing contracts and otherwise comply with the Executive Order. For example:

- Department of Defense—Memorandum from John M. Tenaglia, Principal Dir., Def. Pricing, Contracting, & Acquisition Pol'y, U.S. Dep't of Def. (Apr. 24, 2026), https://www.acq.osd.mil/dpap/dars/classdev/DFARS_RFO/Part-222/Class _Deviation_2026-O0040_Revision_1_DFARS_222.pdf.

- Department of Education—Memorandum from Christopher Rosier, Deputy Assistant Sec'y for Acquisition Mgmt., Deputy Chief Acquisition Officer/Senior Procurement Exec., U.S. Dep't of Educ. (Apr. 22, 2026), https://perma.cc/CK86 -NH8U.

- Department of Energy—U.S. Dep't of Energy, Class Deviation Findings and Determination: Federal Acquisition Regulation (FAR) Parts 9, 12, 22, And 52 Regarding Implementation of Executive Order 14398, Addressing DEI Discrimination by Federal Contractors (Apr. 28, 2026), https://perma.cc/WYW2 -SF5Z.

26

- Environmental Protection Agency—Memorandum from Stefan Martiyan, EPA Senior Procurement Exec., Off. of the Chief Procurement Officer, U.S. EPA (Apr. 23, 2026), https://perma.cc/47XD-XE4X.

- Department of Homeland Security—Memorandum from Sarah Green, Deputy Chief Procurement Officer, U.S. Dep't of Homeland Sec. (Apr. 24, 2026), https://perma.cc/V78V-W8KR.

- Department of the Interior—U.S. Dep't of the Interior, Application of Labor Laws to Government Acquisitions (May 4, 2026), https://perma.cc/A3PY-CGAC.

- Department of Health and Human Services—Memorandum from Jennifer D. Johnson, Deputy Assistant Sec'y for Acquisitions and Senior Procurement Exec., U.S. Dep't of Health & Hum. Servs. (Apr. 24, 2026), https://perma.cc/9GUY -9U4V.

- Department of Justice—Memorandum from William N. Taylor II, Deputy Assistant Att'y Gen. for Mgmt. & Compliance, Senior Procurement Exec., U.S. Dep't of Just. (Apr. 23, 2026), https://perma.cc/8Y7D-SZBV.

- Department of Commerce—Memorandum from Olivia J. Bradley, Senior Procurement Exec. & Dir. for Acquisition Mgmt., U.S. Dep't of Commerce (Apr. 22, 2026), https://perma.cc/ES5U-8X56.

- Department of Transportation—Memorandum from Chrishaun Jones, Senior Procurement Exec., U.S. Dep't of Transp. (Apr. 24, 2026), https://perma.cc /D3WS-4ZDN.

- Department of Agriculture—Memorandum from Hilary Erickson, Senior Procurement Exec., Off. of Contracting & Procurement, U.S. Dep't of Agric. (Apr. 23, 2026), https://perma.cc/L4UF-GAXE.

- Department of Veterans Affairs—Memorandum from Exec. Dir., Off. of Acquisition & Logistics (003A), & Senior Procurement Exec., U.S. Dep't of Veterans Affairs (Apr. 23, 2026), https://perma.cc/X9FV-V2QT.

- Department of Housing and Urban Development—U.S. Dep't of Hous. & Urban Dev., Supplement to the Federal Acquisition Regulation (FAR) for FAR Parts 9, 12, and 22 in Support of Executive Order (E.O.) 14398, Addressing DEI Discrimination by Federal Contractors (Apr. 23, 2026), https://perma.cc/XL64 -FLNZ.

- Department of State—Memorandum from Sharon D. James, Acting Senior Procurement Exec., U.S. Department of State (Apr. 27, 2026), https://perma.cc /B54N-PJWW.

- Department of Labor—Memorandum from Carl V. Campbell, Senior Procurement Exec., U.S. Dep't of Labor (Apr. 27, 2026), https://perma.cc/83KD-7HD7.

