# Exhibit 3
Declaration of Jeni Kitchell (California)

**DECLARATION OF JENI KITCHELL**

I, Jeni Kitchell, declare as follows:

1. I am a resident of the State of California. I am over the age of 18. I make this declaration based on personal knowledge and information provided to me in my official capacity. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional and Agency Background**

2. I am currently employed by California State University (CSU) as Assistant Vice Chancellor, Finance & Budget Administration and Controller. CSU is the State of California operating in its higher education capacity.

3. As the Assistant Vice Chancellor, Finance & Budget Administration and Controller, I am responsible for oversight of financial operations at the CSU and financial reporting from all sources, including federal contracting. As part of my regular duties, I oversee and supervise compliance and audits at CSU campuses, including related to federal contracting.

4. The CSU is the largest four-year public university system in the United States and is the state's greatest producer of bachelor's degrees. Consisting of 22 university campuses, nearly a dozen off-campus centers, and over 90 auxiliary organizations, the CSU educates more than 450,000 undergraduate and graduate students each year, and serves each of California's regions, from Humboldt to San Diego. The CSU has more than 63,000 employees. The CSU offers more than 4000 degree programs that align with workforce demands, including in health care and the sciences. CSU alumni make up a global network that is over four million strong. One in twenty Americans with a college degree earned it at the CSU. Workforce preparation is integral to the CSU educational mission, and the CSU leverages its relationships with federal agencies to provide students with valuable research and practical experience, which promotes workforce readiness.

5. I provide this declaration in support of Plaintiffs' motion for summary judgment.

**Federal Contracting Activities of CSU**

6. Federal contracts with the university are either with the CSU or, more frequently, with one of its research foundations. These foundations, which support the financial and operational vitality of the CSU, are officially recognized auxiliary organizations established pursuant to California Education Code sections 89900 et seq. Auxiliary organizations are separate nonprofit entities authorized under the Education Code to perform designated functions that support of the CSU's educational mission. See 5 Cal. Code Regs. § 42500. Although separately incorporated, auxiliary organizations operate within a statutory and regulatory framework that requires CSU recognition, oversight, and a written operating agreement governing the relationship between the auxiliary organization and the university.

7. CSU regularly and routinely supplies services to the federal government under procurement contracts with federal agencies both as a direct contractor and a subcontractor, and both directly and through its auxiliary organizations.

8. CSU regularly and routinely seeks opportunities for new federal contract work, including contract extensions and renewals of long-standing projects and relationships. For example, the San Diego State University Research Foundation (SDSURF), a CSU auxiliary organization, recruits, employs, and assigns undergraduate and graduate students to support the Navy's Point Loma laboratories, including in environmental monitoring, pathogen characterization, microbial fuel cell and sensor technology development, and classified research supporting Department of Defense priorities. Although the current contract runs from January 27, 2022, through January 26, 2027 the SDSURF has held contracts supporting the Navy's Point Loma laboratories since 1956 and plans to seek renewal when the current contract ends.

9. Similarly, San Jose State University Research Foundation (SJSURF), an auxiliary organization, has had a regularly renewing contract with the National Oceanic and Atmospheric Administration (the San Jose NOAA Contract) to maintain the Marine Optical BuoY (MOBY) in some form since 1989. As I understand it, satellites in orbit degrade over time due to cosmic radiation and atmospheric drift. MOBY provides the highly precise, globally verified, "vicarious calibration" that anchors virtually every major ocean color satellite launched globally. Without MOBY, scientists would not be able to confidently merge data from different generations of satellites to map long-term, subtle climate shifts, such as global trends in phytoplankton or primary ocean production.

10. Currently, CSU and its auxiliary organizations are parties to over a hundred contracts and subcontracts totaling over $100 million with numerous federal agencies. The federal agencies for which the CSU is currently working as a contractor or subcontractor or seeking new contracts include: Department of Defense, Department of Agriculture, Department of Commerce, Department of Education, Department of Health and Human Services, Department of the Interior, Department of Justice, Department of Labor, Department of the Treasury, Department of Veteran's Affairs, Department of Energy, National Science Foundation, Department of Transportation, National Aeronautics Space Administration; U.S. Peace Corps, and the Environmental Protection Agency.

**Executive Order 14398**

11. I understand that on March 26, 2026, President Trump issued Executive Order 14398, Addressing DEI Discrimination by Federal Contractors, 91 Fed. Reg. 16,147 (Mar. 26, 2026). By its plain wording, the order directs federal agencies to include terms in all their contracts barring contractors from "engag[ing] in any racially discriminatory DEI activities,"

defined as "disparate treatment based on race or ethnicity in the recruitment, employment ..., contracting ..., program participation, or allocation or deployment of an entity's resources." The order further states that contractors or subcontractors not in compliance with this prohibition may be subject to contract cancellation, termination, or suspension and debarment from future contracts. The terms also require contractors to "furnish all information and reports, including providing access to books, records, and accounts" for purposes of ascertaining compliance, to report any subcontractor's known or reasonably knowable conduct that may violate the clause concerning DEI activities, and to inform the contracting department or agency if a subcontractor sues the contractor and the suit puts the validity of the new contract terms at issue in any way. The terms further state, "The contractor recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code (False Claims Act)."

