Exhibit 4
Declaration of Theresa Maldonado (California)

## DECLARATION OF THERESA MALDONADO

I, Theresa A. Maldonado, declare as follows:

1. I am over the age of 18 and a resident of the State of California.

2. I have served as the systemwide Vice President for Research & Innovation at the University of California ("UC") since 2020. In addition to my current role, I have a Ph.D. in electrical engineering and over 30 years' experience in academia. As Vice President for Research & Innovation, I lead UC researchers and administrators in research policy, funding for systemwide programs, and the innovation and entrepreneurship ecosystem. We work to build UC-wide partnerships, help shape effective policies and provide a strong voice nationally for research and innovation on behalf of UC. As the systemwide leader for research and innovation, I work very closely with the Vice Chancellor for Research from each UC campus, and I am in regular contact with them to identify any issues impacting UC systemwide research, including concerns related to federal contracts.

3. I am familiar with the information in the statements set forth below either through personal knowledge, in consultation with UC staff, or from documents that have been provided to and reviewed by me. If called as a witness, I could and would testify competently to the matters set forth below.

### Professional and Agency Background
### Federal Contracting Activities of the University of California

4. The University of California regularly and routinely supplies goods and services to the federal government under procurement contracts with federal agencies. The University of California also regularly and routinely supplies goods and services as a subcontractor on procurement contracts with federal agencies.

5. As of December 2025, the University of California had more than 400 active prime contracts with more than 20 different federal agencies totaling more than $1.5 billion in obligated value and more than 2000 subcontracts originating from more than 20 different federal agencies totaling more than $1.8 billion in obligated value. During federal fiscal years 2023-2025, the contractual financial obligations to UC averaged over $250 million annually under more than 500 active federal contracts per year (new and existing), with additional average obligations of more than $700 million annually under more than 2,500 active subcontracts per year. The University of California regularly and routinely seeks opportunities for new federal contract work, which may include extensions on existing contracts or entirely new contracts.

6. To take one example, the University of California is currently party to numerous federal contracts with the Department of Veterans Affairs ("VA") to provide medical care to veterans. California is home to the largest veteran population in the country, and seven of the eight VA medical centers in California are affiliated with a University of California medical school. These are enduring, foundational relationships between the University and the VA, and the relationship is structured through a series of federal contracts between the University and the VA.

7. To take another example, the University of California, Berkeley's Space Sciences Laboratory has a series of federal contracts with the National Aeronautics and Space Administration ("NASA"). For example, the University of California, Berkeley is party to the following active contracts:

8. The Compton Spectrometer Imager (COSI) is a cost reimbursement contract with NASA for a NASA Small Explorer space mission led by the University of California, Berkeley. It features a soft gamma-ray survey telescope designed to observe and map the high-energy

universe. The contract period runs from March 2021 through September 2027, and the total amount obligated under the contract is more than $130 million.

9. Time History of Events and Macroscale Interactions During Substorms (THEMIS) is a cost reimbursement contract for a NASA mission launched in February 2007. Its primary goal is to resolve longstanding questions about "substorms" -- the abrupt and explosive releases of solar wind energy stored within the Earth's magnetotail that power the aurora (Northern and Southern lights). The contract period is from June 2002 to September 2028, and the total amount obligated under the contract is approximately $200 million over that period.

10. The Carruthers Geocorona Observatory, previously called the Global Lyman-alpha Imagers of the Dynamic Exosphere (GLIDE), is a deep-space observatory that measures ultraviolet light to survey Earth's exosphere. It is the first mission dedicated to charting changes in this expansive region we know little about. The mission seeks to answer basic questions about the nature of Earth's exosphere, such as its shape, size, and density, and what causes these aspects to change over time. UC Berkeley's Space Sciences Laboratory (SSL) leads the mission's implementation, payload development, and day-to-day operations. The current contract period is February 2021 to June 2026, with an expectation that it will be extended to 2029. The total amount obligated under the contract for the current contract period is more than $75 million.

11. The federal agencies for which the University of California has been working as a contractor or subcontractor as of December 2025 or is seeking new contracts include, for example: Department of Agriculture, Department of Commerce, Department of Defense, Department of Education, Department of Energy, Department of Homeland Security, Department of the Interior, Department of Justice, Department of Labor, Department of

Transportation, Department of Treasury, Department of Health & Human Services, Department of Housing and Urban Development, Consumer Product Safety Commission, Institute of Museum and Library Services, National Aeronautics and Space Administration, National Foundation on the Arts and Humanities, and National Science Foundation.

