Exhibit 7

Declaration of Chad B. Walton, PhD (Hawai‘i)

# DECLARATION OF CHAD B. WALTON, PH.D.

I, Chad B. Walton, declare as follows:

1. I serve as Interim Vice President for Research and Innovation (IVPRI) for the University of Hawaiʻi System (UH System). I make this declaration based on my personal knowledge and on information obtained in the course of my official duties, and if called as a witness I could and would testify competently to the matters stated below.

## Professional and Agency Background

2. I am currently employed by the UH System as IVPRI.

3. The University of Hawaiʻi (UH) is the State of Hawaiʻi's sole public higher education system. It comprises ten campuses, University of Hawaiʻi at Mānoa (UH Mānoa), University of Hawaiʻi at Hilo (UH Hilo), University of Hawaiʻi–West Oʻahu (UH West Oʻahu), University of Hawaiʻi Maui College (UH Maui College), Honolulu Community College (Honolulu CC), Kapiʻolani Community College (Kapiʻolani CC), Kauaʻi Community College (Kauaʻi CC), Leeward Community College (Leeward CC), Windward Community College (Windward CC), and Hawaiʻi Community College (Hawaiʻi CC), as well as a UH System administration office, serving more than 50,000 students and over 3,000 researchers. Together, these campuses and distance learning programs provide a comprehensive, statewide network of accessible pathways from certificates to doctoral degrees, spanning three university campuses, seven community colleges, and multiple online offerings across the Hawaiian Islands.

4. As IVPRI, I lead the development, coordination, and implementation of research and innovation strategy across the UH System's ten campuses. In this role, I am responsible for managing federal research funding, supporting faculty research initiatives, and ensuring

compliance with federal regulations governing sponsored programs. I exercise direct oversight of the institution's extramural funding portfolio, including the review and approval of grant budgets and the preparation of systemwide financial reports through the Office of Research Services (ORS). Through regular consultation with campus business officers and principal investigators, I maintain a detailed understanding of how direct and indirect costs are allocated across research awards. I also lead negotiations with our cognizant federal agency on UH's federally negotiated indirect cost rate, ensuring that all components of the facilities and administrative cost base—including departmental support services, research compliance infrastructure, and central administrative functions—are accurately captured and apportioned. As a result of these responsibilities, I have firsthand, comprehensive knowledge of the institution's research funding structure and the financial management of sponsored programs.

5. From 2019 to 2025, I held progressively senior research leadership roles at UH Mānoa, including Assistant Vice Provost for Research and Scholarship and Interim Assistant Vice Provost for Research and Scholarship. In these positions, I led the development and implementation of the Strategic Research Development Office and served as Acting Vice Provost for Research and Scholarship. Prior to that, I served as Research Program Officer in the Office of the Vice Chancellor for Research, supporting the office's administrative and research development activities and serving as program development lead for the UH Innovation Lab. Earlier in my career, I was an Assistant Professor of Surgery and Director of Trauma Research and an Assistant Professor of Medicine in the Center for Cardiovascular Research at UH Mānoa's John A. Burns School of Medicine, where my work focused on translational research, cardiovascular science, and mentoring students and trainees. I hold a Ph.D. in Molecular Biosciences and Bioengineering from UH Mānoa, a Master of Biomedical Technology from the

University of Calgary, and a Bachelor of Science in Medical Microbiology from Northern Arizona University. My experience also includes research leadership, teaching, grant development, committee service, professional certification as a Certified Research Administrator, and extensive service to UH and the broader Hawaiʻi research community.

**Federal Contracting Activities of UH**

6. UH regularly and routinely supplies goods and services to the federal government under procurement contracts with federal agencies. UH also regularly and routinely supplies goods and services as a subcontractor on procurement contracts with federal agencies.

