Exhibit 8
Declaration of Dr. Paul Ellinger (Illinois)

## DECLARATION OF DR. PAUL ELLINGER

I, Dr. Paul Ellinger declare as follows:

1. I am the Vice President, Chief Financial Officer, and Comptroller of the University of Illinois System ("UI System"). I make this declaration based on personal knowledge and information provided to me in my official capacity. In preparing this declaration, I reviewed information maintained in the ordinary course of the University's operations and consulted with University personnel responsible for federal contracting, sponsored programs, procurement, compliance, and financial administration. If called as a witness, I could and would testify competently to the matters set forth below.

### Professional and Institution Background

2. I am currently employed by the UI System as Vice President, Chief Financial Officer, and Comptroller and have been in this role since September 2022 after filling it in an interim capacity since July 2021. As Vice President and Chief Financial Officer, my duties include managing all financial functions and overseeing all revenues, costs, capital expenditures, investments and debt. I also serve as Comptroller of the UI System. I previously served as the Associate Chancellor and Vice Provost for Budget and Resource Planning for the University of Illinois Urbana-Champaign.

3. The Board of Trustees of the University of Illinois ("University of Illinois" or "University") is a body corporate and politic established by the Illinois General Assembly (110 ILCS 305), with the authority under Illinois law to manage and operate the UI System, including the power to contract and be contracted with. The UI System is comprised of three universities in Chicago, Springfield, and Urbana-Champaign. By law, the contracting party for all system contracts is the board. The Comptroller is the general fiscal officer of the board and is authorized to sign contracts to which the board is a party, which include all contracts and subcontracts with

the federal government. The Comptroller is authorized to delegate to responsible members of the system authority to sign contracts in the name of the Comptroller.

## Federal Contracting Activities of the University of Illinois

4. The University of Illinois regularly and routinely supplies services to the federal government under procurement contracts with federal agencies. At times, the University of Illinois engages subcontractors in providing services to the federal government. The University of Illinois also regularly and routinely supplies services as a subcontractor on procurement contracts with federal agencies.

5. For example, the University of Illinois is party to the following present contracts:

6. A contract with the U.S. Army Engineer Research and Development Center entitled "Development and Assessment of Optimal, Adaptive Mobility for Manned and Unmanned Construction Engineering System," which involves the integration and development of manned and unmanned system capabilities for machine control that will improve safety and mission effectiveness for a wide range of robotics for engineer operations. The University will implement an expeditionary autonomous construction system and develop a prototype autonomous bulldozer and an underwater robot. The contract period is September 26, 2024 through September 25, 2034. The contract has $3,750,000 obligated with the same total anticipated contract value.

7. A contract with the Defense Advanced Research Projects Agency entitled "Rapid Extrusion of Composite Mega-Structure for Space (REMS2)" is a multiphase project that currently aims to send a specialized construction apparatus to the International Space Station to demonstrate space-based or on-orbit manufacturing, building off the University of Illinois's

extensive experience in composite materials design. The contract period is November 22, 2021 through March 9, 2027. The contract has $5,170,769.58 obligated with the same total anticipated contract value.

8. A contract with the Department of Energy entitled "Center for the Electrification of Steel by Electrosynthesis." The purpose of this contract is to develop the understanding and control of ion coordination needed for low-temperature electrosynthesis of iron and iron alloys for steel production. The contract period is December 22, 2023 through December 21, 2027 for an obligated total of $267,500 and anticipated total value of $1,070,000.

9. A contract with the Department of Veterans Affairs entitled "A Simulation Effectiveness Study of Clinical Decision Support Tools to Prevent Contextual Errors in Medical Decision Making" that will import an evidence-based clinical decision support tool into the Federal Electronic Health Record system and test it in a simulation study to collect data on facilitators and barriers to implementation. The contract period is July 1, 2025 through September 30, 2026. The contract has $380,852 obligated with a total anticipated value of $886,806 and performance period through September 30, 2028.

10. The University of Illinois regularly and routinely seeks opportunities for new federal contract work. For example, the University routinely pursues research, clinical trial, technical testing, and other services contracts, most often in medical and engineering disciplines.

11. The University of Illinois currently has approximately 152 active[1] contracts with nine federal government agencies worth an anticipated approximate total value of $116,543,378. The university is also subcontractor on approximately 73 additional contracts with 11 federal

[1] Contracts with an end date of August 1, 2026 or later.

agencies worth approximately $44,439,272. In 2025, the University of Illinois entered at least 88 new contracts or subcontracts worth approximately $67,321,082.

12. The federal agencies for which the University of Illinois is currently working as a contractor or subcontractor or seeking new contracts include: Department of Agriculture, Department of Commerce, Department of Defense, Department of Education, Department of Energy, Department of Health and Human Services, Department of Interior, Department of Homeland Security, Department of Labor, Department of Transportation, Department of Veterans Affairs, National Aeronautics and Space Administration, and National Science Foundation.

