Exhibit 10
Declaration of Jill A. Frankenfield (Maryland)

## DECLARATION OF JILL A. FRANKENFIELD

I, Jill A. Frankenfield, declare as follows:

1. I am the Associate Vice President of Sponsored Programs Administration at the University of Maryland, Baltimore. I make this declaration based on personal knowledge and information provided to me in my official capacity. If called as a witness, I could and would testify competently to the matters set forth below.

### Professional and Agency Background

2. I am currently employed by the University of Maryland, Baltimore as the Associate Vice President of Sponsored Programs Administration.

3. The University of Maryland, Baltimore (UMB) is a public graduate and professional institution within the University System of Maryland dedicated to advancing human health and social well-being through education, research, and service. UMB provides specialized training in disciplines including medicine, law, nursing, dentistry, pharmacy, and social work, thereby preparing a skilled workforce to serve the State of Maryland and beyond. UMB also conducts substantial biomedical, clinical, and public-policy research and delivers community-based services—such as healthcare, legal assistance, and social support—particularly to underserved populations, contributing to economic development and the improvement of public health and social equity.

4. As Associate Vice President of Sponsored Programs Administration, my duties include the oversight and institutional administration of externally funded research and sponsored activities, including federal contracts. This role encompasses ensuring compliance with applicable federal statutes, regulations, and agency requirements; negotiating and executing sponsored agreements; and establishing policies and internal controls governing pre- and post-award administration. Through these functions, I have developed and maintain substantive

knowledge of federal contracting mechanisms, regulatory frameworks (including the Uniform Guidance and FAR where applicable), and compliance obligations relevant to federally funded programs.

**<u>Federal Contracting Activities of UMB</u>**

5. UMB regularly and routinely supplies goods and services to the federal government under procurement contracts with federal agencies. UMB also sometimes supplies goods and services as a subcontractor on procurement contracts with federal agencies.

6. For example, UMB currently is a party to the following contracts:

a. Under a Blanket Purchase Agreement with the U.S. Department of Veterans Affairs, UMB provides reagents, supplies laboratory services/instrumentation for Veterinary Care and Husbandry Services and provides access to UMB Core Services for the VA's Research Team..

b. A contract with the NIH/National Institute on Drug Abuse to establish/maintain a collection site (i.e., the NIH NeuroBioBank Brain and Tissue Repository) to provide services to actively acquire, receive, process, store, curate, preserve, and distribute brain and central nervous system tissue and related biological specimens to qualified investigators.

c. A contract with the National Highway Traffic Safety Administration to collect data and develop detailed injury causation information for injured pedestrians and motor vehicle occupants involved in crashes.

d. A subcontract under a DOD clinical study to characterize variability in physiological, neurocognitive, and molecular biomarkers across time in

military participants. UMB provides MRI services to support the study protocol.

7. UMB regularly and routinely seeks opportunities for new federal contract work.

8. UMB has dozens of contracts with approximately 15-20 federal agencies worth approximately $100,000,000 and is a subcontractor on approximately 10-15 contracts with 5-10 federal agencies worth approximately $15,000,000. Each year, UMB typically enters into 5-10 new contracts worth $5,000,000 to $10,000,000.

9. The federal agencies for which UMB is currently working as a contractor or subcontractor or seeking new contracts include:

Department of Health and Human Services - Food and Drug Administration

Department of Health and Human Services -Biomedical Advanced Research and Development Authority

CDC - Centers for Disease Control and Prevention

National Institutes of Health - NIH Clinical Center

National Institutes of Health - National Cancer Institute

National Institutes of Health - National Heart, Lung, and Blood Institute

National Institutes of Health - National Institute of Allergy and Infectious Diseases

National Institutes of Health - National Institute on Drug Abuse

National Institutes of Health-National Institute of Mental Health

Department of Defense - Office of Naval Research

Department of Defense - Air Force - Wright-Patterson Air Force Base

Department of Defense - US Army Medical Research Acquisition Activity

Department of Defense - Naval Sea Systems Command

Department of Transportation - National Highway Traffic Safety Admin.

