Exhibit 11

Declaration of Patrick G. O'Shea (Maryland)

## DECLARATION OF PATRICK G. O'SHEA

I, Patrick G. O'Shea, declare as follows:

1. I am the Vice President and Chief Research Officer at the University of Maryland, College Park ("UMCP"), a constituent institution of the University System of Maryland ("USM"), the State of Maryland's public system of higher education. This is a position I have held since 2025, and I previously held this role from 2011 to 2016. I make this declaration based on personal knowledge and information provided to me in my official capacity. If called as a witness, I could and would testify competently to the matters set forth below.

### Professional and Agency Background

2. UMCP is the State of Maryland's flagship research university. UMCP enrolls over 40,000 students across twelve schools and colleges and an interdisciplinary Graduate School and offers more than 300 degree programs.

3. As Vice President and Chief Research Officer, I am responsible for a joint research enterprise that ranks among the top public institutions in research expenditures and garners $1.2 billion in research awards annually. I have personal knowledge of all the facts stated herein or have knowledge of the matters based on my review of information and records gathered by my staff, including campus research administrators, deans, numerous faculty members who serve as Principal Investigators (PIs) on various federal awards, or in reliance on information and records gathered by the Vice President for Finance and Chief Financial Officer and Assistant Vice President for Procurement and Business Services.

### Federal Contracting Activities of UMCP

4. As a prime contractor, UMCP regularly and routinely supplies services to the federal government under procurement contracts with federal agencies and regularly procures goods and services for use on its prime contracts. UMCP also regularly and routinely supplies goods and services as a subcontractor on procurement contracts with federal agencies.

5. UMCP regularly and routinely seeks opportunities for new federal contract work. For example, UMCP has executed a number of contract agreements with the federal government, including a $500 million Indefinite Delivery, Indefinite Quantity (IDIQ) contract with numerous tasks and subprojects with the Department of Defense on behalf of its University-Affiliated Research Center, the Applied Research Laboratory for Intelligence and Security (ARLIS). Smaller contracts, among others, include a $35 million ARLIS-led effort with the Defense Advanced Research Projects Agency (DARPA) on its quantum benchmarking initiative. UMD executes and performs on other contracts with additional Department of Defense agencies (to include the Air Force, Navy, among others), as well as the National Aeronautics and Space Administration (NASA), National Institute of Standards and Technology, National Oceanic and Atmospheric Administration, Department of Transportation, Department of Energy (DOE), and various DOE national laboratories for applied research.

6. UMCP's overall scale of present and future federal contracting activities is vast and ever-changing. In FY24-26, UMCP was awarded $260m on over 480 contracts from 16 different federal agencies. Additionally, UMCP as a subcontractor was awarded $115m on more than 400 contracts with 18 different federal agencies. Each year, UMCP typically enters many new federal contracts worth hundreds of thousands of dollars; in the last three fiscal years, UMCP was awarded $376m on both new and continuing awards.

7. The federal agencies for which UMCP is currently working as a contractor or subcontractor or seeking new contracts include the Department of Agriculture, Department of Commerce (including the National Institutes for Standards and Technology), Department of Homeland Security, Department of Defense (including the Office of the Undersecretary of Defense for Intelligence & Security, Defense Advanced Research Projects Agency, Air Force, Army, Navy,

and Strategic Environmental Research and Development Program Office), Department of Energy (including the Advanced Research Projects Agency - Energy), Department of Health and Human Services (including the National Institutes of Health), Department of Justice, Department of the Interior, Department of Transportation, Department of Veterans Affairs, Environmental Protection Agency, National Science Foundation, Smithsonian Institution, and various federal intelligence agencies.

**Executive Order 14398**

8. I understand that on March 26, 2026, President Trump issued Executive Order 14398, Addressing DEI Discrimination by Federal Contractors, 91 Fed. Reg. 16,147 (Mar. 26, 2026). The order directs federal agencies to include terms in all their contracts barring contractors from "engag[ing] in any racially discriminatory DEI activities," defined as "disparate treatment based on race or ethnicity in the recruitment, employment . . . , contracting . . . , program participation, or allocation or deployment of an entity's resources." Under the terms, contractors or subcontractors not in compliance with this prohibition may be subject to contract cancellation and debarment from future contracts. The terms also require contractors to "furnish all information and reports, including providing access to books, records, and accounts" for purposes of ascertaining compliance. The terms state, "The contractor recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code (False Claims Act)."

