Exhibit 13

Declaration of Timothy Boring (Michigan)

## DECLARATION OF TIMOTHY BORING

I, Timothy Boring, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over the age of 18. I make this declaration based on my own personal knowledge, discussions with agency staff, and review of agency records. If called as a witness, I or my designee could and would testify competently to the matters set forth below.

### Professional and Agency Background

2. I am the Director of the Michigan Department of Agriculture and Rural Development (MDARD). My job duties include providing strategic leadership and oversight of departmental programs and budgets, including federal contracts and funding.

3. I have been employed by MDARD since March 2023 and have served as the Director since that time. Before starting at MDARD, I served most recently as the State Executive Director for the U.S. Department of Agriculture Farm Service Agency.

4. MDARD is the state agency responsible for protecting, promoting, and preserving Michigan food safety and agricultural, environmental, and economic interests through science-backed regulation and support. The mission of MDARD is to improve quality of life by protecting Michiganders from the pump to the plate, supporting farmers and producers who put food on the table, and creating economic opportunities within the agriculture industry.

### Federal Contracting Activities of MDARD

5. MDARD routinely supplies services to the federal government under procurement contracts with federal agencies.

6. For example, MDARD is party to the following present contracts with the U.S. Food and Drug Administration (FDA), both of which run from September 30, 2025, through September 29, 2026:

   a. Human Food Inspection: $955,477.77

b. Animal Food Inspection: $141,377.71

7. MDARD routinely seeks opportunities for new federal contract work. For example, MDARD recently received new contract solicitations for both the Human Food Inspection contract and the Animal Food Inspection contract.

**Executive Order 14398**

8. I understand that on March 26, 2026, President Trump issued Executive Order 14398, Addressing DEI Discrimination by Federal Contractors, 91 Fed. Reg. 16,147 (Mar. 26, 2026). The order directs federal agencies to include terms in all contracts barring contractors from "engag[ing] in any racially discriminatory DEI activities," defined as "disparate treatment based on race or ethnicity in the recruitment, employment . . . , contracting . . . , program participation, or allocation or deployment of an entity's resources." Under the terms, contractors or subcontractors not in compliance with this prohibition may be subject to contract cancellation and debarment from future contracts. The terms also require contractors to "furnish all information and reports, including providing access to books, records, and accounts" for purposes of ascertaining compliance. The terms state, "The contractor recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code (False Claims Act)."

9. I understand that on or about April 20, 2026, the FAR Council issued a memorandum to agency procurement officers with instructions on how to implement Executive Order 14398. The memorandum directs agencies to issue class deviations under FAR subpart 1.4 to incorporate the contract terms and other requirements of Executive Order 14398. The memorandum further directs agencies to start using the contract terms prescribed by Executive Order 14398 in new contracts by April 24, 2026, and to seek to modify existing contracts with

the contract terms prescribed by Executive Order 14398 by July 24, 2026. These new terms are numbered FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors, though they have not yet been officially incorporated into the Federal Acquisition Regulation. The memorandum directs that, "If a contractor refuses to agree to a bilateral modification, the contracting officer should consider whether, absent the modification, the contract no longer meets the agency's needs and should therefore be terminated for convenience."

10. I understand that many federal agencies have issued class deviations to implement Executive Order 14398. Through these class deviations, the agencies have directed contracting officers to use the terms prescribed by Executive Order 14398, including the clause found at FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors.

11. In light of Executive Order 14398, the FAR Council memorandum, and the class deviations described above, I expect that MDARD's federal contracts will be made subject to the order's terms in the immediate future, and thus MDARD will be required to agree to the contract term or risk losing the contracts or contracting opportunities.

**Executive Order 14398's Costs, Burdens, and Harms**

12. I am deeply concerned that the contract terms prescribed by Executive Order 14398, if included in our agency's federal contracts, would lead to significant uncertainty and create substantial costs, burdens, and harms for MDARD and our State.

