Exhibit 21
Declaration of Timothy H. Dellit, MD (Washington)

**DECLARATION OF Timothy H. Dellit, MD**

I, Timothy H. Dellit, MD, declare as follows:

1. I am Chief Executive Officer of UW Medicine, Executive Vice President for Medical Affairs and Paul G. Ramsey Endowed Dean of the University of Washington School of Medicine. I make this declaration based on personal knowledge and information provided to me in my official capacity. If called as a witness, I could and would testify competently to the matters set forth below.

**<u>Professional and Agency Background</u>**

2. I am currently employed by the University of Washington ("University") as CEO of UW Medicine, Executive Vice President for Medical Affairs and Paul G. Ramsey Endowed Dean of the University of Washington School of Medicine. I have held that position since 2023. I served previously as Chief Medical Officer for UW Medicine, Executive Vice Dean for Clinical Affairs for the School of Medicine, Vice President for Medical Affairs, and President of UW Physicians. I earned my medical degree from Cornell University Medical College and am board-certified in Infectious Diseases.

3. As UW Medicine CEO, I lead an integrated clinical, research and learning health system with more than 35,000 faculty, staff, trainees, and students across eight clinically integrated organizations, including UW Medical Center (Montlake and Northwest campuses), UW Medicine Primary Care clinics, the UW School of Medicine, UW Physicians practice plan, and Harborview Medical Center.

4. As Dean of the School of Medicine, I oversee one of the nation's leading medical schools. The UW School of Medicine is a leader in regional medical education and conducts world-leading research across 31 clinical and biomedical research departments and multiple research institutes and centers with areas of focus including behavioral health, neuroscience and

Alzheimer's disease, heart disease and stroke, infectious diseases, cancer, health metrics, genomics and precision medicine, protein design and regenerative medicine.

**Federal Contracting Activities of the University of Washington/UW Medicine**

5. The University of Washington, directly and through other components of UW Medicine, regularly and routinely supplies goods and services to the federal government under procurement contracts with federal agencies. The University also regularly supplies goods and services as a subcontractor under procurement contracts with federal agencies.

6. The University currently has several contracts with federal agencies. For example, the University/UW Medicine is party to present contracts with the Department of Veterans Affairs, Puget Sound("VA Puget Sound"), to provide clinical care, education and research services. Specific examples include contracts to provide clinical services for Neurology, Dermatology, Surgery, Radiation Oncology, Lung Transplant, Plastic Surgery, and Ophthalmology. These contracts provide critical staffing for the VA Puget Sound to ensure that veterans in Washington receive timely medical care that the VA would be unable to provide without UW Physicians staffing many key clinical service areas. These contracts typically run for 5-6 years in length and the currently active total is approximately $57 million, with additional contracts under negotiation to support other understaffed service areas in Cardiothoracic Surgery and Interventional Radiology. These services are critical to ensuring veterans receive high quality medical care.

7. The University/UW Medicine regularly and routinely seeks opportunities for new federal contract work. For example, the contract for Cardiothoracic Surgery has expired and, at the same time, new needs have arisen for support in Interventional Radiology. The University and the VA are under negotiation in these areas for another $1.6 million in services.

## Executive Order 14398

8. I understand that on March 26, 2026, President Trump issued Executive Order 14398, Addressing DEI Discrimination by Federal Contractors, 91 Fed. Reg. 16,147 (Mar. 26, 2026). The order directs federal agencies to include terms in all their contracts barring contractors from "engag[ing] in any racially discriminatory DEI activities," defined as "disparate treatment based on race or ethnicity in the recruitment, employment . . . , contracting . . . , program participation, or allocation or deployment of an entity's resources." Under the terms, contractors or subcontractors not in compliance with this prohibition may be subject to contract cancellation and debarment from future contracts. The terms also require contractors to "furnish all information and reports, including providing access to books, records, and accounts" for purposes of ascertaining compliance. The terms state, "The contractor recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code (False Claims Act)."

9. I understand that on or about April 20, 2026, the FAR Council issued a memorandum to agency procurement officers with instructions on how to implement Executive Order 14398. The memorandum directs agencies to issue class deviations under FAR subpart 1.4 to incorporate the contract terms and other requirements of Executive Order 14398. The memorandum further directs agencies to start using the contract terms prescribed by Executive Order 14398 in new contracts by April 24, 2026, and to seek to modify existing contracts with the contract terms prescribed by Executive Order 14398 by July 24, 2026. These new terms are numbered FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors, though they have not yet been officially incorporated into the Federal Acquisition Regulation. The memorandum directs that, "If a contractor refuses to agree to a bilateral modification, the

contracting officer should consider whether, absent the modification, the contract no longer meets the agency's needs and should therefore be terminated for convenience."

10. I understand that many federal agencies have issued class deviations to implement Executive Order 14398. Through these class deviations, the agencies have directed contracting officers to use the terms prescribed by Executive Order 14398, including the clause found at FAR 52.222-90, Addressing DEI Discrimination by Federal Contractors.

11. In light of Executive Order 14398, the FAR Council memorandum, and the class deviations described above, I expect that all University/UW Medicine federal contracts and subcontracts will be made subject to the order's terms in the immediate future, and thus the University/UW Medicine will be required to agree to the contract term or risk losing the contracts or contracting opportunities.

12. The VA has already asked the University/UW Medicine to sign contract modifications with the new contract terms prescribed by Executive Order 14398. For example, on May 8, 2026, the VA Puget Sound told the University/UW Medicine, that they needed to sign a modification for 12 clinical services contracts within five days, each accepting FAR clause 52.22-90, in order to comply with EO 14398. Following a period of review and discussions with the VA Puget Sound, UW was told they must sign by June 15 or the termination process would begin for these contracts.