- General Services Administration—Memorandum from Jeffrey A. Koses, Senior Procurement Exec., Off. of Acquisition Pol'y, Gen. Servs. Admin. (Apr. 20, 2026), https://perma.cc/J3HP-W9YD.

- Nuclear Regulatory Commission—Memorandum from Eleni Jernell, Dir., Acquisition Mgmt. Div., Off. of Admin., Nuclear Regul. Comm'n (Apr. 30, 2026), https://perma.cc/VL2U-YYJS.

87.     Some of the defendant agencies have issued class deviations that incorporate by reference the model deviation text that the FAR Council has published on its website in connection with the "Revolutionary FAR Overhaul." For example:

- National Aeronautics and Space Administration—NASA, Class Deviation from Federal Acquisition Regulation (FAR) Part 22 and NASA FAR Supplement (NFS) Part 1822 to Implement the Revolutionary FAR Overhaul (NASA Case 2025-N045), PCD 25-41 (Dec. 19, 2025), https://perma.cc/J68H-A7ZR.

- Consumer Product Safety Commission—Memorandum from Brien Lorenze, Exec. Dir., U.S. Consumer Prod. Safety Comm'n (Nov. 24, 2025), https://perma.cc/SLD7-PNEC.

- National Science Foundation—Memorandum from Patrick K. Breen, Senior Procurement Exec., Nat'l Sci. Found. (Dec. 2, 2025), https://perma.cc/YAB8-HPNZ.

The FAR Council has revised the model deviation text on its website to incorporate the model deviation text that the FAR Council issued to implement Executive Order No. 14398. *See supra* ¶ 79; *see also, e.g.*, Fed. Acquisition Regul. Council, FAR Overhaul—FAR Part Deviation Guidance, https://perma.cc/TT5W-HPA6.

## III.     The agency actions implementing Executive Order No. 14398 are unlawful.

### A.     The Agency Implementing Actions Exceed Lawful Authority and Contravene Statutory and Regulatory Restrictions.

88.     The actions taken by the FAR Council and federal agencies to implement Executive Order No. 14398 are final or otherwise reviewable under the APA.

28

89.     The actions taken by the FAR Council and federal agencies are unlawful for several reasons.

90.     First, they violated the procedural requirements of 41 U.S.C. § 1707. The contract terms and related policies prescribed by Executive Order No. 14398 "relate[] to the expenditure of appropriated funds," 41 U.S.C. § 1707(a)(1)(A), have significant effects outside the walls of the agency, *see id.* § 1707(a)(1)(B)(i), and impose significant costs and administrative burdens on contractors, *id.* § 1707(a)(1)(B)(ii). Accordingly, the contract terms and policies are subject to the notice and comment procedures of § 1707, *see supra* ¶¶ 62–64.

91.     The FAR Council and federal agencies did not comply with those procedures. That deprived the plaintiffs and other stakeholders of an opportunity to contribute input on and obtain clarification of the new contract terms and policies.

92.     The FAR Council and federal agencies also did not properly invoke the waiver provisions of § 1707(d) and (e) and did not attempt to show circumstances that would justify a waiver. In any event, there are no urgent and compelling circumstances that would justify a waiver.

93.     The agencies' failure to publish and permit comment on the new contract terms and policies likewise violated the requirements of FAR subpart 1.5, 48 C.F.R. subpart 1.5, which largely parallel the requirements of § 1707.

94.     The April 2026 FAR Council memorandum also exceeded the authority granted to the FAR Council under 41 U.S.C. § 1303, the statute that defines the functions and authority of the FAR Council. That statute authorizes the FAR Council to "manage, coordinate, control, and monitor the maintenance of, issuance of, and changes in, the Federal Acquisition Regulation." *Id.* § 1303(d). But the statute does not empower the FAR Council to prescribe agency deviations

from the FAR or to direct agencies' procurement activities. The April 2026 FAR Council memorandum directed agencies to adopt FAR deviations, prescribed an April 27, 2026, deadline and specific text for those deviations, and stated that agencies would need FAR Council approval to adopt different text. It also prescribed steps and a July 24, 2026, deadline for seeking bilateral modification of existing contracts. None of these actions is within the FAR Council's authority.