12. As I explain in more detail below, the terms of this order lack sufficient clarity for the reader to understand how it will be interpreted and enforced.

13. I understand that the Federal Acquisition Regulation (FAR) Council issued a memorandum dated April 17, 2026 to federal agency acquisition officers and procurement executives with instructions on how to implement Executive Order 14398. As I read it, the memorandum directs agencies to issue class deviations to incorporate the contract terms and other requirements of Executive Order 14398. The memorandum further directs agencies to start using the contract terms prescribed by Executive Order 14398 in new contracts by April 24, 2026, and to seek to modify existing contracts with the contract terms prescribed by Executive Order 14398 by July 24, 2026. The FAR Council memorandum also instructs agencies to insert the new clause in new contract solicitations and amend open solicitations to include the clause.

The new terms are numbered FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors, though I understand from the memorandum that they have not yet been officially incorporated into the Federal Acquisition Regulation. The memorandum directs that, "If a contractor refuses to agree to a bilateral modification, the contracting officer should consider whether, absent the modification, the contract no longer meets the agency's needs and should therefore be terminated for convenience."

14. I understand that some federal agencies have already issued class deviations to implement Executive Order 14398. Based on what the CSU has received, such agencies have directed contracting officers through these class deviations to use the terms prescribed by Executive Order 14398, including the clause found at FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors.

15. Based on Executive Order 14398, the FAR Council memorandum, the class deviations described above, and what the CSU has received to date, I expect that each of the CSU and its auxiliary organizations' federal contracts and subcontracts will be made subject to the order's terms in the immediate future, and thus the CSU and its auxiliary organization will be required to agree to the contract term or risk losing the contracts and future contracting opportunities.

16. As an example, the CSU's auxiliary SJSURF received a request on May 27, 2026 from the Federal Aviation Administration (FAA) to extend a federal contract with terms pursuant to Executive Order 14398, a true and correct copy of which is attached as **Exhibit 1**. Under this contract, SJSURF develops training materials aimed at reducing pilot error to improve flight safety including simulator scenarios for airlines aimed to reduce cognitive biases, which have been implicated in aviation accidents including KLM Flight 4805 in Tenerife, Asiana Flight 214

in San Francisco, and the Challenger space shuttle. On this contract, SJSURF uses one subcontractor located outside the United States in the Netherlands. The FAA, which is part of the U.S. Department of Transportation, requested that SJSURF sign an amendment as part of a no-cost extension to January 3, 2027 revising the statement of objectives and adding "Add AMS Clause 3.6.2-50 Addressing DEI Discrimination by Federal Contractors (Executive Order 14398)" with the identical contract terms prescribed by Executive Order 14398. SJSURF obtained an extension to July 10, 2026 to sign the amendment.

17. As another example, SJSURF (as a federal contract subcontractor) was asked by the primary contractor for a different contract to certify compliance with Executive Order 14398. Specifically, SJSURF received a document titled "Racially Discriminatory Diversity, Equity, and Inclusion (DEI) Activities Compliance Questionnaire & Certification" from KBR Wyle Services, LLC, the primary contractor on a NASA contract for which SJSURF is a subcontractor. The contract funds student internships to work at NASA. This "Questionnaire and Certification" states that it "is being distributed in response to Executive Order 14398 'Addressing DEI Discrimination by Federal Contractors' issued on March 26, 2026 (the "DEI EO") [and that] KBR is collecting this information to ensure compliance with this obligation and applicable federal requirements." A true and correct copy of the Questionnaire and Certification is attached as **Exhibit 2**.

18. As of the date of this declaration, to the best of my knowledge, CSU (including through its auxiliary organizations) has not yet agreed to the new contract terms for either the contract or subcontract described above and is still weighing its options. CSU has deep concerns about the scope and effect of these terms, including the significant uncertainty and substantial costs, burdens, and harms caused by agency actions implementing Executive Order 14398,

coupled with the significant and unprecedented penalties agency actions implementing Executive Order 14398 would impose.

**Executive Order 14398's Costs, Burdens, and Harms**

19. I am deeply concerned that the contract terms prescribed by agency actions implementing Executive Order 14398 will create significant uncertainty for and impose substantial costs, burdens, and harms on the CSU and our State.

20. Executive Order 14398's prohibition of "racially discriminatory DEI activities" is unclear. The order and the contract terms adopted to implement the order define "racially discriminatory DEI activities" to mean "disparate treatment based on race or ethnicity in the recruitment, employment (e.g., hiring, promotions), contracting (e.g., vendor agreements), program participation, or allocation or deployment of an entity's resources." The order in turn defines "program participation" to mean "membership or participation in, or access or admission to: training, mentoring, or leadership development programs; educational opportunities; clubs; associations; or similar opportunities that are sponsored or established by the contractor or subcontractor."

21. This definition is too vague and ambiguous to provide clarity to the CSU regarding how it is expected to comply. The definition is not anchored to the laws that govern the CSU's activities. It provides insufficient clarity to the CSU as the contracting party as to what the CSU is agreeing to do. Nor does it set any objective standard under which the newly-amended clauses will be interpreted to assess compliance. Thus, the CSU does not know whether the clauses added through this amendment merely restate existing law or whether the federal government will attempt to apply them in unforeseen and potentially subjectively broad and inconsistent ways. Because the terms are capable of multiple interpretations, there are a

wide range of potential standards that could be used by any given federal agency, or the government's enforcement entities, to determine whether the CSU and its auxiliary organizations are in compliance.