**Executive Order 14398**

12. I understand that on March 26, 2026, President Trump issued Executive Order 14398, Addressing DEI Discrimination by Federal Contractors, 91 Fed. Reg. 16,147 (Mar. 26, 2026). The order directs federal agencies to include terms in all their contracts barring contractors from "engag[ing] in any racially discriminatory DEI activities," defined as "disparate treatment based on race or ethnicity in the recruitment, employment . . . , contracting . . . , program participation, or allocation or deployment of an entity's resources." Under the terms, contractors or subcontractors not in compliance with this prohibition may be subject to contract cancellation and debarment from future contracts. The terms also require contractors to "furnish all information and reports, including providing access to books, records, and accounts" for purposes of ascertaining compliance. The terms state: "The contractor recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code (False Claims Act)."

13. I understand that on or about April 20, 2026, the Federal Acquisition Regulatory Council (FAR Council) issued a memorandum to agency procurement officers with instructions on how to implement Executive Order 14398. The memorandum directs agencies to issue class deviations under FAR subpart 1.4 to incorporate the contract terms and other requirements of Executive Order 14398. The memorandum further directs agencies to start using the contract terms prescribed by Executive Order 14398 in new contracts by April 24, 2026, and to seek to

modify existing contracts with the contract terms prescribed by Executive Order 14398 by July 24, 2026. These new terms are numbered FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors, though they have not yet been officially incorporated into the Federal Acquisition Regulation (FAR). The memorandum directs that, "If a contractor refuses to agree to a bilateral modification, the contracting officer should consider whether, absent the modification, the contract no longer meets the agency's needs and should therefore be terminated for convenience."

14. I understand that many federal agencies have issued class deviations to implement Executive Order 14398. Through these class deviations, the agencies have directed contracting officers to use the terms prescribed by Executive Order 14398, including the clause found at FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors.

15. In light of Executive Order 14398, the FAR Council memorandum, and the class deviations described above, I expect that all or nearly all of the University of California federal contracts and subcontracts will be made subject to the order's terms in the near future, and thus the University of California will be required to agree to the contract term or risk losing the contracts or contracting opportunities.

16. University of California campuses have already been asked to accept the new contract terms prescribed by Executive Order 14398 in connection with contracts or subcontracts for a range of federal agencies (or sub-agencies within those agencies) including NASA, the Department of Defense, the Department of Commerce, the Department of the Interior, and the VA.

17. For example, on May 14, 2026, NASA sent the University of California, Berkeley a bilateral modification incorporating the new contract terms from the Executive Order for the

COSI contract described above within an initial response deadline of May 22, 2026. UC Berkeley requested an extension until July 24, the date specified in the Executive Order, but was informed that the clause had to be incorporated in June. UC Berkeley agreed to the modification on June 17, 2026.

18. For the THEMIS contract referenced above, the NASA Contracting Officer issued a bilateral modification incorporating the new contract terms from the Executive Order on June 9, 2026, requesting a response by June 22, 2026. UC Berkeley requested additional time to respond, and the Contractor Officer indicated that the modification needed to be fully executed by June 29 or they would assume that UC Berkeley decided not to accept the clause. UC Berkeley agreed to the modification on June 25, 2026.

19. For the Carruthers contract referenced above, UC Berkeley received a bilateral modification incorporating the new contract terms from the Executive Order on May 25 and has been in communication with NASA regarding these terms. UC Berkeley agreed to the modification on June 25, 2026.

20. In some cases, when adding the new DEI-related terms from the Executive Order, federal agencies have included an additional term in the contract modification that purports to be a release of claims related to the contract modification incorporating the new DEI-related language, such as the following example: "In consideration of the Modification agreed to herein, the contractor hereby releases the Government from any and all liability, demands, obligations, or claims arising under or by virtue of this Modification." The University of California campuses have asked to have this term removed because it is not included in the Executive Order or in the FAR. However, agencies within the Department of Defense have in several instances stated that the release language is mandatory and cannot be removed, requiring University of California

campuses to determine whether to agree to this additional term or risk termination of the contract.

21. Notwithstanding the deep concerns described below, University of California campuses have, in some cases, agreed to the new contract terms prescribed by Executive Order 14398 even though the federal government has not provided a clear explanation of what, if anything, the terms require from contractors beyond compliance with existing federal anti-discrimination law.

22. In light of those significant concerns, University of California campuses have, in some cases, delayed agreeing to the new contract terms notwithstanding repeated requests from agencies to agree to the new terms, risking potential termination by the agencies.

## Executive Order 14398's Costs, Burdens, and Harms

23. I am deeply concerned that the contract terms prescribed by Executive Order 14398, which have already been included in some of the University's federal contracts and that federal agencies will include in many more contracts going forward, will create uncertainty about our obligations and impose significant risks on the research enterprise of the University of California.