7. UH is currently party to multiple federal procurement contracts spanning defense, space, environmental, and data-intensive research and development activities. These include, for example, a contract with the Department of Defense (DOD), Assistant Secretary of Defense for Industrial Base Policy, for research and development on materials corrosion testing and analysis in support of critical infrastructure and defense systems, in the amount of approximately $6.1 million dollars for the period from December 20, 2024, to December 19, 2027. UH also holds a contract with the DOD, U.S. Army Corps of Engineers, for research and development in high performance computing and artificial intelligence to address evolving mission needs, in the amount of approximately $9.3 million dollars for the period from September 15, 2025, to September 14, 2030.

8. UH also regularly and routinely seeks opportunities for new federal contract work that align with its research strengths and the needs of federal sponsors. For example, UH has submitted a proposal to the DOD's Environmental Security Technology Certification Program for research and development on the efficacy of a hybrid living breakwater for coastal resiliency, with an anticipated award amount of approximately $4.5 million dollars, which is currently

pending. UH has also pursued a contract with the DOD, U.S. Naval Observatory, for research and development on the celestial reference frame to support national positioning, navigation, and timing capabilities, with an anticipated award amount of approximately $2.3 million dollars, which is likewise pending. UH regularly and routinely seeks opportunities for new federal contract work.

9. In all, as of July 1, 2026, UH has 107 contracts with 9 different federal agencies worth $177.8 million, and is a subcontractor on 326 contracts with 19 different federal agencies worth $224.8 million. Each year, UH typically enters about 28 new contracts worth $37.2 million.

10. The federal agencies for which UH is currently working as a contractor or subcontractor or seeking new contracts include: Department of Agriculture, Department of Commerce, Department of Education, Department of Energy, Department of Health and Human Services, Department of Homeland Security, Department of Housing and Urban Development, Department of Interior, Department of Transportation, DOD, Environmental Protection Agency, National Aeronautics and Space Administration (NASA), and the National Science Foundation.

**Executive Order 14398**

11. I understand that on March 26, 2026, President Trump issued Executive Order 14398, Addressing DEI Discrimination by Federal Contractors, 91 Fed. Reg. 16,147 (Mar. 26, 2026). The order directs federal agencies to include terms in all their contracts barring contractors from "engag[ing] in any racially discriminatory DEI activities," defined as "disparate treatment based on race or ethnicity in the recruitment, employment . . . , contracting . . . , program participation, or allocation or deployment of an entity's resources." Under the terms, contractors or subcontractors not in compliance with this prohibition may be subject to contract cancellation and debarment from future contracts. The terms also require contractors to "furnish all

information and reports, including providing access to books, records, and accounts" for purposes of ascertaining compliance. The terms state, "The contractor recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code (False Claims Act)."

12. I understand that on or about April 20, 2026, the Federal Acquisition Regulation (FAR) Council issued a memorandum to agency procurement officers with instructions on how to implement Executive Order 14398. The memorandum directs agencies to issue class deviations under FAR subpart 1.4 to incorporate the contract terms and other requirements of Executive Order 14398. The memorandum further directs agencies to start using the contract terms prescribed by Executive Order 14398 in new contracts by April 24, 2026, and to seek to modify existing contracts with the contract terms prescribed by Executive Order 14398 by July 24, 2026. These new terms are numbered FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors, though they have not yet been officially incorporated into the FAR. The memorandum directs that, "If a contractor refuses to agree to a bilateral modification, the contracting officer should consider whether, absent the modification, the contract no longer meets the agency's needs and should therefore be terminated for convenience."

13. It is my understanding that many federal agencies have issued class deviations to implement Executive Order 14398. Through these class deviations, the agencies have directed contracting officers to use the terms prescribed by Executive Order 14398, including the clause found at FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors.

14. In light of Executive Order 14398, the FAR Council memorandum, and the class deviations described above, it is my understanding that all UH federal contracts and subcontracts

will be made subject to the order's terms in the immediate future, and thus UH will be required to agree to the contract term or risk losing the contracts or contracting opportunities.