**Executive Order 14398**

13. I understand that on March 26, 2026, President Trump issued Executive Order 14398, Addressing DEI Discrimination by Federal Contractors, 91 Fed. Reg. 16,147 (Mar. 26, 2026). The order and subsequent implementing actions by the Federal Acquisition Regulatory (FAR) Council and federal agencies require federal contractors and subcontractors to comply with a new contract clause addressing "racially discriminatory DEI activities" including through incorporation of FAR 52.222-90 into new and existing federal contracts. Contractors that do not comply with the clause may face significant contractual consequences, including termination or suspension of existing contracts, debarment from future contracts, and potential False Claims Act implications.

14. I understand that many federal agencies have issued class deviations to implement Executive Order 14398. Through these class deviations, the agencies have directed contracting officers to use the terms prescribed by Executive Order 14398, including the clause found at FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors.

15. In light of Executive Order 14398, the FAR Council memorandum, and the class deviations described above, I expect that all University of Illinois federal contracts and subcontracts will be made subject to the order's terms in the immediate future, and thus the University of Illinois will be required to agree to the contract term or risk losing the contracts or contracting opportunities.

16. The University of Illinois has already been asked to sign or assure compliance with the new contract terms prescribed by Executive Order 14398 in connection with contracts or subcontracts for the Department of Agriculture, Department of Defense, Department of Health and Human Services, Department of Veterans Affairs, and National Aeronautics and Space Administration. For example, on June 4, 2026, the U.S. Army sought bilateral modification of a contract for the Illinois Fire Service Institute (IFSI) to provide firefighter training services for the 416th Theater Engineer Command. IFSI is the oldest continuous fire training institution in the United States and a leader in life safety research. The training services were provided between April 7, 2026 and May 11, 2026. The U.S. Army is withholding payment of the over $130,000 invoice until the University accepts the new terms.

17. In certain instances, the University of Illinois has in some cases accepted the new contract terms prescribed by Executive Order 14398 to avoid interruption of essential services, withholding of payment for work already performed, to loss of time-sensitive contracting opportunities. Acceptance of the terms has not resolved the University's uncertainty regarding the terms' meaning or the compliance, financial, and operational risks described below.

**Executive Order 14398's Costs, Burdens, and Harms**

18. From my perspective as Vice President, Chief Financial Officer, and Comptroller, Executive Order 14398 and its implementing contract clause create operational, financial, and

compliance risks and uncertainty that affect the University's administration of federal contracts and subcontracts.

19. The University has not received sufficient guidance to determine with confidence how federal agencies will interpret and enforce the prohibition of "racially discriminatory DEI activities" set forth in Executive Order 14398. Although the Executive Order and related contract clause define certain terms, those definitions do not provide clear boundaries regarding what conduct is prohibited. The definitions employ broad concepts—including "racially discriminatory DEI activities," "program participation," and the "allocation or deployment of an entity's resources"—without explaining how those concepts will be applied by federal agencies in specific contracting contexts. Nor do the Executive Order and implementing materials explain what documentation contractors will be expected to maintain or what compliance measures contractors will be expected to implement. As a result, the University is unable to assess with confidence the full scope of its obligations under FAR 52.222-90.

20. The University already maintains extensive compliance systems designed to ensure adherence to numerous federal and state laws, regulations, and contractual requirements addressing discrimination. Executive Order 14398 and the agency actions implementing it do not explain how the new contract terms relate to those existing obligations or whether they impose requirements beyond those already applicable to federal contractors.

21. As a result of Executive Order 14398 and the implementing actions described above, the University is already devoting substantial personnel time and resources to reviewing existing and anticipated contracts and subcontracts, assessing potential compliance obligations, and evaluating the implications of incorporating FAR 52.222-90 into existing and future agreements. The University must determine whether its current compliance systems,

documentation practices, procurement procedures, subcontracting processes, and contract-monitoring activities are sufficient and whether additional monitoring, reporting, tracking, or review mechanisms will be necessary. These reviews must be conducted across approximately 152 active federal contracts and approximately 73 federal subcontracts currently administered by the University. The resulting expenditures of personnel time and institutional resources are substantial and ongoing.

22. Executive Order 14398's prohibition of racially discriminatory DEI activities by contractors *or their subcontractors* and the requirement to report "any subcontractor's known or reasonably knowable conduct that *may* violate this clause" (emphasis added) creates additional compliance and monitoring costs for the University of Illinois—especially because the University lacks clear guidance regarding the scope of conduct that federal agencies may regard as prohibited. With each new subcontract issuance or modification, the University of Illinois reasonably anticipates that it will need to develop and retain additional documentation, in addition to the comprehensive risk assessment procedures already in place. This may require system enhancements and additional personnel time, with associated costs being borne by the University. This provision also implies the potential for ongoing tracking at a level of detail not typically conducted, but that may be necessary given the increased potential for termination if a subcontractor is found to be non-compliant. The vague definitions combined with unclear expectations with respect to the University of Illinois's responsibility for subcontractor oversight create substantial uncertainty for the university.