Department of Veterans Affairs

Department of Energy

Centers for Medicare and Medicaid Services

**<u>Executive Order 14398</u>**

10. I understand that on March 26, 2026, President Trump issued Executive Order 14398, Addressing DEI Discrimination by Federal Contractors, 91 Fed. Reg. 16,147 (Mar. 26, 2026). The order directs federal agencies to include terms in all their contracts barring contractors from "engag[ing] in any racially discriminatory DEI activities," defined as "disparate treatment based on race or ethnicity in the recruitment, employment . . . , contracting . . . , program participation, or allocation or deployment of an entity's resources." Under the terms, contractors or subcontractors not in compliance with this prohibition may be subject to contract cancellation and debarment from future contracts. The terms also require contractors to "furnish all information and reports, including providing access to books, records, and accounts" for purposes of ascertaining compliance. The terms state, "The contractor recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code (False Claims Act)."

11. I understand that on or about April 20, 2026, the FAR Council issued a memorandum to agency procurement officers with instructions on how to implement Executive Order 14398. The memorandum directs agencies to issue class deviations under FAR subpart 1.4 to incorporate the contract terms and other requirements of Executive Order 14398. The memorandum further directs agencies to start using the contract terms prescribed by Executive Order 14398 in new contracts by April 24, 2026, and to seek to modify existing contracts with

the contract terms prescribed by Executive Order 14398 by July 24, 2026. These new terms are numbered FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors, though they have not yet been officially incorporated into the Federal Acquisition Regulation. The memorandum directs that, "If a contractor refuses to agree to a bilateral modification, the contracting officer should consider whether, absent the modification, the contract no longer meets the agency's needs and should therefore be terminated for convenience."

12. I understand that many federal agencies have issued class deviations to implement Executive Order 14398. Through these class deviations, the agencies have directed contracting officers to use the terms prescribed by Executive Order 14398, including the clause found at FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors.

13. In light of Executive Order 14398, the FAR Council memorandum, and the class deviations described above, I expect that all UMB's federal contracts and subcontracts will be made subject to the order's terms in the immediate future, and thus UMB will be required to agree to the contract terms or risk losing the contracts or contracting opportunities.

14. UMB has already been asked to sign or assure compliance with the new contract terms prescribed by Executive Order 14398 in connection with contracts or subcontracts for the Department of Veterans Affairs. For example, on May 22, 2026, UMB received an email from the Department of Veterans Affairs about a modification incorporating FAR 52.222-90. The email stated: "If a contractor refuses to agree to a bilateral modification, the contracting officer should consider whether, absent the modification, the contract no longer meets the agency's needs and should therefore be terminated for convenience." Similar emails were received regarding other contracts that included deadlines for signing and indicated that further contract

modifications or actions were on hold until the modification incorporating FAR 52.222-90 was signed.

15. Notwithstanding the deep concerns described below—including the significant uncertainty and substantial costs, burdens, and harms caused by Executive Order 14398, coupled with the significant and unprecedented penalties Executive Order 14398 would impose—UMB has in some cases agreed to the new contract terms prescribed by Executive Order 14398 even though the federal government has not provided a clear explanation of what, if anything, the terms require from contractors beyond compliance with existing federal antidiscrimination law.

**Executive Order 14398's Costs, Burdens, and Harms**

16. I am deeply concerned that the contract terms prescribed by Executive Order 14398, if included in our agency's federal contracts, will lead to significant uncertainty and create substantial costs, burdens, and harms for UMB and our State.

17. Executive Order 14398's prohibition of "racially discriminatory DEI activities" is unclear. The order and the contract terms adopted to implement the order define "racially discriminatory DEI activities" to mean "disparate treatment based on race or ethnicity in the recruitment, employment (e.g., hiring, promotions), contracting (e.g., vendor agreements), program participation, or allocation or deployment of an entity's resources." The order in turn defines "program participation" to mean "membership or participation in, or access or admission to: training, mentoring, or leadership development programs; educational opportunities; clubs; associations; or similar opportunities that are sponsored or established by the contractor or subcontractor."

18. Other federal and state laws applicable to UMB and other contract terms prescribed by the federal government in the past have previously addressed the subject of racial

discrimination. The new Executive Order and the agency actions implementing it do not explain how the new contract terms relate to those earlier laws and contract terms, nor do they explain whether the Executive Order imposes requirements that are different from those earlier laws and contract terms.

19. As a result, the inclusion of the new terms in our agency's federal contracts will create significant uncertainty going forward. This uncertainty will create additional costs associated with ensuring compliance. UMB may need to undergo an institution-wide review and modification of academic, research, training, and outreach programs.