9. I understand that on or about April 20, 2026, the FAR Council issued a memorandum to agency procurement officers with instructions on how to implement Executive Order 14398. The memorandum directs agencies to issue class deviations under FAR subpart 1.4 to incorporate the contract terms and other requirements of Executive Order 14398. The

memorandum further directs agencies to start using the contract terms prescribed by Executive Order 14398 in new contracts by April 24, 2026, and to seek to modify existing contracts with the contract terms prescribed by Executive Order 14398 by July 24, 2026. These new terms are numbered FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors, although they have not yet been officially incorporated into the Federal Acquisition Regulation. The memorandum directs that, "If a contractor refuses to agree to a bilateral modification, the contracting officer should consider whether, absent the modification, the contract no longer meets the agency's needs and should therefore be terminated for convenience."

10. I understand that many federal agencies have issued class deviations to implement Executive Order 14398. Through these class deviations, the agencies have directed contracting officers to use the terms prescribed by Executive Order 14398, including the clause found at FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors.

11. In light of Executive Order 14398, the FAR Council memorandum, and the class deviations described above, I expect that all UMCP federal contracts and subcontracts will be made subject to the order's terms in the immediate future, and thus UMCP will be required to agree to the contract term or risk losing the contracts or contracting opportunities.

12. UMCP has already been asked to sign or assure compliance with the new contract terms prescribed by Executive Order 14398 in connection with contracts or subcontracts for federal intelligence agencies, the Department of Health and Human Services, the Army, the Air Force Office of Scientific Research, NASA, and the Applied Physics Lab. For example, on June 9, 2026, NASA provided a bilateral modification incorporating FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors (DEVIATION APR 2026), with a deadline of June 30, 2026 to sign and return the modification. We were instructed to report to NASA headquarters any

issues with getting the modification bilaterally signed, and we were advised that any issues had to be resolved before NASA could look into exercising the next option. We also received a bilateral modification from the Maryland Procurement Office, exercising Option Year 4 adding $1.8 million and extending the period of performance through 5/31/2027, that also incorporated FAR clauses 52.222-90 and 52.244-6. Delaying the modification puts the next year's funding at risk, as well as the entire project, as the current period of performance was due to expire on 5/31/2026.

13. Notwithstanding the deep concerns described below—including the significant uncertainty and substantial costs, burdens, and harms caused by Executive Order 14398, coupled with the significant and unprecedented penalties Executive Order 14398 would impose—UMCP has in some cases agreed to the new contract terms prescribed by Executive Order 14398 even though the federal government has not provided a clear explanation of what, if anything, the terms require from contractors beyond compliance with existing federal antidiscrimination law.

**<u>Executive Order 14398's Costs, Burdens, and Harms</u>**

14. I am deeply concerned that the contract terms prescribed by Executive Order 14398, if included in our agency's federal contracts, will lead to significant uncertainty and create substantial costs, burdens, and harms for UMCP and our State.

15. Executive Order 14398's prohibition of "racially discriminatory DEI activities" is unclear. The order and the contract terms adopted to implement the order define "racially discriminatory DEI activities" to mean "disparate treatment based on race or ethnicity in the recruitment, employment (e.g., hiring, promotions), contracting (e.g., vendor agreements), program participation, or allocation or deployment of an entity's resources." The order in turn defines "program participation" to mean "membership or participation in, or access or admission to: training, mentoring, or leadership development programs; educational opportunities; clubs;

associations; or similar opportunities that are sponsored or established by the contractor or subcontractor."

16. Other federal and state laws applicable to UMCP and other contract terms prescribed by the federal government in the past have previously addressed the subject of racial discrimination. The new Executive Order and the agency actions implementing it do not explain how the new contract terms relate to those earlier laws and contract terms, nor do they explain whether the Executive Order imposes requirements that are different from those earlier laws and contract terms.

17. As a result, the inclusion of the new terms in our agency's federal contracts will create significant uncertainty going forward. This uncertainty will create additional costs associated with ensuring compliance.

18. Executive Order 14398's prohibition of racially discriminatory DEI activities by contractors *or their subcontractors* and the requirement to report "any subcontractor's known or reasonably knowable conduct that *may* violate this clause" (emphasis added) creates additional compliance and monitoring costs for UMCP—especially because the prohibition of "racially discriminatory DEI activities" is unclear, as explained above. As UMCP receives new contracts or modifications to existing contracts that include the DEI clauses, we must issue or modify existing subcontracts to include the clauses. We are unsure if some of our subcontractors will willingly accept the new clauses.