13. Executive Order 14398's prohibition of "racially discriminatory DEI activities" is unclear. The order and the contract terms adopted to implement the order define "racially discriminatory DEI activities" to mean "disparate treatment based on race or ethnicity in the recruitment, employment (e.g., hiring, promotions), contracting (e.g., vendor agreements), program participation, or allocation or deployment of an entity's resources." The order in turn

defines “program participation” to mean “membership or participation in, or access or admission to: training, mentoring, or leadership development programs; educational opportunities; clubs; associations; or similar opportunities that are sponsored or established by the contractor or subcontractor.”

14. Other federal and state laws applicable to MDARD and other contract terms prescribed by the federal government in the past have previously addressed the subject of racial discrimination. The new Executive Order and the agency actions implementing it do not explain how the new contract terms relate to those earlier laws and contract terms, nor do they explain whether the Executive Order imposes requirements that are different from those earlier laws and contract terms.

15. As a result, the inclusion of the new terms in MDARD’s federal contracts would create significant uncertainty going forward. This uncertainty would create additional costs associated with ensuring compliance. The Department would have to move personnel resources away from existing food and animal feed safety work to instead not only evaluate content of training but also generate documentation of those evaluations, without knowing exactly how the new terms apply to training content. For instance, it is not clear whether attending a conference session held by the Council on Licensure, Enforcement, and Regulation on monitoring for disparities in enforcement of a regulatory program for disparate treatment based on race or ethnicity would be a prohibited activity because it includes content describing disparate treatment. It is also not clear whether translating of materials into other languages to assist with small business development and regulatory compliance, or providing inspectors with access to foreign language classes would be considered a violation of the new terms.

16. The lack of clarity in Executive Order 14398 and the associated contract terms is especially harmful given that the Executive Order directs federal agencies to "cancel, terminate, suspend, or cause to be cancelled, terminated, or suspended" any contract for the contractor or subcontractor's noncompliance—especially because the prohibition of "racially discriminatory DEI activities" is unclear as explained above—would create substantial risk should MDARD agree to the new terms. Without the funding that comes for this work, food and animal feed safety staff would be laid off, leading to delayed inspection frequencies of the facilities that make, store, and sell these products. Reduced inspection frequency means longer periods of time without detections of contamination, filth, and other causes that lead directly to food and animal feed contamination and illnesses.

17. Executive Order 14398's requirement that federal agencies "take appropriate action to suspend and debar" contractors or subcontractors for noncompliance—especially because the prohibition of "racially discriminatory DEI activities" is unclear as explained above— would create substantial risk associated with such unprecedented penalties, should MDARD agree to the new terms. No federal contracts means fewer trained professional preventing contamination of food and animal feed products, or being able to respond to contamination incidents or illness outbreaks.

18. The contract term under which the contractor "recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of" the False Claims Act is harmful because it threatens lawsuits under the False Claims Act. States would face costs associated with defending lawsuits under the False Claims Act even if they were to prevail in those lawsuits. This includes the direct costs of the litigation (i.e., fees and costs), as well as diversion of limited resources away from other necessary programs.

**Executive Order 14398's Procedural Harms**

19. The FAR Council guidance explains that the FAR Council "intends to conduct rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707" to amend the Federal Acquisition Regulation (FAR). But the FAR Council guidance also directed federal agencies to implement the Executive Order before this rulemaking was completed.

20. Because the FAR Council and other federal agencies began implementation of the Executive Order without the required process, MDARD has had no opportunity to share its concerns regarding the new terms, including the significant uncertainty and substantial costs, burdens, and harms they cause. Nor does MDARD have the benefit of federal agencies' responses to public comments, which might have helped clarify the meaning of the new terms. The significant uncertainty and substantial costs, burdens, and harms caused by Executive Order 14398 could have been mitigated, and perhaps avoided altogether, had the new terms been issued pursuant to lawful procedures.

21. As another example, the FAR Council guidance explains the FAR Council "is seeking clearance from the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (PRA) for the information collections related to FAR clause 52.222-90." The guidance provides that "agencies will be expected to enforce full compliance with these requirements" once OMB approves the information collection under the PRA, but does not address whether agencies may enforce compliance before that time, and in any event requires the immediate insertion of the new contract terms in new and existing contracts.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 16, 2026 at Lansing, Michigan.

Timothy Boring
Director, Michigan Department of Agriculture and Rural Development