13. Notwithstanding the deep concerns described below—including the significant uncertainty and substantial costs, burdens, and harms caused by Executive Order 14398, coupled with the significant and unprecedented penalties Executive Order 14398 would impose for the VA Puget Sound contracts described above, the University/UW Medicine agreed to the new contract terms prescribed by Executive Order 14398, even though the federal government has not provided

a clear explanation of what, if anything, the terms require from contractors beyond compliance with existing federal antidiscrimination law.

**Executive Order 14398's Costs, Burdens, and Harms**

14. I am deeply concerned that the contract terms prescribed by Executive Order 14398, will lead to significant uncertainty and create substantial costs, burdens, and harms for the University /UW Medicine and our State.

15. Executive Order 14398's prohibition of "racially discriminatory DEI activities" is unclear. The order and the contract terms adopted to implement the order define "racially discriminatory DEI activities" to mean "disparate treatment based on race or ethnicity in the recruitment, employment (e.g., hiring, promotions), contracting (e.g., vendor agreements), program participation, or allocation or deployment of an entity's resources." The order in turn defines "program participation" to mean "membership or participation in, or access or admission to: training, mentoring, or leadership development programs; educational opportunities; clubs; associations; or similar opportunities that are sponsored or established by the contractor or subcontractor."

16. Other federal and state laws applicable to the University/UW Medicine and other contract terms prescribed by the federal government in the past have previously addressed the subject of racial discrimination. The new Executive Order and the agency actions implementing it do not explain how the new contract terms relate to those earlier laws and contract terms, nor do they explain whether the Executive Order imposes requirements that are different from those earlier laws and contract terms.

17. As a result, the inclusion of the new terms in our agency's federal contracts creates significant uncertainty and additional costs associated with ensuring compliance going

forward. UW Medicine has taken steps to assure that all its programs and activities comply with state and federal civil rights laws, however this Executive Order inserts another level of risk and uncertainty to meaningful compliance efforts based on standards that the administration cannot articulate with specificity.

18. For other contracts the University/UW Medicine has with federal agencies, Executive Order 14398's prohibition of racially discriminatory DEI activities by contractors *or their subcontractors* and the requirement to report "any subcontractor's known or reasonably knowable conduct that *may* violate this clause" (emphasis added) creates additional compliance and monitoring costs for the University/UW Medicine —especially because the prohibition of "racially discriminatory DEI activities" is unclear as explained above. The University/UW Medicine will have to spend resources to create a subcontractor compliance program or methodology for these contracts.

19. The lack of clarity in Executive Order 14398 and the associated contract terms is especially harmful given that the Executive Order directs federal agencies to "cancel, terminate, suspend, or cause to be cancelled, terminated, or suspended" any contract for the contractor or subcontractor's noncompliance—especially because the prohibition of "racially discriminatory DEI activities" is unclear as explained above. In agreeing to modify the VA Puget Sound contracts noted above, the University/UW Medicine was put in a position of either signing the contract modifications or stopping critical health care for veterans. The University/UW Medicine has a long-standing relationship with the VA Puget Sound and for years has provided specialty medical care as well as quaternary and tertiary care that the VA is not funded or staffed to provide directly. Pulling UW Medicine providers from VA Puget Sound facilities would have been extremely disruptive to patients and left veterans vulnerable to not being able to access

certain kinds of healthcare. While the VA Puget Sound might be able to contract with a different entity to provide the care UW Medicine provides, there would be a break in care for veterans while a new entity or providers go through the federal government contracting process. —

20. Executive Order 14398's requirement that federal agencies "take appropriate action to suspend and debar" contractors or subcontractors for noncompliance—especially because the prohibition of "racially discriminatory DEI activities" is unclear as explained above, creates substantial risk associated with such unprecedented penalties. The University/UW Medicine receives significant amounts of federal funding each year. As discussed above, this includes approximately $5-10 million from the VA Puget Sound contracts, funds that would be lost if the University/UW Medicine were suspended or debarred.

21. The contract term under which the contractor "recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes" of the False Claims Act is harmful because it threatens lawsuits under the False Claims Act. The University/UW Medicine would incur substantial legal fees and reputation harm if forced to defend a False Claims Act lawsuit, even if the suit is ultimately unsuccessful.

**Executive Order 14398's Procedural Harms**

22. The FAR Council guidance explains that the FAR Council "intends to conduct rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707" to amend the Federal Acquisition Regulation (FAR). But the FAR Council guidance also directed federal agencies to implement the Executive Order before this rulemaking was completed.

23. Because the FAR Council and other federal agencies began implementation of the Executive Order without the required process, the University/UW Medicine has had no opportunity to share its concerns regarding the new terms, including the significant uncertainty

and substantial costs, burdens, and harms they cause. Nor does the University/UW Medicine have the benefit of federal agencies' responses to public comments, which might have helped clarify the meaning of the new terms. The significant uncertainty and substantial costs, burdens, and harms caused by Executive Order 14398 could have been mitigated, and perhaps avoided altogether, had the new terms been issued pursuant to lawful procedures.

24. As another example, the FAR Council guidance explains the FAR Council "is seeking clearance from the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (PRA) for the information collections related to FAR clause 52.222-90." The guidance provides that "agencies will be expected to enforce full compliance with these requirements" once OMB approves the information collection under the PRA, but does not address whether agencies may enforce compliance before that time, and in any event requires the immediate insertion of the new contract terms in new and existing contracts.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 15, 2026, at Seattle, Washington

______________________________
Timothy H. Dellit, MD
CEO, UW Medicine
Executive Vice President for Medical Affairs
University of Washington
Paul G. Ramsey Endowed Dean, University of
Washington School of Medicine