95.     Although labeled "guidance," the FAR Council's instructions were clearly directives to agencies. They were phrased in mandatory language, using the imperative mood and words like "must."

96.     In addition, the FAR Council's suggestion that a contractor's refusal to agree to a bilateral modification may equate to a failure to meet the agency's needs, and therefore may justify termination of the contract, conflicts with the FAR provisions governing bilateral modifications and terminations of contracts, *e.g.,* 48 C.F.R. § 43.103(a), 49.101(b).

97.     Because the FAR Council's memorandum was unlawful, the agency actions taken to implement the FAR Council's instructions were also unlawful.

98.     The class deviations adopted by each of the agencies are also unauthorized under the FAR provisions that govern deviations. The FAR provides for agencies to adopt "deviations" from the FAR only "when necessary to meet the specific needs and requirements of each agency." *Id.* § 1.402. Deviations are not permissible to implement a new governmentwide policy. The FAR provisions authorizing deviations also do not override the provisions of 41 U.S.C. § 1707 requiring notice and public comment.

99.     The False Claims Act provision specified in the Executive Order and adopted by the FAR Council and agencies is contrary to law because it is founded on an erroneous interpretation of the False Claims Act, 31 U.S.C. §§ 3729–3733. The provision purports to obtain

the contractor's agreement that "compliance with the requirements of this clause [is] material to the Government's payment decisions for purposes of [31 U.S.C. § 3729(b)(4)]." But as interpreted by the Supreme Court, materiality under § 3729(b)(4) depends ultimately on the "effect on the likely or actual behavior of the recipient of [an] alleged misrepresentation." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016). Merely labeling a clause "material" does not make it so. *See id.* at 190–96; *see also id.* at 196 (noting that a term requiring contractors to aver compliance with all federal statutes and regulations would not make any and all violations "material").

100.    The FAR Council and federal agencies also violated the Paperwork Reduction Act, 44 U.S.C. §§ 3501–3521, by imposing reporting and recordkeeping requirements without first completing the notice-and-comment process required under the Act.

101.    The Paperwork Reduction Act regulates efforts by federal agencies to collect information from the public, including the imposition of reporting and recordkeeping requirements. *See id.* § 3502(3) (definition of "collection of information"). An agency generally cannot conduct an information collection without first obtaining approval from the Director of the Office of Management and Budget. *Id.* § 3507(a). Before seeking approval, an agency must complete an internal review of the details of the proposed collection, *id.* § 3506(c)(1); "provide 60-day notice in the Federal Register," and solicit comments from the public and other federal agencies, *id.* § 3506(c)(2).

102.    After the 60-day comment period, and after reviewing the comments received, the agency must submit the proposed information collection to the Director of the Office of Management and Budget for review, with a certification (and a supporting record, including public comments received) that the proposed collection meets certain requirements, including

that it "is necessary for the proper performance of the functions of the agency" and that it "has been developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected." *Id.* § 3506(c)(3). The agency must publish notice of the submission in the Federal Register with a request for comments to be submitted to the Office of Management and Budget within 30 days. *Id.* § 3507(a)(1)(D); 5 C.F.R. § 1320.10(a). The Office of Management and Budget generally must provide at least 30 days for public comment after receipt of the proposed collection of information before making its decision. 44 U.S.C. § 3507(b); 5 C.F.R. § 1320.10(b).

> **B.      The Implementing Actions Taken by the FAR Council and Other Agencies Are Also Arbitrary and Capricious.**

103.    The actions of the FAR Council and agencies are also arbitrary and capricious under the standards of the APA, for numerous reasons. First, the definitions of "racially discriminatory DEI activities" and "program participation" provided in the Executive Order and adopted by the agencies are unclear and fail to provide sufficient guidance either to contractors or federal contracting officers regarding what particular activities are prohibited. Neither the Executive Order nor the agencies' implementing actions provided meaningful assistance in the way of explanation, analysis, comparisons to existing laws, or examples or illustrations.