22. As a result, the inclusion of the new terms in the CSU's federal contracts injects significant uncertainty going forward. This uncertainty will create substantial additional costs associated with ensuring compliance, which will be difficult to quantify because the standards under which the CSU will be assessed are unclear and subjective, so the range of potential actions that the CSU will need to undertake to be in anticipated compliance are myriad and costly. This impacts both administrative requirements and unprecedented access issues.

23. The federal contracts and federal subcontracts to which the CSU's campuses and auxiliary organizations are parties affected by agency actions implementing Executive Order 14398 and its lack of clarity create substantial and unquantifiable administrative burdens.

24. First, the CSU may need to collect information from its campuses and may need to revise its policies and procedures to account for the new contract terms if it were determined that the new contract terms required by Executive Order 14398 differ from existing federal law in terms of what they prohibit. Generally, the addition of any new term that affects CSU campuses in such a wide-ranging fashion could require CSU to assess across all 22 campuses which, if any, of its programs are potentially implicated. Depending on how the new contract terms are interpreted, CSU may need to create training materials and conduct training of CSU employees responsible for contract and project management that differ from existing training, including for contracts with the federal government. At this time, these are impracticable tasks given that the federal government and contracting parties have not made clear how the mandates in Executive Order 14398 differ from existing federal antidiscrimination law.

25. Second, as it relates to contracts for which CSU engages subcontractors, the CSU is directed to include these new terms in its contracting instruments at any tier, including for commercial products and services. The scope of such contract amendment is unclear CSU would need to spend time and resources preparing and negotiating contract amendments, but the scope of such time and resource commitment is extremely unclear. It is difficult to quantify how the business transactions of each contract may change because of EO 14398, depending on subcontractor's operations. CSU has an obligation to answer questions from subcontractors about subcontract terms, which is impossible to do given the lack of clarity. Some subcontractors may choose not to accept the new terms prescribed by EO 14398, thus potentially requiring CSU to terminate subcontracts, requiring CSU to spend time and resources to find a new subcontractors who will accept the new terms, and resulting in a smaller number of subcontractors from which CSU can choose to accomplish the federal contracting work.

26. Further, the prohibition of racially discriminatory DEI activities by contractors *or their subcontractors* and the requirement to report "any subcontractor's known or reasonably knowable conduct that *may* violate this clause" (emphasis added) creates additional compliance and monitoring costs for CSU and its auxiliary organizations. CSU may need to collect information from its subcontractors to assess compliance. However, this compliance and monitoring work is impracticable because what is contemplated within the prohibition of "racially discriminatory DEI activities" is unclear for the reasons explained above.

27. As it relates to both the CSU's direct contracts and its subcontracts, the CSU would potentially need to revise audit materials, risk assessments, and conduct audits of campuses, auxiliary organizations, and subcontractors to ensure compliance with the newly added terms. Generally, internal audits are significant undertakings to maintain compliance on

various issues. Internal CSU auditors annually visit two or three campuses to review and test the campus procedures to ensure that the processes are working. CSU also engages external auditors to conduct annual independent audits. An increase in the scope of CSU's audits, whether internal or external, would likely result in increased costs. However, without clarity about the scope of what the audit would be expected to cover and the standards on which the audit would be conducted, it is both impracticable and impossible to determine the scope and cost of these added activities.

28. CSU has already been spending time and resources to evaluate and respond to the FAA's request for a contract modification to include the new contract terms required by Executive Order N. 14398, and to evaluate and try to figure out how to respond to KBR's "Questionnaire and Certification," described above. The lack of clarity and the ambiguity about the scope, implementation and compliance expectations of the new contract terms as imposed by the Executive Order and the FAR Council memorandum, has made this assessment both uncertain and close to impossible.

29. The lack of clarity in Executive Order 14398, the FAR Council memorandum, and the associated contract terms is especially harmful given that federal agencies were instructed to "cancel, terminate, suspend, or cause to be cancelled, terminated, or suspended" any contract for the contractor or subcontractor's noncompliance or failure to sign the new amendments. The imposition of contract terms that the contracting party does not understand and thus cannot ensure compliance—especially because the prohibition of "racially discriminatory DEI activities" is unclear as explained above—will create substantial risk should the CSU and its auxiliary organizations agree to the new terms.

30. If the CSU's federal contracts were terminated for failure to sign amendments that are not clear to the CSU, not only will CSU, its students, faculty and the community surrounding its campuses be harmed, but the harm would also reverberate far beyond California. Most immediately, CSU and its auxiliaries would lose the contract revenue and may have to terminate employees, including in contract-funded positions. Because CSU focuses on experiential learning and real-world job training, contract termination would also result in a loss of student engagement and learning associated with the contract. CSU focuses on undergraduate engagement, to facilitate experiential learning that allows for seamless integration of CSU students into the workforce.