24. Executive Order 14398's prohibition of "racially discriminatory DEI activities" is not specifically defined with reference to practices that violate federal anti-discrimination laws, which creates some uncertainty about whether the administration intends to reach beyond the federal anti-discrimination laws enacted by Congress as interpreted by federal courts. The order and the contract terms adopted to implement the order define "racially discriminatory DEI activities" to mean "disparate treatment based on race or ethnicity in the recruitment, employment (e.g., hiring, promotions), contracting (e.g., vendor agreements), program

participation, or allocation or deployment of an entity's resources." The order in turn defines "program participation" to mean "membership or participation in, or access or admission to: training, mentoring, or leadership development programs; educational opportunities; clubs; associations; or similar opportunities that are sponsored or established by the contractor or subcontractor."

25. Other federal and state laws applicable to the University of California and other contract terms prescribed by the federal government in the past have previously addressed the subject of racial discrimination. The new Executive Order and the agency actions implementing it do not directly explain how the new contract terms relate to those earlier laws and contract terms, nor do they explain whether the Executive Order imposes requirements that are different from those earlier laws and contract terms.

26. As a result, the inclusion of the new terms in our federal contracts will create some uncertainty going forward. This uncertainty will create additional costs associated with ensuring compliance.

27. Executive Order 14398's prohibition of racially discriminatory DEI activities by contractors *or their subcontractors* and the requirement to report "any subcontractor's known or reasonably knowable conduct that *may* violate this clause" (emphasis added) creates additional compliance and monitoring costs for the University of California—especially because of lack of clarity about the precise scope of the prohibition on "racially discriminatory DEI activities" as explained above.

28. The lack of clarity in Executive Order 14398 and the associated contract terms is especially harmful given that the Executive Order directs federal agencies to "cancel, terminate, suspend, or cause to be cancelled, terminated, or suspended" any contract for the contractor or

subcontractor's noncompliance. The fact that the prohibition of "racially discriminatory DEI activities" is not clearly defined, as explained above, will also introduce new risks for the University of California. The University has devoted substantial resources over many years to fulfilling its obligations under these contracts and has large numbers of employees working on them. Termination of contracts for perceived noncompliance with these new terms would be tremendously disruptive to the University's research enterprise and longstanding partnership with the federal government.

29. To take one example, suspension or termination of the University's contracts with the VA would halt critical medical services that University faculty deliver to thousands of Veterans at VA medical facilities, harming the health and well-being of the Veterans who depend on these services. It would also bring vital health research to a standstill, with significant associated financial and academic consequences for the University.

30. Executive Order 14398's requirement that federal agencies "take appropriate action to suspend and debar" contractors or subcontractors for noncompliance—especially because the prohibition of "racially discriminatory DEI activities" is unclear as explained above—introduces a new element of risk associated with such unprecedented penalties, should the University of California agree to the new terms. As noted above, the University of California has hundreds of active contracts worth more than $1 billion as of December 2025. Suspension or debarment of any of the University's campuses from contracting with the federal government would create huge disruptions to the research enterprise of the University and to the federal government's operations that have long worked in partnership with the University on these federal contracts.

31. The contract term under which the contractor "recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of" the False Claims Act is harmful because it will open the door to False Claims Act litigation (whether by whistleblowers or the Department of Justice) and investigation on the basis of perceived violations of the prohibition against "racially discriminatory practices," even as there is a lack of clarity as to the precise meaning of that term. The University would face costs associated with defending investigations or lawsuits under the False Claims Act even if it were to prevail in those lawsuits. I understand that False Claims Act investigations and lawsuits are very expensive to defend given the substantial damages and penalties that can be imposed, and the novel legal questions that can be presented. This would require the University to divert existing resources to defend against these investigations or lawsuits.

**Executive Order 14398's Procedural Harms**

32. The FAR Council guidance explains that the FAR Council "intends to conduct rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707" to amend the FAR. But the FAR Council guidance also directed federal agencies to implement the Executive Order before this rulemaking was completed.

33. Because the FAR Council and other federal agencies began implementing the Executive Order without the required process, the University of California has had no opportunity to share its concerns regarding the new terms, including the uncertainty and substantial costs, burdens, and harms they cause. Nor does the University of California have the benefit of federal agencies' responses to public comments, which might have helped clarify the meaning of the new terms. The uncertainty and substantial costs, burdens, and harms caused by

Executive Order 14398 could have been mitigated, and perhaps avoided altogether, had the new terms been issued pursuant to lawful procedures.

34. As another example, the FAR Council guidance explains the FAR Council "is seeking clearance from the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (PRA) for the information collections related to FAR clause 52.222-90." The guidance provides that "agencies will be expected to enforce full compliance with these requirements" once OMB approves the information collection under the PRA, but does not address whether agencies may enforce compliance before that time, and in any event requires the immediate insertion of the new contract terms in new and existing contracts. This too adds an element of uncertainty to the University's expected obligations associated with the new clause.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 17th day of July, 2026, in Oakland, California.

Theresa A Maldonado

THERESA A. MALDONADO