15. UH has already been asked to sign or assure compliance with the new contract terms prescribed by Executive Order 14398 in connection with seven contracts funded by NASA and the U.S. Air Force under the DOD. For example, on May 5, 2026, NASA sent a bilateral modification of a contract with a two-day deadline to return the signed modification. When additional time was requested for review, we received a response that this was a "very simplistic modification" and in cases where the bilateral modification was not accepted, NASA would incorporate it unilaterally, meaning the sponsor would not wait for our acceptance.

16. Notwithstanding the deep concerns described below—including the significant uncertainty and substantial costs, burdens, and harms caused by Executive Order 14398, coupled with the significant and unprecedented penalties Executive Order 14398 would impose—UH has in some cases agreed to the new contract terms prescribed by Executive Order 14398 even though the federal government has not provided a clear explanation of what, if anything, the terms required from contractors beyond compliance with existing federal anti-discrimination law.

**Executive Order 14398's Costs, Burdens, and Harms**

17. I am deeply concerned that the contract terms prescribed by Executive Order 14398, if included in our agency's federal contracts, will lead to significant uncertainty and create substantial costs, burdens, and harms for UH and the state of Hawai'i.

18. Executive Order 14398's prohibition of "racially discriminatory DEI activities" is unclear. The order and the contract terms adopted to implement the order define "racially discriminatory DEI activities" to mean "disparate treatment based on race or ethnicity in the recruitment, employment (e.g., hiring, promotions), contracting (e.g., vendor agreements), program

participation, or allocation or deployment of an entity's resources." The order in turn defines "program participation" to mean "membership or participation in, or access or admission to: training, mentoring, or leadership development programs; educational opportunities; clubs; associations; or similar opportunities that are sponsored or established by the contractor or subcontractor."

19. Other federal and state laws applicable to UH and other contract terms prescribed by the federal government in the past have previously addressed the subject of racial discrimination. The new Executive Order 14398 (EO) and the agency actions implementing it do not explain how the new contract terms relate to those earlier laws and contract terms, nor do they explain whether the EO imposes requirements that are different from those earlier laws and contract terms.

20. As a result, the inclusion of the new terms in UH's federal contracts will create significant uncertainty going forward. This uncertainty will generate additional costs associated with ensuring compliance. In my role overseeing the ORS and systemwide sponsored programs, I anticipate that UH would need to undertake extensive internal reviews of how the new terms apply to our existing and planned efforts in hiring, student support, faculty development, and research training. This would likely include: developing new guidance and training materials for principal investigators, campus business officers, human resources staff, and administrators; revising existing policies, procedures, and programs to minimize perceived risk; and consulting with legal counsel on a recurring basis to interpret the order's requirements as they, and the federal administration's interpretation of the order, evolve. These activities would require substantial staff time within ORS, Office of the Vice President for Research and Innovation

(OVPRI), and campus units and would divert resources away from core research support, compliance, and proposal development functions.

21. Executive Order 14398's prohibition of racially discriminatory DEI activities by contractors *or their subcontractors* and the requirement to report "any subcontractor's known or reasonably knowable conduct that *may* violate this clause" (emphasis added) creates additional compliance and monitoring costs for UH—especially because the prohibition of "racially discriminatory DEI activities" is unclear, as explained above. UH routinely issues and administers subawards and subcontracts under federally funded projects, and ORS already maintains processes for assessing subrecipient risk, monitoring financial and programmatic performance, and ensuring compliance with existing federal requirements. To address the new clause, UH would need to expand these processes to include systematic reviews of subcontractors' DEI-related policies and practices, add new certifications or representations to subaward agreements, and establish reporting channels and investigation protocols for alleged subcontractor violations of the EO. This would require additional staff effort within ORS and OVPRI, greater documentation and oversight burdens for principal investigators and campus fiscal offices, and could discourage collaboration with smaller or community-based partners who lack the capacity to navigate these new requirements.