23. The University frequently collaborates with hospitals, research institutions, nonprofit organizations, industry partners, and other entities in connection with its federal contract activities. Although the University can contractually require subcontractors to adhere to

the applicable terms of the federal contract, it does not control all their actions or day-to-day operations and cannot independently verify all conduct that a federal agency might later contend violates FAR 52.222-90. As a result, the University must devote additional time and resources to evaluating and monitoring potential subcontractors and collaborators and to assessing whether particular subcontracting relationships present heightened compliance risks.

24. Even with such efforts, the University cannot eliminate the risk that a subcontractor or collaborator may later be alleged to have violated FAR 52.222-90. If that occurs, the University could face significant consequences despite its inability to control the subcontractor's actions fully. Addressing such issues could require the University to devote additional administrative resources, retain outside counsel, or become involved in disputes concerning subcontractor compliance. These risks may also affect the University's willingness to pursue certain subcontracting arrangements and collaborative opportunities in future federal contracts.

25. Executive Order 14398 and the associated contract terms create substantial risk because Executive Order 14398 directs agencies to terminate, suspend, or otherwise discontinue contracts for noncompliance. Even before any termination occurs, the possibility of such action requires the University to assess contingency plans affecting personnel, research activities, subcontractors, and ongoing contractual commitments. If a contract is terminated or suspended, personnel funded through that contract may need to be reassigned to other projects or positions, which may not be possible in all circumstances. Such actions could result in the loss of personnel and delays in performing the work if the contract is reinstated. Additionally, a finding of non-compliance could jeopardize future contracting opportunities and the associated federal funding that might otherwise be reasonably anticipated. Loss of those funds could impact personnel

decisions, lead to a reduction in staff, and compromise the University's capacity to offer similar services in the future.

26. Executive Order 14398's requirement that federal agencies "take appropriate action to suspend and debar" contractors or subcontractors for noncompliance creates substantial risk for the University should it agree to the new terms. If debarred from receiving federal contracts, the University would suffer substantial reputational damage and a significant loss of funding. Such an outcome would materially affect University operations that depend upon federal contracts and would significantly reduce the University's ability to pursue mission-related research, clinical, engineering, and technical service activities.

27. The contract term under which the contractor "recognizes that compliance with the requirements of this clause are [sic] material to the Government's payment decisions for purposes

of" the False Claims Act creates additional litigation and financial risk for the University. The University ordinarily evaluates its ability to comply with contractual certification requirements based on reasonably clear standards. Here, the University has not received clear guidance regarding the scope of conduct prohibited by FAR 52.222-90 or the measures necessary to demonstrate compliance. As a result, University personnel must evaluate the risk that actions later deemed noncompliant could result in contractual disputes, payment consequences, or allegations under the False Claims Act when deciding whether to enter into or modify federal contracts. The University would incur significant costs defending a False Claims Act action, including legal defense expenses, even if it ultimately prevailed. The prospect of such allegations may also discourage other organizations from engaging the University as a subcontractor or collaborator on future federal contracting opportunities.

28. Federal contracts and subcontracts represent a significant component of the University's research, technical services, engineering, and clinical activities. The risks associated with contract termination, suspension, debarment, and potential False Claims Act allegations affect financial planning, personnel planning, subcontracting decisions, and operational decision-making throughout the University system.

**Executive Order 14398's Procedural Harms**

29. The FAR Council guidance explains that the FAR Council "intends to conduct rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707" to amend the Federal Acquisition Regulation (FAR). But the FAR Council guidance also directed federal agencies to implement the Executive Order before this rulemaking was completed.

30. Because implementation began before completion of the anticipated notice-and-comment process, the University of Illinois has had no opportunity to share its concerns regarding the new terms, including the significant uncertainty and substantial costs, burdens, and harms they cause. Nor does the University of Illinois have the benefit of federal agencies' responses to public comments, which might have helped clarify the meaning of the new terms.

31. As another example, the FAR Council guidance explains the FAR Council "is seeking clearance from the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (PRA) for the information collections related to FAR clause 52.222-90." The guidance provides that "agencies will be expected to enforce full compliance with these requirements" once OMB approves the information collection under the PRA, but does not address whether agencies may enforce compliance before that time, and in any event requires the immediate insertion of the new contract terms in new and existing contracts. As a result, the University must evaluate and prepare for potentially significant documentation, reporting, and

compliance obligations without knowing the full scope of the information-collection requirements that ultimately may be imposed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 17, 2027, at Urbana, Illinois.

Paul N. Ellinger

Dr. Paul Ellinger