20. Executive Order 14398's prohibition of racially discriminatory DEI activities by contractors *or their subcontractors* and the requirement to report "any subcontractor's known or reasonably knowable conduct that *may* violate this clause" (emphasis added) creates additional compliance and monitoring costs for UMB—especially because the prohibition of "racially discriminatory DEI activities" is unclear, as explained above. Enhanced oversight of subrecipients would be necessary, thereby extending compliance obligations beyond traditional functions. Modifications for all vendor contracts under existing contracts would also have to be completed with a short turnaround time.

21. The lack of clarity in Executive Order 14398 and the associated contract terms is especially harmful given that the Executive Order directs federal agencies to "cancel, terminate, suspend, or cause to be cancelled, terminated, or suspended" any contract for the contractor or subcontractor's noncompliance—especially because the prohibition of "racially discriminatory DEI activities" is unclear as explained above—will create substantial risk should UMB agree to the new terms. Termination would result in the immediate loss of significant revenue streams supporting research, personnel, and infrastructure, potentially disrupting ongoing clinical trials,

scientific studies, and public health initiatives. Termination could necessitate layoffs of faculty, staff, and research personnel, and impair UMB's ability to attract and retain top talent. Additionally, termination may damage UMB's reputation and competitiveness for future funding, undermine collaborations with governmental and private partners, and interrupt essential services currently being provided to the United States government.

22. Executive Order 14398's requirement that federal agencies "take appropriate action to suspend and debar" contractors or subcontractors for noncompliance—especially because the prohibition of "racially discriminatory DEI activities" is unclear as explained above—will create substantial risk associated with such unprecedented penalties, should UMB agree to the new terms. Debarment would impose severe and potentially existential harms on UMB by precluding it from receiving federal contracts, grants, and other forms of federal funding for a specified period. Given UMB's substantial reliance on federal support, debarment would result in the loss of hundreds of millions of dollars in research and program funding, forcing the suspension or termination of ongoing projects, including critical biomedical and public health initiatives. It would likely lead to significant layoffs, the loss of faculty and research talent, and the dismantling of research infrastructure. Debarment would also cause reputational damage, impairing UMB's ability to secure future funding from both governmental and private sources, and undermining partnerships with federal agencies, healthcare providers, and community organizations. Collectively, these effects would materially disrupt UMB's core missions of education, research, and public service, with cascading impacts on students, patients, and the broader community it serves.

23. The contract term under which the contractor "recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes

of" the False Claims Act is harmful because it threatens lawsuits under the False Claims Act. States would face costs associated with defending lawsuits under the False Claims Act even if they were to prevail in those lawsuits. Even if ultimately successful, defending against a False Claims Act lawsuit would impose significant harms on UMB. It would incur substantial legal and administrative costs associated with investigation, document production, and litigation, diverting financial and personnel resources away from its core missions of education, research, and public service. The demands of litigation would place a heavy burden on faculty, researchers, and administrative staff, disrupting ongoing federally funded projects and institutional operations. Additionally, the mere existence of a False Claims Act action could cause reputational harm, potentially affecting UMB's ability to attract future federal funding, private grants, and research partnerships. The uncertainty and scrutiny associated with such proceedings may also deter collaborators and donors and create internal instability, even if UMB ultimately prevails in the lawsuit.

**Executive Order 14398's Procedural Harms**

24. The FAR Council guidance explains that the FAR Council "intends to conduct rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707" to amend the Federal Acquisition Regulation (FAR). But the FAR Council guidance also directed federal agencies to implement the Executive Order before this rulemaking was completed.

25. Because the FAR Council and other federal agencies began implementation of the Executive Order without the required process, UMB has had no opportunity to share its concerns regarding the new terms, including the significant uncertainty and substantial costs, burdens, and harms they cause. Nor does UMB have the benefit of federal agencies' responses to public comments, which might have helped clarify the meaning of the new terms. The significant

uncertainty and substantial costs, burdens, and harms caused by Executive Order 14398 could have been mitigated, and perhaps avoided altogether, had the new terms been issued pursuant to lawful procedures.

26. As another example, the FAR Council guidance explains that the FAR Council "is seeking clearance from the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (PRA) for the information collections related to FAR clause 52.222-90." The guidance provides that "agencies will be expected to enforce full compliance with these requirements" once OMB approves the information collection under the PRA but does not address whether agencies may enforce compliance before that time, and in any event requires the immediate insertion of the new contract terms in new and existing contracts. UMB may need to implement additional compliance tracking, recordkeeping, and reporting processes, which could result in increased administrative effort and costs.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 17, 2026, at Baltimore, Maryland.

Jill A. Frankenfield

JILL A. FRANKENFIELD