19. The lack of clarity in Executive Order 14398 and the associated contract terms is especially harmful given that the Executive Order directs federal agencies to "cancel, terminate, suspend, or cause to be cancelled, terminated, or suspended" any contract for the contractor or subcontractor's noncompliance—especially because the prohibition of "racially discriminatory

DEI activities" is unclear as explained above—would create substantial risk should the UMCP agree to the new terms. The harms that would follow if UMCP's contracts were terminated for noncompliance with an unclear Executive Order (including noncompliance on the part of one of UMCP's subcontractors) would extend far beyond the immediate loss of existing funding and would have significant and far-reaching consequences. Financial impacts may include the loss of future federal funding, repayment of disallowed costs, unreimbursed project closeout expenses, and reduced recovery of facilities and administrative costs that support UMCP's research enterprise. Contract termination can also disrupt ongoing research, delay or halt critical scientific projects, and jeopardize long-term studies, research infrastructure, and opportunities for innovation. Faculty, research staff, postdoctoral scholars, graduate students, and other personnel may experience layoffs, loss of funding, diminished research opportunities, and increased challenges in recruitment and retention, while undergraduate and graduate students may face reduced educational and experiential learning opportunities. In addition, contract termination may result in significant unnecessary reputational harm, reducing confidence among federal sponsors, peer institution research collaborators, industry partners, donors, and prospective faculty and students. UMCP may also face substantial compliance and legal consequences, including increased federal oversight, audits, investigations, corrective action requirements, and potential civil or administrative penalties; UMCP would have to expend significant institutional time and resources to investigate "deficiencies," implement corrective measures, strengthen compliance programs, and respond to regulatory inquiries even where UMCP clearly is in compliance with existing Federal anti-discrimination laws and with the laws and regulations that apply to federally-funded research. Collectively, these effects can diminish UMCP's research capacity, operational stability, and national competitiveness, with long-term consequences that may persist for years as research

programs are rebuilt, research teams are reconstituted, institutional relationships are restored, and UMCP reestablishes its standing as a trusted recipient of federal research funding. Additionally, these harms would impact the federal government, including U.S. national and economic security, and would also impact American taxpayers, as terminating research contracts midway through performance would essentially result in a waste of U.S. and State taxpayer dollars and time and effort already exerted by UMCP and federal scientists.

20. Executive Order 14398's requirement that federal agencies "take appropriate action to suspend and debar" contractors or subcontractors for noncompliance—especially because the prohibition of "racially discriminatory DEI activities" is unclear as explained above—would create substantial risk associated with such unprecedented penalties, should the UMCP agree to the new terms. If UMCP were to be suspended or debarred, it would be excluded from receiving federal contracts, and federal agencies could not award contracts to or consent to subcontracts with UMCP. Additionally, UMCP would be excluded from federal grants, cooperative agreements, fellowships, and other forms of federal financial and non-financial assistance, which would substantially harm UMCP, its faculty and staff, and its students; there would also be continuing harm to federal research projects and to the State of Maryland, because UMCP is the State's flagship university and employs a substantial number of Maryland residents. UMCP receives approximately $527 million annually in federal funding, including grants, contracts, and student aid, that it would be unable to accept if it were suspended or debarred for noncompliance with Executive Order 14398.

21. The contract term under which the contractor "recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of" the False Claims Act is harmful because it threatens lawsuits under the False Claims Act. States

would face costs associated with defending lawsuits under the False Claims Act even if they were to prevail in those lawsuits.

**Executive Order 14398's Procedural Harms**

22. The FAR Council guidance explains that the FAR Council "intends to conduct rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707" to amend the Federal Acquisition Regulation (FAR). But the FAR Council guidance also directed federal agencies to implement the Executive Order before this rulemaking was completed.

23. Because the FAR Council and other federal agencies began implementation of the Executive Order without the required process, UMCP has had no opportunity to share its concerns regarding the new terms, including the significant uncertainty and substantial costs, burdens, and harms they cause. Nor does UMCP have the benefit of federal agencies' responses to public comments, which might have helped clarify the meaning of the new terms. The significant uncertainty and substantial costs, burdens, and harms caused by Executive Order 14398 could have been mitigated, and perhaps avoided altogether, had the new terms been issued pursuant to lawful procedures.

24. As another example, the FAR Council guidance explains the FAR Council "is seeking clearance from the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (PRA) for the information collections related to FAR clause 52.222-90." The guidance provides that "agencies will be expected to enforce full compliance with these requirements" once OMB approves the information collection under the PRA but does not address whether agencies may enforce compliance before that time, and in any event requires the immediate insertion of the new contract terms in new and existing contracts.

25. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 16, 2026, at College Park, Maryland.

Patrick O'Shea

______________________________

Patrick G. O'Shea