104.    This lack of clarity is harmful in a number of ways that the Executive Order, and the implementing agencies, failed to address. First, the unclear contract terms are likely to chill lawful and salutary activity. For example, suppose a contractor, seeking applicants for a position dedicated to work on a federal contract, forwarded the job listing to an associate at a historically Black college, or to a networking group explicitly intended for Arab American professionals, or attended a job fair in a predominantly white rural community. It is unclear whether such activities would be prohibited as "disparate treatment based on race or ethnicity" in

32

"recruitment" under the contract terms. Or suppose that a contractor, in response to workplace incidents of antisemitism, implemented measures to train its employees on applicable workplace policies and track violations of those policies, and distributed a memo educating employees about harmful stereotypes. Or suppose a contractor took similar steps in response to hate incidents against Asian Americans. The language of the order does not make clear whether these efforts, if they reached employees working on a federal contract, would be prohibited as disparate treatment in "allocation or deployment" of resources.

105.    Moreover, unclear rules impose costs on contractors by increasing the costs of compliance. In another Executive Order issued a year earlier, President Trump directed an overhaul of what he called an "excessive and overcomplicated regulatory framework" for federal procurement, "resulting in an onerous bureaucracy" that makes "conducting business with the Federal Government . . . often prohibitively inefficient and costly." Exec. Order No. 14275, Restoring Common Sense to Federal Procurement, § 1, 90 Fed. Reg. 16447, 16447 (Apr. 15, 2025). Neither the Executive Order nor the agencies' implementing actions explain why those same concerns do not apply here.

106.    Unclear rules also lend themselves to inconsistent or arbitrary enforcement, which itself increases confusion, inefficiency, and unfairness.

107.    The harms discussed above are amplified by the ancillary requirements included in the new contract terms. The contract terms require contractors to provide broad access to records "for purposes of ascertaining compliance." Exec. Order No. 14398, § 3. Given the lack of clarity of the contract terms, the records-access requirement imposes an inordinate burden on contractors and lends itself to inconsistent or improper application by agencies. The terms also require contractors to report conduct by subcontractors that "may" violate the DEI prohibition.

33

*Id.* It is unreasonable to demand that contractors identify *possible* violations of a requirement that itself has not been defined clearly.

108.   The contract terms threaten serious penalties for noncompliance, including termination of contracts and exclusion from future government contracts. *Id.* §§ 3–4.

109.   Each of these ancillary requirements is unreasonable when attached to terms that are not clear.

110.   In addition, neither the Executive Order nor the agency implementing actions are supported by any factual basis, evidence, or analysis. The Executive Order states that "DEI activities impose artificial costs," "creat[e] excessive workforce turnover," "jeopardiz[e] . . . employee collaboration," and "reduc[e] the pool of available labor" by "artificially limiting" hiring and promotion based on race. *Id.* § 1. And it says these costs are "inevitably passed on to the Federal Government." *Id.* But neither the Executive Order nor the agency implementing actions identifies evidence or a factual basis for any of these broad claims, as is required to the extent that the agencies seek to impose any new requirements.[3]

111.   The actions of the FAR Council and agencies are also arbitrary and capricious when analyzed under the change-in-position doctrine. *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025) (explaining that an agency changing an existing policy must "provide a reasoned explanation for the change," "display awareness that [it is] changing position," and

---

[3] In the past, federal agencies taking action to implement Presidential procurement directives have collected evidence concerning the subject matter of the directives and thoroughly analyzed that evidence. *See, e.g.*, Increasing the Minimum Wage for Federal Contractors, 86 Fed. Reg. 67126, 67204–15 (2021) (detailed analysis of costs and benefits of minimum wage policy adopted under an Executive Order, based on economic literature and evidence cited in comments); Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects, 88 Fed. Reg. 88708, 88709–12 (2023) (detailed analysis of costs and benefits of Project Labor Agreement requirement adopted under an Executive Order).

34

"consider serious reliance interests"). To the extent the agencies' actions impose any new requirements, they failed to account for prior, still operative policy concerning racial discrimination in federal contracting.