31. In addition, termination of CSU's federal contracts would also have unanticipated impacts that go far beyond the CSU. For example, under the San Jose NOAA Contract, San Jose State University houses the highly specialized, irreplaceable oceanographic, computer modeling, and engineering expertise required to maintain and calibrate this global reference point. As I understand it, because this unique technical knowledge is deeply institutionalized, transitioning operations to another entity would be nearly impossible without completely disrupting decades of specialized methodology. Consequently, even a minor operational delay or gap in MOBY data – such as by the termination of the San Jose NOAA contract – could be catastrophic, instantly blinding global satellite networks by stripping them of the real-time verification needed to ensure the accuracy of international climate and ocean monitoring.

32. Because of Executive Order 14398's requirement that federal agencies "take appropriate action to suspend and debar" contractors or subcontractors for noncompliance—made even more acute because the prohibition of "racially discriminatory DEI activities" is unclear to CSU as a contracting party—will create substantial risk associated with unprecedented

penalties, should the CSU and its auxiliary organizations agree to the new terms and then later be determined to be out of compliance with unarticulated and potentially subjective standards. Significant harm to the CSU would result if any CSU campus or auxiliary were to be debarred. All losses described above associated with contract termination would also ensue with debarment, but federal debarment would also cause significant reputational harm with compounding concrete losses. Faculty may choose to teach at, and students may choose to attend, other universities with access to the experience, learning and professional connections which result from federal contracts. Donors may be less willing to donate as a result.

33. In addition, the contract terms under which the contractor "recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of" the False Claims Act is harmful because it threatens lawsuits against the contracting party under the FCA. That harm is compounded because the CSU is not on notice of the standards to which it is expected to comply, but yet must agree through contract that such compliance with such unarticulated standards is "material" under the FCA. Even if CSU were to prevail in those lawsuits, the resulting legal costs and reputational harm would be difficult to remedy.

**Executive Order 14398's Procedural Harms**

34. I understand the FAR Council guidance, which explains that the FAR Council "intends to conduct rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707" to amend the Federal Acquisition Regulation (FAR), to mean that the FAR has not yet gone through the administrative procedure requirements to amend it, but that the FAR Council directed federal agencies to implement the Executive Order now and amend its contracts before this rulemaking can be completed (or possibly even started).

35. Because the FAR Council and other federal agencies began implementation of the Executive Order without the required process, CSU has had no opportunity to share its concerns regarding the new terms, including the significant uncertainty and substantial costs, burdens, and harms they cause, through the rulemaking process. Nor does the CSU have the benefit of federal agencies' responses to public comments, which might have helped clarify the meaning of the new contract terms. The significant uncertainty and substantial costs, burdens, and harms caused by Executive Order 14398 could have been mitigated, and perhaps avoided altogether, had the new terms been issued pursuant to lawful procedures.

36. As another example, the FAR Council guidance states that the FAR Council "is seeking clearance from the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (PRA) for the information collections related to FAR clause 52.222-90." It also says that "agencies will be expected to enforce full compliance with these requirements" once OMB approves the information collection under the PRA. But even though those necessary precursor steps have not been taken, the FAR Council memorandum requires the immediate insertion of the new contract terms in new and existing contracts and leaves unaddressed whether agencies may enforce compliance before then. This compounds the issues with ambiguity and makes the assessment process by CSU impossible to do.

37. Finally, the new required contract term in which contractors agree to furnish all information and reports, including providing access to books, records, and accounts for purposes of ascertaining compliance with Executive Order 14398 creates confusion and uncertainty, creating more administrative burdens. It is not clear what activities are prohibited, it is not clear what information and reports, including books, records, and accounts must be provided, and it is not clear how long this information must be retained. CSU must either risk penalties for taking

too little action to comply or incur excessive administrative costs and burdens to allow for the widest possible interpretation.

38. CSU has already expended resources and would need to expend more resources to determine how to proceed through the uncertainty created by federal agency actions to implemented Executive Order 14398, including all the actions described above.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 14th day of July, 2026, at Long Beach, California.

JENI KITCHELL

EXHIBIT 1

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

1. CONTRACT ID CODE

PAGE OF PAGES: 1 | 8

2. AMENDMENT/MODIFICATION NO.: P00002

3. EFFECTIVE DATE: See Block 16C

4. REQUISITION/PURCHASE REQ.NO.

5. PROJECT NO. *(If applicable)*

6. ISSUED BY CODE: AAQ610-AFN

AAQ-610 Grants & R&D
FAA William J. Hughes Technical Center
Building 300, Fourth Floor
Atlantic City International Airport
Atlantic City NJ 08405

7. ADMINISTERED BY *(If other than Item 6)* CODE

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

SAN JOSE STATE UNIVERSITY RESEARCH FOUNDATION
Attn: DEBORAH MALONEY
210 N 4TH ST FL 4
SAN JOSE CA
US 951125569

CODE

FACILITY CODE

(x) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

x 10A. MODIFICATION OF CONTRACT/ORDER NO.: 692M15-25-T-00001

10B. DATED *(SEE ITEM 13)*: 02/25/2025

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended , by one of the following methods: (a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted ; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment number. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER If by virtue of this amendment you desire to change an offer already submitted , such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required.)*

See Schedule $0.00

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| (x) | |
|---|---|
| ☐ | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| ☐ | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14. |
| ☒ | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO THE AUTHORITY OF: ARTICLE 13. CHANGES, MODIFICATIONS |
| ☐ | D. OTHER *(Specify type of modification and authority)* |

**E. IMPORTANT:** Contractor ☐ is not. ☒ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

Modification P00002 is hereby issued for the following:

A. To extend the period of performance to January 3, 2027, at no additional cost to the Government.

B. To incorporate the revised Statement of Objectives dated May 26, 2027.

C. Add AMS Clause 3.6.2-50 Addressing DEI Discrimination by Federal Contractors (Executive Order 14398) (INTERIM April 2026) per Attachment 2.