22. The lack of clarity in Executive Order 14398 and the associated contract terms is especially harmful given that the EO directs federal agencies to "cancel, terminate, suspend, or cause to be cancelled, terminated, or suspended" any contract for a contractor or subcontractor's noncompliance. Agreeing to the new terms would therefore expose UH to substantial risk that contracts could be terminated based on disputed or evolving interpretations of "racially discriminatory DEI activities." Termination of major research and training contracts would

disrupt ongoing projects, force UH to halt work mid-stream, and jeopardize support for faculty, staff, students, and community partners who rely on these awards. It would also undermine long-standing research collaborations with federal sponsors, interrupt time-sensitive scientific activities (including fieldwork, instrumentation operations, and clinical or translational studies), and damage UH's reputation as a reliable federal partner. The resulting loss of funding would have cascading effects on campus research infrastructure, student training opportunities, and Hawai'i's broader innovation ecosystem.

23. Executive Order 14398's requirement that federal agencies "take appropriate action to suspend and debar" contractors or subcontractors for noncompliance further heightens this risk. Suspension or debarment from future federal contracts would effectively bar UH from competing for or receiving new federal awards, severely constraining our ability to support research, education, and public-service activities across the ten-campus system. Given that UH depends on federal funding for a wide range of sponsored programs—from basic and applied research to workforce development, teacher preparation, and health and environmental initiatives—loss of eligibility would erode faculty research programs, limit training opportunities for students, and diminish UH's capacity to address critical needs in Hawai'i such as climate resilience, public health, and national security. It would also negatively affect UH's standing with state partners and private funders who rely on the university's federal grants and contracts to underpin long-term collaborative efforts.

24. The contract term under which the contractor "recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of" the False Claims Act is harmful because it threatens lawsuits under the False Claims Act. Treating compliance with an unclear and evolving DEI-related clause as material to payment

decisions exposes UH to the risk of investigations and litigation alleging false claims or improper certifications, even where UH has acted in good faith and complied with existing antidiscrimination law. Defending against such actions would require substantial time and resources from UH's administrative leadership, ORS, OVPRI, general counsel, and affected campus units, including responding to subpoenas, conducting internal reviews, and producing large volumes of documentation related to personnel, program participation, and resource allocation. These burdens would be incurred regardless of the ultimate outcome of any case, diverting attention away from UH's core mission of education and research and potentially chilling legitimate, lawful efforts to advance and support Hawaiʻi's multi-ethnic communities.

**Executive Order 14398's Procedural Harms**

25. The FAR Council guidance explains that the FAR Council "intends to conduct rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707" to amend the FAR. But the FAR Council guidance also directed federal agencies to implement the EO before this rulemaking was completed.

26. Because the FAR Council and other federal agencies began implementation of the EO without the required process, UH has had no opportunity to share its concerns regarding the new terms, including the significant uncertainty and substantial costs, burdens, and harms they cause. Nor does UH have the benefit of federal agencies' responses to public comments, which might have helped clarify the meaning of the new terms. The significant uncertainty and substantial costs, burdens, and harms caused by Executive Order 14398 could have been mitigated, and perhaps avoided altogether, had the new terms been issued pursuant to lawful procedures.

27. The FAR Council guidance explains that the FAR Council "is seeking clearance from the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (PRA)

for the information collections related to FAR clause 52.222-90." The guidance provides that "agencies will be expected to enforce full compliance with these requirements" once OMB approves the information collection under the PRA, but does not address whether agencies may enforce compliance before that time, and in any event requires the immediate insertion of the new contract terms in new and existing contracts. I am concerned that the new clause will significantly increase UH's paperwork and reporting burdens without the benefit of prior PRA review or public input. In practice, ORS and OVPRI would likely be required to develop new forms, certifications, and internal reporting processes to document compliance with the EO; maintain additional records regarding DEI-related activities, subcontractor monitoring, and any investigations or remedial actions; and respond to expanded federal requests for information and access to books and records. These obligations would compound existing federal reporting requirements for sponsored programs, strain limited administrative capacity, and reduce the time and resources available to support proposal development, research compliance, and direct services to faculty and students.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 16, 2026, at Honolulu, HI.

Chad B. Walton