112.    In 1965, President Johnson issued Executive Order No. 11246, Equal Employment Opportunity, 3 C.F.R. 339 (1964–1965). The order required federal agencies to include terms in their federal contracts prohibiting racial discrimination. The order was amended several times by later Presidents but was part of the fabric of government contracting for 60 years, until President Trump issued Executive Order No. 14173 at the beginning of his second term. Even though the stated purpose of Executive Order No. 14173 was to "end[] illegal preferences and discrimination," *id.* § 1, the order revoked Executive Order No. 11246 in its entirety. Exec. Order No. 14173, § 3(b)(i).

113.    The requirements of Executive Order No. 11246 had been codified into binding provisions of the FAR. *See, e.g.*, 48 C.F.R. §§ 22.810(e); 52.222-26 (current FAR provisions prescribing contract terms required under Executive Order No. 11246). Plaintiff States complied with these terms for decades.

114.    Following the rescission of Executive Order No. 11246, federal agencies ceased enforcing its requirements and took steps to remove the associated contract terms from their contracts and subcontracts. But the FAR Council so far has not taken steps to formally amend the FAR to reflect the rescission. Thus, the regime established under Executive Order No. 11246 remains operative as a matter of law.

115.    To the extent that the defendant agencies have adopted new policies under Executive Order No. 14398 without discussion of the Executive Order No. 11246 regime, each of the defendant agencies failed to "display awareness that it *is* changing position," "depart[ed]

from a prior policy *sub silentio*," and "simply disregard[ed] rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The defendant agencies also failed to account for the reliance interests of longtime, frequent, and large-scale contractors such as the plaintiff States, who worked under Executive Order No. 11246 for many years and tailored their operations around it.

116.    The agencies also violated their obligation to consider reasonably obvious alternatives and explain why they rejected them. One obvious alternative would have been to retain or reinstate the prior regime of Executive Order No. 11246. Again, federal contractors were already familiar with Executive Order No. 11246 and had tailored their operations to it for 60 years. The agencies did not explain why simply retaining the FAR regulations adopted under Executive Order No. 11246, or retaining them with modifications, would not be a more efficient way to combat racial discrimination by federal contractors. Nor did they explain how the new regime imposed under Executive Order No. 14398 differs in operation from the regime imposed under Executive Order No. 11246.

117.    Another obvious alternative would have been to adopt requirements that clearly track existing laws against racial discrimination and related violations. For example, Title VII of the Civil Rights Act of 1964 restricts racial discrimination in employment. *See* 42 U.S.C. § 2000e-2. Title VII and other existing civil rights laws have been developed through the democratic process, have been further illuminated through judicial decisions, and have stood the test of time, and contractors already have experience complying with them. Neither Executive Order No. 14398 nor the agencies' implementing actions explained whether they are imposing new restrictions or how the new restrictions differ from existing civil rights laws. To the extent that Executive Order No. 14398 contemplates new and different restrictions, neither the

Executive Order nor the agencies' implementing actions explained why existing civil rights laws were not sufficient to address racial discrimination by federal contractors, or why any new contract terms could not be designed to track existing civil rights laws (in the manner of section 3(b)(iv)(B) of Executive Order No. 14173, for example).

118.    The FAR Council's suggestion that a contractor's refusal to agree to a bilateral modification may equate to a failure to meet the agency's needs, and therefore may justify termination of the contract, is arbitrary and capricious because it reflects bad faith—in that it encourages contracting officers to take action for contrived reasons—and is not supported by any reasoning.

## IV.    The Plaintiff States' Activities as Contractors and Subcontractors on Federal Contracts

119.    Each of the plaintiff States, through its agencies and instrumentalities, regularly engages in the business of federal contracting. The agencies and instrumentalities of each plaintiff State regularly work on federal procurement contracts either as contractors or subcontractors and continuously seek new federal contracts and subcontracts. They also manage subcontractors on federal contracts.