D. As a result of this modification, the total obligated amount remains unchanged at

Continued ...

Except as provided herein, all terms and conditions of the document referenced in Item 9 A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER *(Type or print)*

16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)*: Stephen Jenniss

15B. CONTRACTOR/OFFEROR

*(Signature of person authorized to sign)*

15C. DATE SIGNED

16B. CONTRACT AUTHORITY

*(Signature of Contracting Officer)*

16C. DATE SIGNED

NAME OF OFFEROR OR CONTRACTOR
SAN JOSE STATE UNIVERSITY RESEARCH FOUNDATION

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | $444,015.45.<br><br>E. All other terms and conditions remain unchanged.<br>COR/Special Representatives: CHENG, ANDREW<br>Discount Terms: PROMPT NET 30<br>Period of Performance: 03/03/2025 to 01/03/2027 | | | | |

**FEDERAL AVIATION ADMINISTRATION**
**STATEMENT OF OBJECTIVES (SOO)**
**ARSS0007 REDUCING PILOT ERROR THROUGH RAISING AWARENESS OF COGNITIVE BIASES**
**~~January 24, 2025~~May 26, 2026**

## 1. INTRODUCTION

Pilot error remains the leading contributing factor to aviation accidents worldwide. Often, errors arise from typical human failings, such as confirmation bias, attention tunneling, etc. While pilots have varying levels of understanding of these typical human failings, unfortunately, the failings still occur operationally, and pilots are often surprised that they succumbed to those failings. This research aims to ~~create~~ develop materials for a ~~succinct~~ training module to enhance the knowledge, skills, and awareness of the key cognitive biases that most commonly affect commercial transport aviation safety.

## 2. OBJECTIVES

To improve the quality of pilot decision-making by increasing awareness of the pilots' susceptibility to cognitive biases, the following objectives are proposed:

(a) Following the review of applicable literature, deliver an aviation-focused list of relevant concepts and methods for possible incorporation into an academic curriculum.
(b) Based on the findings from the literature review, explore concepts and methods for inclusion in the practical training modules, using a combination of focus groups of airline subject matter experts and applied research methodologies.
(c) Develop simulator scenarios for use by instructional systems designers at airlines, explaining how to incorporate scenarios designed to elicit cognitive bias into simulator sessions.

## 3. BACKGROUND

Cognitive biases have been cited as affecting the safety of flight by distorting decision-making and associated mental processes and, therefore, may negatively influence judgment, behavior, and action. For example, cognitive biases such as confirmation bias, anchoring bias, continuation bias, etc., have been implicated in several aviation and industry accidents (KLM Flight 4805 in Tenerife, Asiana Flight 214 in San Francisco, Challenger space shuttle, Three Mile Island nuclear power plant, etc.). Although pilots may have some awareness of these biases, they may not understand how a biased perspective could influence decision-making, perception, or performance.

To mitigate the potentially hazardous consequences of cognitive biases, it is essential that pilots understand the kinds of cognitive biases that may affect their decision-making ability and their susceptibility to them. Training is an opportunity to provide pilots with knowledge that enables them to understand and recognize the presence of cognitive bias when it occurs.

For example, training could provide pilots with knowledge of relevant cognitive biases, what they are, how they might arise, and how to identify them in the operational environment. Furthermore, mitigation strategies for reducing any adverse consequences of cognitive bias could be introduced in training and practiced in context-based flight simulation scenarios that expose crews to situations that likely induce cognitive biases.

## 4. REQUIREMENTS

The Contractor must complete the following tasks, noting the following: The main objective of this effort is to develop scenarios that elicit cognitive bias. If at Task 3, satisfactory scenarios are not found, the Contractor should not go on to Task 4 and develop a training program.  Instead, they should continue with Task 3, scenario development.

### Task 1. Identify Relevant Cognitive Biases

Objective – Identify the most-relevant cognitive biases for commercial jet transports.

The Contractor must review the academic literature, as well as other FAA efforts on this topic and develop a practical framework for talking about cognitive biases. The Contractor must link the most discussed bias types (e.g., availability bias, confirmation bias) to this framework to facilitate describing the final outputs to airlines, since some of these types are more widely recognized. The Contractor will select a panel of SMEs from a group of interested airlines and training organizations consisting of simulator scenario developers, training managers, and human factors/CRM practitioners. With the help of this panel, the cognitive bias framework will be linked to safety events or operational situations through a review of commercial transport accidents and incidents.

### Task 2. Develop and Validate Scenarios

Objective – Develop and compare the effectiveness of an initial set of simulator scenarios to support the training and gather data on those scenarios. These scenarios should make pilots susceptible to cognitive biases, allowing pilots to recognize the bias. This can then lead to a discussion on awareness and potential mitigation strategies as part of Task 3, in which the training approach will be elaborated.