120.    The services provided by the plaintiff States under federal contracts and subcontracts meet a wide range of federal government needs, from scientific research and development to highway safety analysis to medical treatment of military veterans. Each year, the plaintiff States' federal contracting activities amount to hundreds of contracts worth billions of dollars.

121.    Collectively, the plaintiff States' agencies and instrumentalities currently have or are actively pursuing contracts or subcontracts for work for all of the federal agencies that are named as defendants, or subcomponents of those agencies, other than the FAR Council.

37

## V.    Harms to the Plaintiff States from the Defendants' Actions

122.    The defendants' actions have caused ongoing material and irreparable harm to the plaintiff States.

123.    The defendants' actions harm the plaintiff States in the marketplace, particularly in their role as federal contractors. Each plaintiff State, through its agencies and instrumentalities, regularly acts as a federal contractor or as a subcontractor working for a federal contractor. In both roles, plaintiff States are subject to and harmed by the defendants' actions.

124.    Because of the defendants' actions, the plaintiff States and their instrumentalities will be required to agree to contract terms that were not previously required and that impose obligations and costs on the States, or else lose the benefit of federal contracts.

125.    The Executive Order, FAR Council memorandum, agency class deviations, and other implementing actions impose onerous compliance costs on plaintiff States. State universities, for example, regularly enter into contracts with the federal government totaling millions of dollars and involving various university resources and personnel. Reviewing policies and practices that are connected with state universities' work on these contracts would require significant resource investments. Compliance reviews are likely to be even more costly given that the defendants have not explained what measures the states might need to undertake beyond complying with existing civil rights laws.

126.    In addition to the burdens of compliance with the new DEI prohibition, the contract terms require state agencies that work on federal contracts to make their books, records, and accounts available to federal contracting agencies and to assemble information and reports that the agency decides are necessary to determine the contractor's compliance. The lack of clarity in the prescribed contract terms increases the risk that federal agencies will make excessive, unnecessary, or unduly burdensome requests for information and increases the time

38

and resource costs of complying with or otherwise responding to such requests. State entities must also ensure they comply with privacy and data protection requirements found in other state and federal laws, which may conflict with the defendants' directives challenged here.

127.    The defendants' actions also require plaintiff States to report conduct by subcontractors that "may" violate the DEI prohibition. This monitoring and reporting requirement imposes additional costs and administrative burdens on the plaintiff States, especially given the lack of clarity of the DEI prohibition and the difficulty of discerning whether subcontractors' conduct "may" violate a prohibition that is itself unclear.

128.    When the plaintiff States are unable to adequately determine what the contract terms require of them, they may lose out on valuable contracting opportunities. The lack of clarity in the contract terms and the explicit threat of litigation under the False Claims Act could also impose costs on states associated with defending against claims under the False Claims Act. This risk may cause plaintiff States to lose meaningful opportunities to act as contractors or subcontractors on federal projects.

129.    The lack of clarity in the contract terms also increases the risk that prime contractors on federal contracts will take unwarranted actions against state agencies that are working as subcontractors on those federal contracts.

130.    The defendants created this uncertainty both through the lack of clarity in the Executive Order, FAR Council memorandum, agency deviations, and other implementing actions, and through their failure to comply with procedural requirements, including the requirement to engage in notice and comment. If the defendants had complied with these procedural requirements and engaged with the regulated community as Congress intended, they could have avoided inflicting the harms the plaintiff States are now suffering. The violation of

the plaintiff States' procedural rights has in turn injured their material interests as discussed above.

131.    The defendants' failure to seek comments from the plaintiff States before finalizing the challenged actions highlights the capriciousness with which the decisions were made. The plaintiff States were entirely excluded from the process and had no opportunity to provide comments on the proposed language. If the defendants had followed the required procedures, the plaintiff States could have alerted the FAR Council and other agencies to the myriad problems with the FAR Council memorandum and agency actions as currently formulated, and the FAR Council and other agencies could have addressed those problems. Because the FAR Council and agencies bypassed the required procedures and have not otherwise explained their actions, the contract terms are not sufficiently clear about what they require from contractors—for example, whether the requirements differ from previous contract requirements or applicable civil rights laws and, if so, how.