The Contractor must develop an overall structure of the scenarios, specifying general length and whether it is for a two-person crew or uses a confederate pilot. With the SME panel members and European Pilot Selection and Training (EPST) training developers, and using the output of Task 1, brainstorm situations or scenarios that might produce the types of biases identified in Task 1. Identify methods for covering or concealing the actual intent of the scenario, so that pilots do not anticipate what is to come. Then, gather input for the to-be-developed academic and training materials that are connected to the identified cognitive biases and scenarios.

For each of the three most-relevant cognitive bias categories, the Contractor must develop two realistic scenario ideas. A script will be drafted for these scenarios and implemented in the EPST flight simulator training device (FSTD) and tested until they can be run smoothly. Scripts will be developed in such a way that they can be applied across different aircraft types; however, the primary

focus will be on the Airbus A320, because of the availability of an A320 simulator. Identify behavioral markers to detect whether pilots are influenced by the bias; for example, (lack of) control inputs, decision making, communication, etc. The scenario scripts will be offered to a select number of airlines to let them test (or discuss) these scripts and provide feedback. Secondly, pilot evaluations of the (effectiveness of) the scenarios will be obtained, e.g., with rating scales.

Finally, the Contractor must test the scenarios with a group of airline pilots to get feedback on how well each scenario creates opportunities for cognitive biases. Each of the six scenarios will be tested with at least six flight crews at the EPST simulator. These scenarios will be offered to a few airline partners in the event they are able to run some flight crews through them. Based on the outcome of the tests, select one from each pair of scenarios (i.e., one for each cognitive bias) for integration in the training module.

**Task 3. Develop the ~~Training~~ Materials for Training Guidance**

Objective – ~~Develop a training module around~~Document the guidance how to develop and incorporate the simulator scenarios into training programs so that pilots learn to recognize, prevent and recover from cognitive biases.

The Contractor must ~~develop~~ document a set of ~~training~~ guidance materials ~~that incorporates~~for developing and using the training scenarios. ~~First, formulate learning goals, calling out the knowledge that should be gained by the pilots or behavioral changes that should occur after training. Then, develop materials (e.g., power point slides, documents) that, when paired with the scenarios, would help an instructor to achieve those learning goals with the pilots. For example:~~ The guidance includes:

- Approaches to create potentially successful events: It is required to document the procedural approaches, like a "cookbook," for developing operational scenarios. The focus will be on the development of the events/triggers that were successful in Task 2. The document describes the process from a cognitive bias category to an operational event to the implementation in a Line-Oriented Flight Training (LOFT) scenario and includes guidance on how to evaluate the efficacy of an event.
- Overview of Training Approaches for Cognitive Bias: The overview, primarily in the form of a literature review, describes the various training approaches that have been evaluated for reducing cognitive bias. This review provides actionable ideas and concepts for organizations interested in integrating cognitive bias scenarios into their own training programs.
- ~~The (scripts of) selected scenarios. The idea is that each scenario can serve two purposes: first, to create "awareness" at the beginning of the training session, i.e., before the topic of cognitive biases is being discussed, and the pilots may thus succumb to the bias; and second, to allow pilots to "practice" certain mitigation strategies in a later stage of the training session, i.e., after these strategies have been discussed (see fourth bullet below).~~
- ~~A general introduction on cognitive biases, if possible, supported by video material and visual schematics,~~
- ~~Instructions and tips for instructors on how to brief and debrief the scenarios, and how to observe the pilots' actions in the scenarios,~~

- ~~An outline of factors that could induce the cognitive biases that are covered, which are optimally also recognizable in the scenarios. An outline of:~~
    - ~~preventive measures (e.g. critical thinking, cross-checking, confirming)~~
    - ~~markers that recognition occurred after occurrence of a bias,~~
    - ~~and of ways to manage a cognitive bias.~~

**Task 4. Refine ~~Evaluate the Training Module~~Evaluation Strategy**

Objective – ~~Test~~ Improve the effectiveness of the ~~training module~~ approaches ~~from~~ tested in Tasks 2 and 3 ~~in increasing pilot knowledge of how~~ to ~~recognize, prevent, or recover from~~ enhance the simulation of experiencing ~~the~~ biases. Fine-tune training ~~module~~ scenarios and guidance materials.

The contractor must conduct an iterative evaluation and improvement of a single LOFT scenario with at least six events which are carefully selected from tests in Task 2 across two LOFT scenarios. The selection process must prioritize the most promising events based on prior testing outcomes. The scenario includes a general briefing about the simulator session but without explaining the topic of cognitive biases. The final consolidated LOFT scenario must be evaluated and refined with six qualified Airbus crews (12 participant pilots), ensuring robust feedback and continuous improvement throughout the process.
~~Instructors from EPST will be prepared to give the training module. Scenarios will be implemented in the EPST simulator. Training module may involve 42 participants (21 crews). For example:~~

1) ~~a general briefing about the simulator session, but without explaining the topic of cognitive biases;~~
2) ~~an initial "awareness" scenario (with bias #1, #2, or #3);~~
3) ~~a debriefing on this initial scenario, and general academics on cognitive biases;~~
4) ~~a "practice" scenario with a different bias than in the awareness scenario~~