### CLAIMS FOR RELIEF

### COUNT I
### AGENCY ACTION IN VIOLATION OF LAW, IN EXCESS OF AUTHORITY, OR WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW (ADMINISTRATIVE PROCEDURE ACT)

132.    The plaintiffs incorporate by reference the allegations in the preceding paragraphs.

133.    Federal agencies' "power to act and how they are to act are authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Indeed, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

134.    The Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706, authorizes judicial review of the actions of federal agencies or officers. A court must "hold unlawful and set aside agency action" that is "an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." *Id.* § 706(2).

135.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), authorizes a federal court to "declare the rights and other legal relations of any interested party" in a case within its jurisdiction.

136.    Other sources of authority provide alternative bases for relief against violations of federal law. Under 28 U.S.C. § 1361, a federal court may issue relief "in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." *Id.*

137.    Federal courts may issue equitable relief against federal officials who act ultra vires, or "beyond . . . limitations" imposed by federal statute or the Constitution. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–90 (1949). Federal courts also have historically recognized authority to issue injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

138.    The actions of the defendant agencies and officers exceeded lawful authority and violated federal law for the reasons discussed in section III.A above: they exceeded the procedural requirements of 41 U.S.C. § 1707, *see supra* ¶¶ 90–92, 97; they exceeded the authority granted to the FAR Council under 41 U.S.C. § 1303, *see supra* ¶¶ 94–95, 97; they conflict with applicable FAR provisions, *see supra* ¶¶ 96–98; they conflict with the False Claims

Act, *see supra* ¶ 99; and they conflict with the requirements of the Paperwork Reduction Act, *see supra* ¶¶ 100–102.

## COUNT II
### ARBITRARY AND CAPRICIOUS AGENCY ACTION (ADMINISTRATIVE PROCEDURE ACT)

139. The plaintiffs incorporate by reference the allegations in the preceding paragraphs.

140. The Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706, authorizes judicial review of the actions of federal agencies or officers. A court must "hold unlawful and set aside agency action" that is "arbitrary" or "capricious." *Id.* § 706(2). An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). An agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

141. An agency fails to meet this standard if it "failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

142. When an agency action breaks with a prior policy or decision, "the requirement that an agency provide reasoned explanation for its action . . . ordinarily demand[s] that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*,

556 U.S. 502, 515 (2009) (citations omitted); *accord FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025).

143.    Moreover, "a more detailed justification" is needed if the agency's "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Id.* An agency must consider "reasonably obvious alternative[s]" and explain why it rejected them. *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (alteration in original).

144.    The actions of the defendant agencies and officers were arbitrary and capricious for the reasons discussed in section III.B above.

## REQUESTS FOR RELIEF

Plaintiffs request that the Court:

(a) hold unlawful, set aside, and vacate the challenged actions of the defendants;

(b) enter a preliminary and permanent injunction against all of the defendants preventing any implementation of the challenged actions with respect to the plaintiffs, including any adverse action against the plaintiffs for failure to agree to the contract terms;

(c) enter a declaratory judgment declaring that the challenged agency actions are unauthorized, unlawful, and void;

(d) award the plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

(e) grant such other relief as the Court may deem proper.

Date: June 10, 2026

Respectfully submitted,

**ANTHONY G. BROWN**
Attorney General of Maryland

**ROB BONTA**
Attorney General of California

/s/ JAMES C. LUH
JAMES C. LUH (D. Md. Bar No. 31776)
VIRGINIA A. WILLIAMSON (D. Md. Bar No. 31472)
ADAM KIRSCHNER (D. Md. Bar No. 31767)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.maryland.gov

Attorneys for State of Maryland

By: */s/ Alexis M. Piazza*
Alexis M. Piazza*
*Deputy Attorney General*
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013-1230
Michael L. Newman*
*Senior Assistant Attorney General*
Laura L. Faer*
*Supervising Deputy Attorney General*
Kenneth J. Sugarman*
Xiyun Yang*
*Deputy Attorneys General*
Alexis.Piazza@doj.ca.gov
Laura.Faer@doj.ca.gov
Kenneth.Sugarman@doj.ca.gov
Xiyun.Yang@doj.ca.gov
Michael.Newman@doj.ca.gov