~~[Note that this may change slightly based on the findings from Task 3].~~

~~The sample size would allow conclusion of medium-sized effects (d=0.6) with acceptable risks of Type-I (alpha = 0.05) and Type-II errors (beta = 0.2). Furthermore, the 21 flight crews can be divided in three sub-groups of seven, so that each group starts with a different awareness scenario (#1, #2, or #3, respectively). This would produce additional data on the effectiveness of the scenarios to induce the respective biases in naïve flight crews (in addition to the data collected in Task 2). For each group, one of the remaining scenarios can be used as a practice scenario.~~

~~Candidates for dependent~~ Evaluation measures ~~involve~~include ~~: 1)~~ both ~~E~~expert ratings of behavioral markers indicative of pilots succumbing to the cognitive bias in the awareness scenario~~; 2) Pilot evaluations of different parts of the training module; 3) Application of the mitigation strategy in the practice scenario; 4)~~ and ~~P~~pilot's ~~knowledge of how to recognize, prevent or recover from the biases, as well as~~ self-reported behavior~~, both measured with a paper test a month after having received the training~~. ~~Paper test results will be compared with that of a control sample of pilots who did not receive the training (see Figure 1).~~

~~Analyze the data to determine the training module increased pilot knowledge and self- reported behavior. Training evaluation thus will address level 1 (Reactions) as well as level 2 (Learning) of the Kirkpatrick model of evaluation (Kirkpatrick & Kirkpatrick, 2006). Refine or revise aspects of the training module based on pilot feedback.~~

**Task 5. Project Management and Dissemination**

Objective - Manage the project and report findings in a final report.

The Contractor must coordinate with team members and inputs to project deliverables and communicate with FAA technical leads. The Contractor must submit monthly reports and integrate outcomes for final report.

## 5. TRAVEL

Travel will be invoiced on a cost reimbursable basis in accordance with the Federal Travel Regulations. Travel must be coordinated with and approved by the FAA technical point of contact prior to scheduling.

## 6. PERIOD OF PERFORMANCE

The period of performance for this effort is twenty-two eighteen (1822) months from date of award.

## 7. DELIVERABLES AND MILESTONES

| Task | Deliverable | Deliverable Due |
| --- | --- | --- |
| 1 | A set of at least three relevant categories of cognitive biases, with a description of at least one safety event for each, to be used as material for the academics of the training module. | 63 months after award |
| 2 | Scripts of six two LOFT scenarios, each including six bias-triggering events, and a description of their characteristics regarding cognitive biases. An initial set of behavioral markers for each scenario. A report on whether the bias-triggering events scenarios produced the desired effects with the flight crews and a list of scenario revisions that were made based on that experience. | 10 13 months after award |
| 3 | (a) A technical report that documents the procedural approaches, like a "cookbook," for developing operational scenarios, including each bias-triggering event tested in the simulator scenarios from Task 2.<br>(b) A literature review of debiasing techniques.<br>A prototypical training module consisting of a rationale of the material, written instructions for instructors, and a PowerPoint slide deck. These, together with the scenario scripts, will form the training package that can be used for organizing airline training. | 191 months after award |
| 4 | A description of the simulator study and results, to be integrated in the final report (see Task 5). Revised training module materials. | 2217 months after award |
| 5 | Draft final report, final scenario scripts, final training materials. | 2218 months after award |

**AMS Clause 3.6.2-50 Addressing DEI Discrimination by Federal Contractors (Executive Order 14398) (INTERIM April 2026)**

a) *Definitions*. As used in this clause:

“Program participation” means membership or participation in, or access or admission to: training, mentoring, or leadership development programs; educational opportunities; clubs; associations; or similar opportunities that are sponsored or established by the contractor or subcontractor.

“Racially discriminatory DEI activities” means disparate treatment based on race or ethnicity in the recruitment, employment (e.g., hiring, promotions), contracting (e.g., vendor agreements), program participation, or allocation or deployment of an entity’s resources.

b) In connection with the performance of work under this contract, the Contractor agrees as follows: 1) The Contractor will not engage in any racially discriminatory DEI activities;

2) The Contractor will furnish all information and reports, including providing access to books, records, and accounts, as required by the Contracting Officer, for purposes of ascertaining compliance with this clause;

3) In the event of the Contractor’s or a subcontractor’s noncompliance with this clause, this contract may be canceled, terminated, or suspended in whole or in part, and the contractor or subcontractor may be declared ineligible for further Government contracts;

4) The Contractor will report any subcontractor’s known or reasonably knowable conduct that may violate this clause to the contracting officer and take any appropriate remedial actions directed by the Contracting Officer;

5) The Contractor will inform the Contracting Officer if a subcontractor sues the Contractor and the suit puts at issue, in any way, the validity of this clause; and

6) The Contractor recognizes that compliance with the requirements of this clause are material to the Government’s payment decisions for purposes of section 31 U.S.C. 3729(b)(4).

c) *Subcontracts*. The Contractor must include the substance of this clause, including this paragraph c), in subcontracts at any tier, including those for commercial products and commercial services, except those where the place of delivery or performance is outside the United States.