*Attorneys for State of California*

**KWAME RAOUL**
Attorney General of Illinois

*/s/ Paul Berks*
CARA HENDRICKSON*
Executive Deputy Attorney General
PAUL BERKS*
Complex Litigation Counsel
ELIZABETH H. JORDAN*
Senior Social Equity Counsel
MOLLY PETCHENIK*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., Chicago, IL 60603
(773) 919-2923
Paul.Berks@ilag.gov
Cara.Hendrickson@ilag.gov
Elizabeth.Jordan@ilag.gov
Molly.Petchenik@ilag.gov

*Attorneys for Plaintiff State of Illinois*


**WILLIAM TONG**
Attorney General of Connecticut

*/s/ Andrew Ammirati*
Andrew Ammirati*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5090
Andrew.Ammirati@ct.gov

*Attorney for Plaintiff State of Connecticut*


**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ Nora Passamaneck*
Nora Passamaneck*
*Senior Assistant Attorney General*
Sam Wolter*
*Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
nora.passamaneck@coag.gov
samuel.wolter@coag.gov

*Counsel for the State of Colorado*


**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Eliza H. Simon*
Eliza H. Simon (D. Md. Bar No. 19648)
*Senior Counsel to the Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 741-5221
Eliza.Simon@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
Attorney General of Hawai'i

By: */s/ Kaliko'onālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawai'i*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Nita K. Klunder*
Nita K. Klunder*
*State Trial Counsel*
Savannah Arguello*
*Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2394
Nita.Klunder@mass.gov
Sav.Arguello@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/ Kimberly Svendsen*
Kimberly Svendsen*
Special Counsel, Rule of Law
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 757-1141
kimberly.svendsen@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON M. FREY**
Attorney General of Maine

*/s/ Katherine W. Thompson*
Katherine W. Thompson*
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov

*Attorneys for Plaintiff State of Maine*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Attorneys for the State of Michigan*

**AARON D. FORD**
Attorney General of Nevada

By: /s/ K. Brunetti Ireland
K. Brunetti Ireland*
Chief of Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

Attorneys for State of Nevada

46

**JENNIFER DAVENPORT**
Attorney General of New Jersey

*/s/ Lucy I. Sprague*
Lucy I. Sprague*
Andrea I. Cavazos*
Deputy Attorneys General
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
lucy.sprague@law.njoag.gov
andrea.cavazos@law.njoag.gov

Counsel for the State of New Jersey

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Olivia den Dulk*
Olivia den Dulk*
Assistant Attorney General
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 490-4060
odendulk@nmdoj.gov

*Attorneys for the State of New Mexico*

**DAN RAYFIELD**
Attorney General of Oregon

By: */s/ Leanne Hartmann*
Leanne Hartmann*
Senior Assistant Attorney General
Galen Knowles*
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Leanne.Hartmann@doj.oregon.gov
Galen.Knowles@doj.oregon.gov

Attorneys for the State of Oregon

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Leonard Giarrano IV*
Leonard Giarrano IV*
*Special Assistant Attorney General*
Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
lgiarrano@riag.ri.gov

*Attorney for State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

Attorneys for State of Vermont

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Sarah E. Smith-Levy*
SARAH E. SMITH-LEVY*
Assistant Attorney General
CRISTINA SEPE*
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
sarah.e.smith-levy@atg.wa.gov
cristina.sepe@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**JAY JONES**
Attorney General of Virginia

By: /s/ *Megan C. Keenan*
Megan C. Keenan*
*Deputy Solicitor General*
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071
mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Aaron J. Bibb*
Aaron J. Bibb*
*Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-0810
aaron.bibb@wisdoj.gov

*Attorneys for State of Wisconsin*

*\* pro hac vice application forthcoming*

48