(End of Clause)

# EXHIBIT 2

Delivering Solutions, Changing the World®

**Racially Discriminatory Diversity, Equity, and Inclusion (DEI) Activities Compliance Questionnaire & Certification**

| | |
|---|---|
| Company Name | San Jose State Univerity Research Foundation |
| Address | One Washington Park, San Jose, CA  95192-0139 |
| UEI | LJBXV5VF2BT9 |
| CAGE Code | 1DPM3 |
| Point of Contact (Name/Title) | |
| Email Address | |
| Phone Number | |

Purpose of Questionnaire:
This questionnaire is being distributed in response to Executive Order 14398 "Addressing DEI Discrimination by Federal Contractors" issued on March 26, 2026 (the "DEI EO"). The DEI EO is intended to prohibit racially discriminatory DEI activities in federal contracting. KBR is collecting this information to ensure compliance with this obligation and applicable federal requirements. Pursuant to Section 2(a) of the DEI EO, "racially discriminatory DEI activities" means disparate treatment based on race or ethnicity in the recruitment, employment (e.g., hiring, promotions), contracting (e.g., vendor agreements), program participation, or allocation or deployment of an entity's resources.

Section 1: Prohibited Activities

1. Confirm that your organization does **not** engage in any program, selection standard or any other activity based on race or ethnicity in recruitment, employment (including hiring, promotion, compensation, or training), program participation (including training, mentoring, leadership development, educational opportunities, clubs, or associations), or allocation of resources (including funding, staffing, or facilities).
☐ Confirmed

Section 2: Contracting Practices

2. Confirm that your organization does **not** engage in disparate treatment based on race or ethnicity in selecting your subcontractors, suppliers, or vendors.
☐ Confirmed

Section 3: Compliance and Monitoring

3. Confirm that your organization has internal controls, policies, or other reasonable measures in place to ensure compliance with this Executive Order.
☐ Confirmed

Section 4: Disclosure of Non-Compliance

4. Confirm that your organization has not been subject to any investigations, findings, or final legal actions related to discriminatory practices as defined in the DEI EO.
   - ☐ Confirmed
   - ☐ Cannot Confirm

   If you answer, "Cannot Confirm," please provide a detailed explanation of any investigation, findings, or legal actions, the underlying allegations, status, and any adverse determinations:

| |
|---|
| |

Section 5: Subcontractor Reporting and Cooperation

5. Confirm that your organization has procedures in place, consistent with applicable contractual requirements, to monitor your subcontractors, regardless of tier level, for compliance with the DEI EO's prohibition on racially discriminatory DEI activities.
   - ☐ Confirmed

6. Confirm that you have taken reasonable steps to inquire, and on the basis of that inquiry, that you are **not** aware of any conduct by any of your subcontractors, regardless of tier, that may violate the DEI EO's prohibition on racially discriminatory DEI activities.
   - ☐ Confirmed
   - ☐ Cannot Confirm

   If you answer, "Cannot Confirm," please provide a detailed explanation of the acts or omissions by your subcontractors that may violate the DEI EO, and your responses to same:

| |
|---|
| |

7. Confirm that you understand your obligations under the DEI EO, to include your ongoing obligation to investigate and, if found, to promptly report to KBR evidence of any racially discriminatory DEI practices by any of your subcontractors.
   - ☐ Confirmed

Section 6: Certification

I certify that the information provided in this questionnaire is accurate and complete to the best of my knowledge as of the date of execution below. In connection with the performance of work under this contract, I further certify and agree on behalf of the undersigned organization that:

1. The organization will not engage in any racially discriminatory DEI activities, as defined in the DEI EO;
2. To the extent required by applicable contract terms or law, the organization will furnish all information and reports, including providing access to books, records, and accounts, as required by KBR or the contracting agency for purposes of ascertaining compliance with the DEI EO;

3. The organization understands that in the event of noncompliance with the DEI EO, the contract may be canceled, terminated, or suspended in whole or in part, and the organization may be declared ineligible for further awards;
4. The organization will promptly report any subcontractor's known or reasonably knowable conduct that may violate the DEI EO to KBR and the contracting agency, and take any appropriate remedial actions directed by KBR or the contracting agency;
5. The organization recognizes that compliance with the requirements of this certification is material to the Government's payment decisions for purposes of 31 U.S.C. § 3729(b)(4) (False Claims Act);
6. The organization will include the substance of this certification in every subcontract or purchase order at any tier for work performed under this contract, and will require each subcontractor to comply with the DEI EO's prohibition on racially discriminatory DEI activities; and
7. The organization will promptly notify KBR in writing if, at any time during the performance of this contract, (a) any of its responses to the questions in this questionnaire would change, (b) the organization becomes subject to any investigation, finding, or legal action related to racially discriminatory DEI activities, or (c) the organization becomes aware of any conduct by itself or its subcontractors that may violate the DEI EO. Such notice shall be provided within five (5) business days of the organization becoming aware of the relevant evidence or occurrence.

| | |
|---|---|
| Name: | |
| Title: | |
| Signature: | |
| Date: | |

*****Internal Use Only*****

KBR Buyer Certification Statement: I certify that, to the best of my knowledge, I have reviewed the submitted questionnaire and taken appropriate steps to evaluate the Vendor/Subcontractor's compliance with the Executive Order dated March 26, 2026. Any identified risks or concerns have been documented and addressed in accordance with applicable procurement procedures.

| | |
|---|---|
| Buyer Name: | |
| Title: | |
| Signature: | |
| Date: | |
| Purchase Order Number: | |