**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, et al.<br><br>Plaintiffs<br><br>v.<br><br>PETE HEGSETH, Secretary of Defense, et al<br><br>Defendants. | Case No: 1:26-cv-02322-MJM |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION TO DISMISS OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 2

STANDARD OF REVIEW ........ 4

ARGUMENT ........ 4

I. The Executive Order, FAR Council Memorandum, and Implementing Agency Guidance Apply Only to Intentional Discrimination Based on Race or Ethnicity........ 5

II. This Court Lacks Jurisdiction over Plaintiffs' Claims. ........ 9

A. Plaintiffs lack Article III standing because they avow that they do not intentionally discriminate based on race or ethnicity and thus do not plausibly establish that the Guidance will be enforced against them. ........ 9

B. Plaintiffs' challenges under the Paperwork Reduction Act are not ripe. ........ 12

C. This Court lacks jurisdiction over challenges to individual contracting actions. . 12

D. The Guidance is not final agency action and this Court lacks jurisdiction over it. ........ 13

III. Plaintiffs' Claims Fail on the Merits. ........ 19

A. The FAR Council had statutory authority to issue the Guidance........ 19

B. The Guidance complies with Section 1707. ........ 22

C. The Guidance complies with the False Claims Act. ........ 24

D. The government's actions comply with the Paperwork Reduction Act. ........ 25

IV. Plaintiffs' Arguments Regarding Agency Class Deviations Fail. ........ 25

V. Plaintiffs' Arbitrary and Capricious Claim Should Be Dismissed for Failure to State a Claim. ........ 26

VI. Plaintiffs' Requested Relief Is Improper. ........ 29

CONCLUSION ........ 30

## TABLE OF AUTHORITIES

**Cases**

*Alegent Health-Immanuel Med. Ctr. v. Sebelius*,
34 F. Supp. 3d 160 (D.D.C. 2014) ... 25
*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
597 F. Supp. 3d 213 (D.D.C. 2022) ... 19
*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.,*
*82* F.4th 1262 (D.C. Cir. 2023) ... 19
*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 4
*Ashwander v. Tenn. Valley Auth.*,
297 U.S. 288 (1936) ... 22
*Babbit v. Farm Workers*,
449 U.S. 289 (1979) ... 10
*Bennett v. Spear*,
520 U.S. 154 (1997) ... 14, 15, 29
*Bradford v. U.S. Dep't of Lab.*,
101 F.4th 707 (10th Cir. 2024) ... 28
*Brnovich v. Biden*,
562 F. Supp. 3d 123 (D. Ariz. 2022) ... 17, 18
*Brnovich v. Biden*,
No. CV-21-01568-PHX-MTL, 2022 WL 19560411 (D. Ariz. Feb. 10, 2022) ... 17
*Broadway v. Univ. of Md., Glob. Campus*,
No. CV GLS 21-3226, 2023 WL 4421406 (D. Md. July 7, 2023) ... 7, 12
*Brown v. Fed. Election Comm'n*,
386 F. Supp. 3d 16 (D.D.C. 2019) ... 11
*Carroll v. Walden Univ., LLC*,
650 F. Supp. 3d 342 (D. Md. 2022) ... 8
*Chamber of Com. of U.S. v. Napolitano*,
648 F. Supp. 2d 726 (D. Md. 2009) ... 30
*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ... 4
*Coleman v. Md. Ct. of Appeals*,
566 U.S. 30 (2012) ... 7
*Coleman v. Md. Ct. of Appeals*,
626 F.3d 187 (4th Cir. 2010) ... 7
*Corning Glass Works v. Brennan*,
417 U.S. 188 (1974) ... 6
*D. A. M. v. Barr*,
486 F. Supp. 3d 404 (D.D.C. 2020) ... 13
*Dep't of Educ. v. California*,
604 U.S. 650 (2025) ... 13
*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006) ... 30

*Edwards v. Aurora Loan Servs., LLC*,
791 F. Supp. 2d 144 (D.D.C. 2011) .......... 29

*EEOC v. Abercrombie & Fitch Stores, Inc*.,
575 U.S. 768 (2015) .......... 6

*Equity In Athletics, Inc. v. Dep't of Educ.*,
639 F.3d 91 (4th Cir. 2011) .......... 7

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) .......... 28

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) .......... 13

*Guardians Ass'n v. Civil Serv. Comm'n*,
463 U.S. 582 (1983) .......... 24

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, NA*,
747 F.3d 44 (2d Cir. 2014) .......... 29

*In re Bluewater Network*,
234 F.3d 1305 (D.C. Cir. 2000) .......... 15

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977) .......... passim

*Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*,
105 F.4th 627 (4th Cir. 2024) .......... 13, 16, 19

*Kentucky v. Biden*,
57 F.4th 545 (6th Cir. 2023) .......... 15

*Kentucky v. Biden*,
571 F. Supp. 3d 715 (E.D. Ky. 2021) .......... 15, 16, 17, 18

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) .......... 9

*Laird v. Tatum*,
408 U.S. 1 (1972) .......... 10

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) .......... 16

*Louisiana v. Biden*,
575 F. Supp. 3d 680 (W.D. La. 2021) .......... 16

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 9, 11

*Maher v. United States*,
314 F.3d 600 (Fed. Cir. 2002) .......... 30

*Mayes v. Biden*,
67 F.4th 921 (9th Cir.) .......... 16, 17, 18, 23

*Mayes v. Biden*,
89 F.4th 1186 (9th Cir. 2023) .......... 17, 18

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) .......... 13

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 29

*Nat'l Institutes of Health v. Am. Public Health Ass'n*,
606 U.S. ----, 145 S. Ct. 2658 (Mem.) .......... 13

*Nat'l Shooting Sports Found., Inc. v. Jones,*
716 F.3d 200 (D.C. Cir. 2013)........................................................................................ 28
*Navajo Ref. Co., L.P. v. United States*,
58 Fed. Cl. 200 (2003) ................................................................................................... 23
*Nnadozie v. Genesis Healthcare Corp.*,
730 F. App'x 151 (4th Cir. 2018) ...................................................................................... 6
*Palisades Gen. Hosp. Inc. v. Leavitt*,
426 F.3d 400 (D.C. Cir. 2005)........................................................................................ 30
*Raytheon Co. v. Hernandez*,
540 U.S. 44 (2003)............................................................................................................ 5
*Ricci v. DeStafano*,
557 U.S. 557 (2009)............................................................................................ 5, 6, 8, 27
*Saint Francis Coll. v. Al-Khazraji*,
481 U.S. 604 (1987)........................................................................................................... 6
*Saline Parents v. Garland*,
88 F.4th 298 (D.C. Cir. 2023) .........................................................................................11
*Shaffer v. Def. Intel. Agency*,
601 F. Supp. 2d 16 (D.D.C. 2009) ..................................................................................... 9
*Sherley v. Sebelius*,
689 F.3d 776 (D.C. Cir. 2012)........................................................................................ 28
*Susan B. Ant*hony *List ("SBA")* v. Driehaus,
573 U.S.  (2014).........................................................................................................10, 11
*Sustainability Inst. v. Trump*,
165 F.4th 817 (4th Cir. 2026)........................................................................................... 13
*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
576 U.S. 519 (2015)...................................................................................................... 6, 7
*Texas v. United States*,
523 U.S. 296 (1998)........................................................................................................... 9
*Trump v. California*,
609 U.S. ---, 2026 WL 2473573 (U.S. Aug. 24, 2026) ..................................................... 12, 20
*Trump v. CASA*,
606 U.S. 831 (2025)......................................................................................................... 29
*Trump v. Slaughter*,
146 S. Ct. 2283 (2026)..................................................................................................... 21
*Trump*,
167 F.4th 86 (4th Cir. 2026)............................................................................................... 9
*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016)................................................................................................... 24, 25
*Watson v. Fort Worth Bank & Tr.*,
487 U.S. 977 (1988)...................................................................................................... 5, 6
*Woodhull Freedom Found. v. United States*,
948 F.3d 363 (D.C. Cir. 2020).........................................................................................11

**Statutes**

28 U.S.C. § 1491(a)(1)...................................................................................................... 13
31 U.S.C. § 3729(a) ......................................................................................................... 24

31 U.S.C. 3729(b)(4) .......... 24
41 U.S.C. § 1302 .......... 21
41 U.S.C. § 1302(a) .......... 3
41 U.S.C. § 1303(a)(1) .......... 3
41 U.S.C. § 1707(a) .......... 22
41 U.S.C. § 7104 .......... 12
41 U.S.C. 1707 .......... 4, 15, 17
42 U.S.C. § 2000e .......... 8
42 U.S.C. § 2000e–2(a)(1) .......... 6, 7
44 U.S.C. § 3501 .......... 25
44 U.S.C. § 3518(c)(1) .......... 25
5 U.S.C. § 704 .......... 13
5 U.S.C. § 706(2)(A) .......... 4, 30
U.S.C. § 1303(d) .......... 19, 20
U.S.C. § 1491(a)(1) .......... 12, 26
U.S.C. § 1707(a) .......... 23

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56(a) .......... 4

**Regulations**

15 C.F.R. § 8.5(a) .......... 22
28 C.F.R. § 42.105(a)(1) .......... 22
29 C.F.R. § 1606.1 .......... 6
29 C.F.R. § 31.6(a)(1) .......... 22
34 C.F.R. § 100.4(a)(1) .......... 22
45 C.F.R. § 80.4(a)(1) .......... 22
48 C.F.R. § 1.402 .......... 4, 26
48 C.F.R. § 1.404 .......... 26
48 C.F.R. §§ 1.401 .......... 14
7 C.F.R. § 15.4(a)(1) .......... 22

**Other Authorities**

Exec. Order No. 11,246,
30 Fed. Reg. 12,319 (Sep. 30, 1965) .......... 2, 21, 23

Exec. Order 14042, *Ensuring Adequate COVID Safety Protocols for Federal Contractors*,
86 Fed. Reg. 50,986 (Sep. 9, 2021) .......... 15

Exec. Order 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*,
90 Fed. Reg. 8,633 (Jan. 21, 2025) .......... 23

Exec. Order 14,398, *Addressing DEI Discrimination by Federal Contractors*,
91 Fed. Reg. 16,147 (Mar. 26, 2025) .......... *passim*

FAR Council, Memorandum, Agency Implementation of Executive Order 14398, Addressing DEI Disrimination by Federal Contractors (April 17, 2026) ............................................ *passim*

## INTRODUCTION

Federal contractors generally cannot, in the performance of federal contracts, intentionally discriminate based on race or ethnicity. This has been true for over sixty years. It is true now. Defendants' efforts to confirm that contractors cannot so discriminate does not violate the Administrative Procedure Act ("APA"). Plaintiffs' motion for partial summary judgment should be denied, and their Complaint dismissed.

The President issued an Executive Order requiring agencies to require their contractors not to engage in "disparate treatment" based on race or ethnicity with respect to their contracts. In doing so, the President noted that calling an activity "DEI" did not excuse it from compliance with long-established antidiscrimination principles. Pursuant to that direction, the Federal Acquisition Regulatory Council ("FAR Council") issued guidance to agencies, noting it would begin the process of amending the Federal Acquisition Regulation ("FAR"), which generally applies to procurement contracting government-wide, and providing model language for "class deviations" by which agencies could temporarily alter their regulations while that amendment process is ongoing. That model language, as with the Executive Order, prohibits "disparate treatment" based on race or ethnicity, which is "the most obvious evil" and "easily understood" form of discrimination, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

Plaintiffs' primary complaint is that "disparate treatment" is unacceptably vague. But as the Supreme Court has made clear for decades, "disparate treatment" means "intentional discrimination." And the Plaintiff States surely know what "intentional discrimination" based on race or ethnicity means—they litigate such cases every day. Indeed, they assert that they do not engage and do not intend to engage in such behavior. Because the challenged activities prohibit only intentional discrimination, and that term is not unclear, Plaintiffs' claims fail.

First, this Court lacks jurisdiction. Plaintiffs have not established standing because they contend that they are not currently intentionally discriminating based on race or ethnicity and have no plans to intentionally discriminate based on race or ethnicity. This Court also lacks jurisdiction over Plaintiffs' claims with respect to the FAR Council Guidance, which is not final agency action. On the merits, the Council complied with all applicable substantive and procedural requirements. So did the agencies that issued class deviations. Plaintiffs' arbitrary and capricious claim fails because it hinges on the incorrect assumption that "disparate treatment" is vague. And lastly, even if there is jurisdiction and a claim, their requested relief is outside the scope of the APA.

## BACKGROUND

For over half a century, Presidents of the United States have prohibited federal contractors from discriminating based on race or ethnicity. *See, e.g.*, Exec. Order No. 11,246, 30 Fed. Reg. 12,319 (Sep. 30, 1965). Consistent with that principle, on March 26, 2026, the President issued Executive Order 14,398, 91 Fed. Reg. 16,147, entitled *Addressing DEI Discrimination by Federal Contractors* (the "Order"). As relevant here, the Order instructs federal agencies to include the Disparate-Treatment Certification in Federal contracts, requiring contractors to certify that "[i]n connection with the performance of work under this contract, [the contractor/] agrees as follows:" (1) it "will not engage in any racially discriminatory DEI activities, as defined in section 2 of the [Order]." *Id.* § 3(1). Section 2 of the Order defines "racially discriminatory DEI activities" as "*disparate treatment* based on race or ethnicity in the recruitment, employment (e.g., hiring, promotions), contracting (e.g., vendor agreements), program participation, or allocation or deployment of an entity's resources." *Id.* § 2(a) (emphasis added). The Order defines "[p]rogram participation" as "membership or participation in, or access or admission to: training, mentoring,

or leadership development programs; educational opportunities; clubs; associations; or similar opportunities that are sponsored or established by the contractor or subcontractor." *Id.* § 2(b).

The Certification also has five additional subparts: (2) requiring contractors to certify that they will "furnish all information and reports" to contracting agencies to ascertain compliance; (3) providing for the cancellation, termination, or suspension of contracts and future ineligibility of contractors for noncompliance; (4) requiring contractors to report "known or reasonably knowable conduct that may violate this clause" by any subcontractor; (5) informing contracting agencies if a subcontractor files a suit that challenges the validity of this clause; and (6) "recogniz[ing] that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of [the False Claims Act (FCA)]." *Id.* § 3(2)–(6).

The Order also directs the FAR Council, which is a body tasked with "assist[ing] in the direction and coordination of Government-wide procurement policy and Government-wide procurement regulatory activities in the Federal Government," 41 U.S.C. § 1302(a), to amend the FAR[1] to include the Certification, and—pending the amendment to the FAR—to issue "deviation and interim guidance" regarding "agency implementation" of the Certification, Order. § 5(a)–(b).

On April 17, 2026, the FAR Council issued a memorandum to "provide guidance to agencies that issue contracts subject to the [FAR] to support their implementation of [the Order]." *See* FAR Council, Memorandum, *Agency Implementation of Executive Order 14398, Addressing DEI Discrimination by Federal Contractors* (Apr. 17, 2026) ("FAR Guidance" or "Guidance").[2] In doing so, it provided interim guidance to agencies pending the forthcoming FAR amendment, which will be issued following "rulemaking pursuant to the notice and comment process set forth

[1] The FAR is a "single, government-wide procurement regulation." 41 U.S.C. § 1303(a)(1).
[2]https://acquisition.gov/sites/default/files/page_file_uploads/FAR%20Council%20Guidance%20to%20Implement%20EO%2014398.pdf.

at 41 U.S.C. 1707." *Id.* at 3. Consistent with the Order, it also calls on agencies to issue "class deviations" as appropriate to implement the Order. *Id.* at 2. Class deviations are agency-specific modifications to the FAR that apply to more than one contract. 48 C.F.R. § 1.402. A number of defendant agencies have issued class deviations consistent with the Guidance. *See* Pls.' Br.. at 17–19, ECF NO. 87-1 (collecting examples).[3]

**STANDARD OF REVIEW**

Defendants move to dismiss the complaint in its entirety under Rule 12. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Alternatively, Defendants cross-move for summary judgment on Count I of the Complaint. Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Under this deferential standard, the agency's decision is presumed valid, and the Court considers only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

**ARGUMENT**

Plaintiffs' claims are all based on a fundamental error—that the term "disparate treatment" is vague. It is not. It means—and has meant for decades—intentional discrimination. This misunderstanding dooms Plaintiffs' Complaint with respect to both jurisdiction and the merits.

[3] All citations in this brief to filings on the docket will refer to the pagination generated by the ECF system, in the upper right corner.

## I. The Executive Order, FAR Council Memorandum, and Implementing Agency Guidance Apply Only to Intentional Discrimination Based on Race or Ethnicity.

The underlying premise of Plaintiffs' lawsuit is that Defendants have instituted a new, vague, and unknown standard of racial discrimination that contractors cannot possibly understand. *See, e.g.*, Pls.' Br. at 8, 20-23, ECF No. 97-1. This premise is wrong. Under the challenged actions, contractors are prohibited from engaging in intentional discrimination; a legal term of art that has formed the foundation of antidiscrimination law for generations. Because that term is—or should be—well known to Plaintiffs, their foundational complaint that they do not understand what the term means rings hollow and should be rejected.

The FAR Guidance explicitly defines "[r]acially discriminatory DEI activities" to mean "disparate treatment based on race or ethnicity in the recruitment, employment (e.g., hiring, promotions), contracting (e.g., vendor agreements, program participation, or allocation or deployment of an entity's resources." FAR Guidance at 7. "[D]isparate treatment" (in contrast to "disparate impact") is a legal term of art that refers to intentional discrimination that springs from a clear discriminatory motive. *Teamsters*, 431 U.S. at 335 n.15.

The Supreme Court has, for decades, used the phrase "disparate treatment" as a legal term of art to refer to intentional discrimination. *See, e.g.*, *Ricci v. DeStafano*, 557 U.S. 557, 577 (2009) ("Title VII prohibits . . . intentional discrimination (known as 'disparate treatment')"); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (referencing "disparate-treatment case" and "disparate-treatment claims"); *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 987–88 (1988); *Disparate Treatment*, Black's Law Dictionary (12th ed. 2024). The definition of "intentional discrimination" is equally long understood in the caselaw. *See, e.g.*, *Ricci*, 557 U.S. at 577 ("Disparate-treatment cases present 'the most easily understood type of discrimination,', and occur where an employer

has 'treated [a] particular person less favorably than others because of' a protected trait.") (quoting, first, *Teamsters*, 431 U.S. at 355 n.15, and, second, *Watson*, 487 U.S. at 985–86).

Simply put, the fact that a prohibition on "disparate treatment" is a prohibition on intentional discrimination is "black-letter law." *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 538 (2015). Given this well-established meaning, the use of the phrase "disparate treatment" in the Guidance incorporates its meaning as a legal term of art. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (explaining that when interpretating "terms of art, 'it (is) proper to explain them by reference to the art or science to which they (are) appropriate" (citation omitted)).

Not surprisingly, a wide range of "disparate treatment" is already barred by civil rights laws. Most relevant here, Title VII of the Civil Rights Act, *see* 42 U.S.C. § 2000e–2(a)(1), already prohibits "disparate treatment" in employment practices on the basis of "race, color, religion, sex, or national origin," *Ricci*, 557 U.S. at 577 (citation omitted).[4] Indeed, the Supreme Court has dubbed the relevant Title VII provision, *see* 42 U.S.C. § 2000e–2(a)(1), as Title VII's "disparate-treatment provision," *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 (2015), and has explained that "disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII," *Teamsters*, 431 U.S. at 335 n.15. Notably, Title VII is "read in the broadest possible terms" "to include a wide range of activities or practices which occur in the work place." EEOC, *Enforcement Guidance on Terms, Conditions, and Privileges of Employment*, § 613.1(a);

[4] *See also* EEOC, *EEOC Enforcement Guidance on National Origin Discrimination*, II.B (explaining that "Title VII prohibits employment discrimination against individuals because of their . . . . 'ethnic group'" (citing 29 C.F.R. § 1606.1)); *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 162–63 (4th Cir. 2018) ("[I]n the title VII context, national origin, ethnicity, and ancestry often 'overlap as a legal matter.'" (quoting *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring))).

*see* 42 U.S.C. §§ 2000e–2(a)(1), 2(b), 2(c)(1), 2(d) (barring discrimination in, among other things, hiring and terminations decisions; "compensation, terms, conditions, or privileges of employment"; reference for employment; "membership"; as well as "training programs"); *see also* EEOC, *EEOC Race Discrimination Guidance*, 15-VI(A)–(B), VII(B) (Title VII prohibits discrimination in, among other things, "recruitment practices," "advertisements," "work assignments, performance measurements, pay, training, mentoring or networking, discipline").

Similarly, civil rights laws other than Title VII also bar "disparate treatment." *See, e.g.*, *Tex. Dep't of Hous. & Cmty. Affs*., 576 U.S. at 535 (explaining that "disparate treatment" is barred under the Fair Housing Act, 42 U.S.C. § 3605(a), and the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)); *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 102 (4th Cir. 2011) ("disparate treatment" is barred under Title IX, 20 U.S.C. § 1681). None of these laws prohibiting disparate treatment have been found to be impermissibly vague.

In short, the Guidance covers "the most obvious evil" and "easily understood" form of discrimination—i.e., intentional discrimination. *See Teamsters*, 431 U.S. at 335 n.15. Plaintiffs assert in the first page of their brief that they "oppose racial discrimination and are committed to complying with all existing state and federal laws against discrimination." Pls.' Br. at 8. And they acknowledge that federal contractors have been prohibited from racial discrimination since 1965. *Id.* at 13. They, therefore, presumably understand the meaning of the term "intentional discrimination" and "disparate treatment." *See, e.g.*, *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (Maryland Office of the Attorney General defending a claim of disparate treatment), *aff'd* 566 U.S. 30 (2012); *Broadway v. Univ. of Md., Glob. Campus*, No. CV GLS 21-3226, 2023 WL 4421406, at *1 (D. Md. July 7, 2023) (same).

Because the Guidance covers only intentional discrimination, Plaintiffs' asserted concerns about the purported "lack of clarity" in the Memorandum ring hollow. On this point, Plaintiffs state that "[t]he contract terms prescribed by Executive Order No. 14398 … prohibit 'disparate treatment' in 'recruitment' without meaningful elaboration . . . ." Pls.' Br. at 22; *see also id.* at 22-23 (similar complaint as to application of "disparate treatment" vis-à-vis resource allocation or deployment). But the case law itself provides the relevant elaboration for the meaning of disparate treatment, including in the advertising and recruitment context. *See, e.g.*, *Carroll v. Walden Univ., LLC*, 650 F. Supp. 3d 342, 356–47 (D. Md. 2022) (discussing plausible allegations of discriminatory intent by race in the student recruitment context). Indeed, the fact that a legal standard does not answer all questions about its application *ex ante* is not a problem of clarity, it is the hallmark of a common-law legal system, where courts adjudicate cases or controversies by applying the law to the facts before them.

To be sure, the Guidance's prohibition—"disparate treatment based on race or ethnicity" "[i]n connection with the performance of work under this contract," Guidance at 8–9—is not perfectly coextensive with prohibitions under the civil rights laws. For instance, whereas Title VII is limited to "employers" that have "fifteen or more employees," 42 U.S.C. § 2000e–(b), the Certification does not include any such limitation. But more notably, the Guidance is in many ways *narrower* than recipients' existing legal obligations. For instance, whereas Title VII bars discrimination based on a number of protected characteristics, *Ricci*, 557 U.S. at 577, the Guidance only focuses on discrimination based on race or ethnicity. And, in all events, Plaintiffs' stated concern is not the scope of *who* is covered (or based upon what protected class), but on a purported lack of clarity of the *term* "intentional discrimination" based on race or ethnicity. That concern is not directed here—it is directed either to the underlying standard itself, or to a concrete example

of a compliance concern if and when that concern actually materializes. *See, e.g.*, *NADOHE v. Trump*, 167 F.4th 86, 104 (4th Cir. 2026) ("Indeed, existing federal law already demands such compliance, and plaintiffs have not challenged existing law as viewpoint-discriminatory or as over or underinclusive").

## II. This Court Lacks Jurisdiction over Plaintiffs' Claims.

Because the challenged actions prohibit only intentional discrimination based on race or ethnicity, and Plaintiffs do not contend that they do or plan to intentionally discriminate based on race or ethnicity, this Court lacks jurisdiction over Plaintiffs' claims. This Court should thus dismiss these claims in full under Rule 12, or in the alternative, grant summary judgment to the Defendants under Rule 56 as to Count I, grant the motion to dismiss as to Count II, and deny Plaintiffs' partial motion for summary judgment.

"Federal courts are courts of limited jurisdiction and the law presumes that 'a cause lies outside this limited jurisdiction.'" *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citation omitted). This "case or controversy requirement" mandates that plaintiffs have (1) Article III standing at the time the plaintiff files their complaint, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), and (2) that the case is ripe, *i.e.*, it does not "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all," *Shaffer v. Def. Intel. Agency*, 601 F. Supp. 2d 16, 23 (D.D.C. 2009) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Here, Plaintiffs have failed to adequately establish either of these jurisdictional requirements, and this Court thus lacks subject-matter jurisdiction.

### A. Plaintiffs lack Article III standing because they avow that they do not intentionally discriminate based on race or ethnicity and thus do not plausibly establish that the Guidance will be enforced against them.

Plaintiffs bring a facial challenge to the Guidance and all agency action stemming

therefrom; they do not specifically seek to overturn only one specific application thereof (i.e., with respect to a specific contract or enforcement action). *See, e.g.*, Pls.' Br. at 35–37. Their challenge is thus best understood as a type of pre-enforcement facial review. The Supreme Court has "permitted pre-enforcement review" only when the "threatened enforcement [is] sufficiently imminent," namely, when a plaintiff alleges (or, at summary judgment, establishes) "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List* ("*SBA*") *v. Driehaus*, 573 U.S. 159, 159 (2014) (quoting *Babbit v. Farm Workers*, 449 U.S. 289, 298 (1979)). Importantly, that threat of future enforcement is measured objectively: "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

Here, nowhere does Plaintiffs contend that they currently or plan to intentionally discriminate based on race or ethnicity. To the contrary, Plaintiffs vow that they "oppose racial discrimination and are committed to complying with all existing state and federal laws against discrimination. They also have a strong interest in preventing, detecting, and remedying racial discrimination both within their own operations and more broadly." Pls.' Br. at 8. Given this stated commitment and interest in opposing racial discrimination, including intentional discrimination, the States presumably understand the meaning of the term "intentional discrimination." In their papers, they have not identified any specific activities they (or their contracting parties) intend to engage in that would objectively constitute (or even plausibly objectively constitute) intentional discrimination—and mere subjective uncertainty or desire for clarity is not enough for Article III standing. *See Laird*, 408 U.S. at 13–14. This case thus materially differs from situations where courts have found an objective basis for a pre-enforcement challenge, such as where a plaintiff had

engaged in conduct that was the previous subject of an enforcement attempt, or was previously arrested and charged with it. *See, e.g.*, *Saline Parents v. Garland*, 88 F.4th 298, 305 (D.C. Cir. 2023) (collecting examples). It is rather the type of "hypothetical" fear that is insufficient to establish standing *Id.* Indeed, it is notable that the only examples Plaintiffs rely on are precisely those types of hypotheticals that lack grounding in past or plausible current enforcement attempts, much less an explanation of how the conduct might constitute intentional discrimination. *See, e.g.*, Pls.' Br. at 20–23.

Nor can Plaintiffs say that for standing purposes, their view that the agency actions "lack clarity" is enough. *Contra id.* Even in a pre-enforcement challenge at the motion to dismiss stage—and here, Plaintiffs are moving for summary judgment, so the standard is higher, *Lujan*, 504 U.S. at 561—the Court itself must determine whether the plaintiff's conduct is "arguably . . . proscribed by" the challenged government action. Accordingly, the Court must construe the legal effect of the challenged government action as part of the standing inquiry, even though normally it would assume plaintiffs' view of government action for standing purposes. *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 371 (D.C. Cir. 2020); *see also SBA*, 573 U.S. at 162 (construing—rather than assuming plaintiff's interpretation of—challenged statute to determine whether plaintiffs conduct is "arguably proscribed"); *Brown v. Fed. Election Comm'n*, 386 F. Supp. 3d 16, 28 (D.D.C. 2019) (looking as to whether it is "reasonably clear" that plaintiff's conduct will fall within the relevant statute). Here, the challenged action specifically applies only to actions that constitute "disparate treatment based on race or ethnicity," Guidance at 8, which as discussed above, applies only to intentional discrimination. Because these documents are clear on their face as to their scope, any contrary subject perspective by Plaintiffs is inadequate—and certainly could not be the basis for summary judgment in their favor.

**B. Plaintiffs' challenges under the Paperwork Reduction Act are not ripe.**

Plaintiffs' complaint regarding information collections under Paperwork Reduction Act is not ripe. Both the Guidance and the agency implementation make clear that additional steps are required before any such collection would be effective, namely "clearance from OMB for information collection." Guidance at 3. Until that occurs, if it ever does, there are no new collection obligations that would apply to third parties, including Plaintiffs. The case is thus not yet ripe.

As the Supreme Court recently observed, "Article III prohibits federal courts from stacking hypothetical on hypothetical to speculate that harm will eventually materialize." *Trump v. California*, 609 U.S. ---, 2026 WL 2473573, at *2 (U.S. Aug. 24, 2026). Here, the court would have to presume that OMB will approve the information collection, such that it will take effect as drafted. But "[f][ederal courts review final rules, not proposed rules—and certainly not antecedent internal directives to propose a rule." *Id.* at *5. So too here.

**C. This Court lacks jurisdiction over challenges to individual contracting actions**.

Plaintiffs cast the scope of their relief broadly, seeking a permanent injunction barring implementation of the challenged actions. Pls.' Br. at 35–37. To the extent that their claims encompass future contractual actions (including enforcement or termination actions pursuant to specific contract terms), those claims are committed to the exclusive jurisdiction of the Court of Federal Claims (or, if extent applicable, an Agency board of contract appeals, 41 U.S.C. § 7104).

The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act, courts look at "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or

appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *Sustainability Inst. v. Trump*, 165 F.4th 817, 825–26 (4th Cir. 2026) (applying *Megapulse*). Under that framework, the Supreme Court recently held the government was likely to succeed in showing that similar claims were precluded. *Dep't of Educ. v. California*, 604 U.S. 650 (2025). This is so because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)); *see also Nat'l Institutes of Health v. Am. Public Health Ass'n*, 606 U.S. ----, 145 S. Ct. 2658 (Mem.) (2025).

Nor does it matter that any contracting actions would be motivated by the Guidance. That was true *National Institutes of Health*, where the plaintiffs argued that improper guidance caused improper further actions. Justice Barrett, holding the controlling vote, rejected the proposition that a challenge to the guidance vitiated challenges to downstream effects, including individual terminations. *See id.* at 2661 (Barrett, J., concurring) ("Vacating the guidance does not reinstate terminated grants."); *id.* ("Even if the guidance and grant terminations are linked, vacating the guidance does not necessarily void decisions made under it . . . ." (citing *D.A.M. v. Barr*, 486 F. Supp. 3d 404, 415 (D.D.C. 2020)).

**D. The Guidance is not final agency action and this Court lacks jurisdiction over it.**

The APA provides for review only of a "final agency action." 5 U.S.C. § 704. "[F]inality under the APA is a jurisdictional requirement." *Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 2700 (2025). Agency action is final if: it (1) marks "the 'consummation' of the agency's decisionmaking process," and

(2) determines "rights or obligations" or carries "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). The FAR Guidance does not satisfy this standard.

The Order directs the FAR Council to amend the FAR in two steps: (1) in Section 5(b), it instructs the FAR Council to "issue deviation and *interim guidance* . . . as appropriate and consistent with applicable law, regarding agency implementation of the [Certification]," Order § 5(b) (emphasis added); and (2) in Section 5(a), it instructs the FAR Council "to the extent permitted by law. . . amend the [FAR] to . . . provide for inclusion [of the Certification]," *id*. § 5(a). As the Order explains, the interim guidance in step (1) must occur "*before completion* of the amendments under [Section 5(a) in Step (2)]." *Id*. § 5(b) (emphasis added). In other words, the FAR Guidance is merely step (1)—i.e., "interim guidance"—pending step (2)—i.e., amendment to the FAR. This interim guidance makes sense because the Order requires agencies to begin implementing the Certification *prior* to the FAR amendment. *See id.* § 4(c) ("Within 120 days of the date of this order [July 24, 2026], each agency head shall review the agency's *implementation* of section 3 of this order and report to the Assistant to the President for Domestic Policy regarding its *compliance* with that section." (emphases added)).

In circumstances such as this one, where agencies must deviate from the existing FAR until it is amended, they are permitted to issue "deviations" from the FAR, *see* 48 C.F.R. §§ 1.401, 1.403, 1.404. Issuing such deviations, however, is the responsibility of the agencies (not the FAR Council). But the FAR Council can provide *guidance* to agencies to assist them in implementing such deviations pending the forthcoming amendment to the FAR. That is precisely what the FAR Guidance does. It directly states that the "purpose of this memorandum is to provide guidance to agencies that issue contracts subject to the [FAR] to support their implementation of [the Order]." Guidance at 1. As it also makes clear, the FAR amendment itself is still forthcoming: "[t]he FAR

Council intends to conduct rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707" to amend the FAR to reflect the Order. *Id.* at 3. In the meantime, it merely seeks to "support" agencies' "implementation" of the Order via "guidance." *Id.* at 1.

The FAR Guidance is thus a classic interim guidance. The "consummation" of the FAR Council's decision-making process will occur, and "legal consequences" will flow, only once the Council issues the FAR amendment. *Bennett*, 520 U.S. at 177–78 (citation omitted); *see also In re Bluewater Network*, 234 F.3d 1305, 1313 (D.C. Cir. 2000) ("[A]n agency's pronouncement of its intent to defer or to engage in future rulemaking generally does not constitute final agency action reviewable by this court."). In the meantime, Plaintiffs' APA challenge is premature.

For these reasons, courts previously concluded that a similar FAR Council guidance (also issued as a memorandum to help agencies implement an Executive Order) was not a final agency action. *See Issuance of Agency Deviations to Implement Executive Order 14042*, FAR Council (Sep. 30, 2021) ("2021 FAR Guidance").[5] The 2021 FAR Guidance—much like the Guidance at issue here—was issued pursuant to an Executive Order, which "tasked the [FAR] Council with 'amend[ing] the [FAR]'" to reflect new COVID-19-compliance requirements for government contractors. *Kentucky v. Biden*, 571 F. Supp. 3d 715, 720 (E.D. Ky. 2021) (quoting Executive Order 14042, 86 Fed. Reg. 50,986 (Sep. 9, 2021), entitled *Ensuring Adequate COVID Safety Protocols for Federal Contractors*), *aff'd as modified*, 57 F.4th 545 (6th Cir. 2023). Prior to amending the FAR, "the [FAR] Council issued Guidance in the form of a memo to assist agencies responsible for mandating contractor and subcontractor compliance with the vaccination requirement until the [FAR] can be officially amended." *Id.* Several reviewing courts concluded that the 2021 FAR

[5]https://bidenwhitehouse.archives.gov/wp-content/uploads/2021/09/FAR-Council-Guidance-on-Agency-Issuance-of-Deviations-to-Implement-EO-14042.pdf

Guidance was not a final agency action, and thus not subject to APA review. *See id.* at 731; *Kentucky*, 571 F. Supp. 3d 715 at 731 ("[T]he [2021 FAR Guidance] is not final agency action and is therefore not subject to judicial review under the APA."); *Mayes v. Biden*, 67 F.4th 921, 944 (9th Cir.), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023) ("The district court correctly held that the [2021 FAR Guidance] 'is not binding of its own force' and 'does not compel agencies to take any specific action.'").[6]

The reasoning adopted by *Kentucky* and *Mayes* applies equally here because the scope and posture of the FAR Guidance and the 2021 FAR Guidance are nearly identical. Like the FAR Guidance at issue in this case, the 2021 FAR Guidance (1) contained similar "purpose" language regarding implementing an executive order, (2) directed agencies to adopt new language in contracts by a date certain, (3) required agencies that do not adopt the desired new language to engage in further consultations, and (4) included language encouraging agencies to make their deviations effective until the FAR is amended by rulemaking.[7] These are precisely the

[6] The district court in *Louisiana v. Biden* considered the 2021 FAR Guidance "ripe" for review without determining whether it was a final agency action under the APA. 575 F. Supp. 3d 680, 693 (W.D. La. 2021), *aff'd*, 55 F.4th 1017 (5th Cir. 2022). The court observed that in the Fifth Circuit, "whether agency action is ripe for review" examines whether (1) the issue is "purely legal," (2) there has been a "final agency action," (3) existence of "direct and immediate" "impact," and (4) whether resolution "will foster effective administration of the statute." *Id.* (citation omitted). The court proceeded to merits review after concluding that factors (1), (3), and (4) were satisfied, without explicitly addressing factor (2)—i.e., final agency action. *Id.*

*Louisiana* does not help Plaintiffs in the Fourth Circuit, where "finality under the APA is a jurisdictional requirement." *Jake's Fireworks Inc.*, 105 F.4th at 631.

[7] The two memos have very similar language:

(1) *compare* Guidance at 1 ("The purpose of this memorandum is to provide guidance to agencies that issue contracts subject to the [FAR] to support their implementation of [the Order]") *with* 2021 FAR Guidance at 1 ("The purpose of this memorandum is to provide agencies that award contracts under the Federal Acquisition Regulation (FAR) with initial direction for the incorporation of a clause into their solicitations and contracts to implement guidance issued by the Safer Federal Workforce Task Force (Task Force) pursuant to Executive Order 14042.").

characteristics that *Kentucky* and *Mayes* considered in concluding that the 2021 FAR Guidance was not a final agency action.

Just like the FAR Guidance at issue here, which merely seeks to "encourage[] [agencies] to make their class deviations effective until implemented in the FAR," Guidance at 3, the 2021 FAR Guidance also sought "to 'support agencies in meeting the applicability requirements and deadlines set forth in' the executive order, and to encourage agencies to 'exercise their authority' in helping contractors and subcontractors insert deviation clauses into their contracts," *Kentucky*, 571 F. Supp. 3d at 731. Neither Guidance is "binding of its own force. Instead, [they both] 'encourage[]' agencies to use their independent authority to temporarily deviate from the FAR." *Brnovich v. Biden*, 562 F. Supp. 3d 123, 160 (D. Ariz. 2022) [8] (second alteration in original). As

---

(2) *compare* Guidance at 2 ("To implement section 3 of the E.O., *agencies must* . . . " (emphasis added)) *with* 2021 FAR Guidance at 2 ("In accordance with section 5 of the order, *agencies are required* to . . . (emphasis added)).

(3) *compare* Guidance at 2 ("Unless an agency has existing statutory direction that requires reconciliation with this guidance, agencies must request approval from the Council before adopting FAR text that differs from the Council's model deviation text.") *with* 2021 FAR Guidance at 3 ("[I]f a civilian agency intends to use clause text different than the deviated clause text provided, the agency must consult with the CAAC Chair, William Clark, who will consult with OMB and the Task Force to ensure consistency with Administration policy.").

(4) *compare* Guidance at 3 ("The FAR Council intends to conduct rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707. Agencies are encouraged to make their class deviations effective until implemented in the FAR.") *with* 2021 FAR Guidance at 3 ("The FAR Council has opened a case . . . to make appropriate amendments in the FAR to reflect the requirements of the order. Agencies are encouraged to make their deviations effective until the FAR is amended . . . .").

[8] The *Brnovich* (district court) and *Mayes* (Ninth Circuit) opinions are associated with the same case. Both opinions were ultimately vacated because the FAR Council eventually rescinded the 2021 FAR Guidance as the COVID-19 pandemic abated. The full citation is *Brnovich v. Biden*, 562 F. Supp. 3d 123, 160 (D. Ariz. 2022), *judgment entered*, No. CV-21-01568-PHX-MTL, 2022 WL 19560411 (D. Ariz. Feb. 10, 2022), and *appeal dismissed and remanded sub nom. Mayes v. Biden*, 89 F.4th 1186 (9th Cir. 2023), *vacated sub nom. Mayes v. Biden*, No. CV-21-01568-PHX-MTL, 2024 WL 5252500 (D. Ariz. Jan. 9, 2024), and *rev'd sub nom. Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023), and *appeal dismissed and remanded sub nom. Mayes v. Biden*, 89 F.4th 1186 (9th Cir. 2023).

such, neither Guidance "compel[s] agencies to take any specific action but rather instruct[] contracting officers to adhere to 'the direction[s] . . . issued by their respective agencies' for implementing the . . . guidance." *Id.* (third alteration in original); *see also Mayes*, 67 F.4th at 944 (same).

Courts also observed that the 2021 FAR Guidance's intent to amend the FAR in the *future* showed that the 2021 FAR Guidance itself was not a final agency action. *See, e.g.*, *Brnovich*, 562 F. Supp. 3d at 160 (concluding that the 2021 FAR Guidance itself does not "provide the FAR Council's final guidance regarding COVID-19 safety clauses" because it states that "the FAR Council has opened a case . . . to make appropriate amendments in the FAR to reflect the requirements of [EO 14042]" (citation omitted) (alterations in original)). The same intention appears in the at-issue FAR Guidance. *See* Guidance at 3. Further, neither Guidance "appear[s] in the Code of Federal Regulations or the FAR." *See Brnovich*, 562 F. Supp. 3d at 160. For these reasons, *Kentucky*, *Brnovich*, and *Mayes* all held that the 2021 FAR Guidance was not final agency action, and thus not reviewable under the APA. *Kentucky*, 571 F. Supp. 3d at 731; *Brnovich*, 562 F. Supp. 3d at 160; *Mayes*, 67 F.4th at 944. The at-issue Guidance is also not a final agency action.

Plaintiffs have two responses. First, they argue that the Guidance employs "mandatory language," including the word "must" in instructing agencies. That is a red herring. Pls.' Br. at 27-28. The Guidance uses the word "must" to describe the agencies' obligations *under the Order*; it is not imposing any *new* obligations on third parties. *See, e.g.*, Guidance at 2 (describing what the "agencies must" do in order "*[t]o implement* section 3 of the E.O." (emphasis added)).[9] The 2021 FAR Guidance used similar language to describe agencies' obligations under EO 14,042. *See* 2021 FAR Guidance at 2 ("In accordance with section 5 of the order, agencies are required to . . . ."). In

[9] The July 24, 2026, compliance date appears in the Order itself. Order § 4(c).

other words, both memoranda use mandatory language to describe the agencies' obligations under the respective Orders. But those obligations stem from the Orders themselves, not the memoranda. The Guidance otherwise uses terms of recommendation: *e.g.*, "[a]gencies are *encouraged* to make their class deviations effective until implemented in the FAR," Guidance at 3, "[m]odification of contracts with a final expiration no later than December 31, 2026, is at contracting officer discretion," *id.* at 2.

Second, Plaintiffs say that the Guidance "has been incorporated by reference into other agencies' operative procurement policies." Pls.' Br. at 22 at 29. But this would be a separate *agency* choice, and might make the document that incorporated that Guidance final. It would not make the underlying document a "final agency action" under *Bennett*; just like a technical standard later adopted into federal law reference does not itself have legal effect absent separate final agency action. *See, e.g.*, *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc*., 597 F. Supp. 3d 213, 222 (D.D.C. 2022), *aff'd*, 82 F.4th 1262 (D.C. Cir. 2023) ("The standards ordinarily serve as voluntary guidelines for self-regulation. However, federal, state, and local governments have incorporated by reference thousands of these standards into law.").

Because the FAR Guidance is not a final agency action, Plaintiffs' APA claims challenging it fail outright. *See Jake's Fireworks Inc.*, 105 F.4th at 631.

## III. Plaintiffs' Claims Fail on the Merits.

### A. The FAR Council had statutory authority to issue the Guidance.

Congress has granted the FAR Council broad statutory authority to "manage, coordinate, control, and monitor the maintenance of, issuance of, and changes in, the Federal Acquisition Regulation." 41 U.S.C. § 1303(d). Plaintiffs, nonetheless, contend that the Council lacked authority to issue the Guidance. This argument fails for multiple reasons.

Plaintiffs assert that the Council could not "direct[] agencies to adopt deviations." Pls.' Br. at 30. But the *Guidance* did not do so. Rather, the President directed agencies to make the substantive contractual changes of which Plaintiffs complain. *See* Order § 3. Plaintiffs do not challenge the President's authority to give direction to his subordinates. *See, e.g.*, *California*, 2026 WL 2473573, at *1 ("The Order is an internal directive from the President to his subordinates mandating that certain agencies pursue certain policies. It neither requires nor forbids anything of anyone outside the Executive Branch."). It was the President who directed that agencies update their contracting requirements for new contracts. *See* Order § 3. And it was the President who directed that the Council issue "deviation guidance." *Id.* § 5. That is what the Council did. As discussed above the Guidance is "guidance to agencies that issue contracts subject to the [FAR] to support their implementation of Executive Order (E.O.) 14398." Guidance at 1. The Guidance does not mandate any specific manner for agencies to comply with the Order; it simply provides model examples, and then a process for agencies to report whether or not they adopted that model. *See id.* at 3–4. Similarly, while Plaintiffs are correct that the Guidance set certain deadlines for April 24 or April 27, *see* Pls.' Br. at 30; Guidance at 2, these dates follow from the Order, which orders changes to new contracts to occur by April 24, 2026. *See* Order § 3 (implementation date is 30 days after March 26, 2026). In short, the Council effectuated the President's directive to executive branch agencies he supervises; it did not impose new requirements on its own.

But even to the extent that it did take independent action, the Council has statutory authority to "manage, coordinate, control, and monitor the maintenance of, issuance of, and changes in, the Federal Acquisition Regulation." 41 U.S.C. § 1303(d). The Guidance is part of the process of coordinating, managing, and monitoring government-wide changes to the FAR (as done through agency-specific deviations). It sets a template for proposed changes consistent with an Executive

Order, coordinates among different agencies, and monitors agency implementation of the President's Executive Order. That is the type of coordination Congress tasked the Council with. Nor does it matter that the Guidance addressed FAR deviations, rather than the text of the FAR itself, as those deviations constitute agency-specific changes to the FAR and thus properly fall within the expansive text of Section 1303.

Finally, even if Plaintiffs were right that the Guidance is not authorized by Section 1303(d), it would be an anomaly—and a potentially unconstitutional result—for the express grant of authority to the Council to "manage, coordinate, control, and monitor" changes to the FAR to *preclude* the President from using the Council to help implement changes he directs to federal contracting. Again, Plaintiffs do not dispute the President's ability to direct how government agencies issue federal contracts, so long as that is consistent with the law, a type of direction that has a long pedigree (as they acknowledge). *See* Pls.' Br. at 9 ("For 60 years, Executive Order No. 11246,1 issued by President Lyndon B. Johnson in 1965, had required contract terms prohibiting racial discrimination by federal contractors."). And they do not dispute the fact that the President has supervisory power over the Executive Branch. *See Trump v. Slaughter*, 146 S. Ct. 2283, 2293 (2026) ("To vest 'the whole executive power' in just one person was not to suggest that he could execute the laws alone and unaided. But it was to establish a hierarchy—a 'Chief Magistrate' with whom the buck stops, and below him various 'assistants or deputies' who 'derive their offices from his appointment' and remain 'subject to his superintendence.'" (citations omitted)). Accordingly, the President may use the FAR Council, which Congress specifically established "to assist in the direction and coordination of Government-wide procurement policy" (41 U.S.C. § 1302), in order to assist and coordinate how agencies use their powers to implement the President's direction. Such bodies are routinely used, and holding that the President cannot direct his subordinates to

advise him in certain ways would raise constitutional problems. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). This Court should avoid such a holding, which is not mandated by the text of Section 1303 nor by the Guidance itself.

**B. The Guidance complies with Section 1707.**

Federal law provides that "a procurement policy, regulation, procedure, or form" relating to expenditure of appropriated funds that has a "significant cost or administrative impact on contractors or offerors" or a "significant effect" on the issuing agency may not take effect until after a period of notice and comment has occurred. 41 U.S.C. § 1707(a). The government was not required to submit the Guidance for notice and comment for two reasons. *Contra* Pls.' Br. at 27–29.

First, as discussed above, the premise of Plaintiffs' argument—that the Guidance imposes significant new costs—is wrong. The Order, and the Guidance which helps implement it, requires contractors to refrain from engaging in intentional discrimination based on race or ethnicity. Stripped of the incorrect assumption that it covers something else, Plaintiffs' grievances fall by the wayside. Indeed, the government has, for decades, required recipients of federal funds to refrain from engaging in discriminatory practices—as Plaintiffs acknowledge in the fourth paragraph of their brief, Pls.' Br. at 9; *see also*, *e.g.*, 7 C.F.R. § 15.4(a)(1); 15 C.F.R. § 8.5(a); 28 C.F.R. § 42.105(a)(1); 29 C.F.R. § 31.6(a)(1); 34 C.F.R. § 100.4(a)(1); 45 C.F.R. § 80.4(a)(1). Because the Guidance reinforces—rather than fundamentally changes—existing contractor requirements, the change is not "significant." *See, e.g.*, *Significant*, Black's Law Dictionary (12th ed. 2024) (defining "significant" as "[o]f special importance; momentous, as distinguished from insignificant"). Indeed, Plaintiffs never explain why requiring contractors to avoid intentional discrimination based on race—when they are already subject to such laws and profess to already

not take such actions—constitute a significant change. *See* Pls.' Br. at 30–32. They simply assert that it is so. But an *ipse dixit* assertion cannot be the basis of an APA challenge.

Besides, Plaintiffs' assertion that the Guidance imposes significant cost cannot withstand scrutiny in light of the fact that from 1965 until 2025, Plaintiffs were subject to Executive Order 11,246, which required them to include provisions in their government contracts certifying that "[d]uring the performance of this contract, the contractor agrees [to] . . . not discriminate against any employee or applicant for employment because of race, creed, color, or national origin"; "will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin"; "will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders" among other things. *See* Executive Order 11,246, Subpart B, Section 202.[10]

Second, as discussed above, the Guidance itself is not a "a procurement policy, regulation, procedure, or form." 41 U.S.C. § 1707(a). Rather, it is an internal guidance document that gives further instructions to agencies that will take separate actions—and only those further agency actions will bind third parties. *See, e.g.*, *Mayes*, 67 F.4th at 944 (guidance that had no "standalone legal force" was not subject to the requirements of Section 1707).

Finally, Plaintiffs argue that the agencies were required to submit class deviations for public notice and comment. Pls.' Br. at 29. Section 1707 "does not specifically address class deviations," *Navajo Ref. Co., L.P. v. United States*, 58 Fed. Cl. 200, 208 (2003), but even assuming the statute

[10] Executive Order No. 11,246 was revoked on January 21, 2025 by Executive Order 14,173, 90 Fed. Reg. 8633, entitled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, § 3(b)(i).

applies to deviations, because the relevant changes were not "significant" within the meaning of the statute, agencies were not required to submit the changes for notice and comment rulemaking.

**C. The Guidance complies with the False Claims Act.**

One of the relevant clauses in the Guidance states that "[t]he Contractor recognizes that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of 31 U.S.C. 3729(b)(4)." Guidance at 9. By requiring recipients of federal funds to recognize their obligation not to intentionally discriminate based on race, the federal government calls recipients' attention to those obligations and makes them certify that they understand and have accepted those obligations. Recipients' "assurances" of compliance are "given 'in consideration of' federal aid, and the federal government extends assistance 'in reliance on' the assurance of compliance." *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 630 (1983) (Marshall, J., dissenting). Such certifications can thus be relevant to claims under the False Claims Act, which imposes civil liability on persons who knowingly make false statements "material to a false or fraudulent claim" for payment from the government. 31 U.S.C. § 3729(a).

The government thus puts recipients on notice that their compliance with those obligations is material, i.e., that it is "capable of influencing" the government's payment decision. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016). Providing such notice, and asking recipients to acknowledge it, is itself unremarkable and adds nothing to recipients' obligations.

Plaintiffs' concern appears to be that "[m]erely labeling a clause 'material' does not make it so." Pls.' Br. at 32. True enough. But the government would still have to prove materiality in any False Claims Act action; the fact that the government tells contractors in advance that this term is important *to the government* promotes clarity and good government, it does not frustrate

those objectives. Moreover, the government's statements about what is important are, as the Supreme Court held, clearly relevant, and it saying so is not improper. *See Escobar*, 579 U.S. at 194 ("[W]hen evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive."). The False Claims Act does not require obfuscating what is important to the government.

**D. The government's actions comply with the Paperwork Reduction Act.**

The government's actions accord with the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501 *et seq*, to the extent Plaintiffs challenge such actions under the APA (as the PRA lacks its own private right of action). The PRA imposes certain notice and comment requirements before the government may collect information. *See id.* But the PRA lacks a private right of action, *see Alegent Health-Immanuel Med. Ctr. v. Sebelius*, 34 F. Supp. 3d 160, 170 (D.D.C. 2014), and even if the APA did apply generally to the PRA, here, for the same reasons Plaintiffs' PRA challenge is not ripe, there is no final agency action. In any event, the FAR Guidance explicitly says that it "is seeking clearance from [OMB] under the [PRA] for the information collections." Guidance at 3. It also makes clear that "agencies will be expected to enforce full compliance with these requirement" only "*[o]nce* OMB approves the information collection under the PRA." *Id.* (emphasis added). But "until that time . . . agencies may still enforce the requirement . . . in connection with individual investigations." *Id.*; *see also* 44 U.S.C. § 3518(c)(1) (permitting collections in connection with investigations). In other words, any information collection requirements do not apply unless and until the PRA notice requirements are complied with.

**IV. Plaintiffs' Arguments Regarding Agency Class Deviations Fail.**

Plaintiffs essentially incorporate by reference their challenges against the Guidance with

respect to class deviations. *See* Pls.' Br. at 35–36. These arguments fail for largely the same reasons above, with several qualifications.

First, Defendants acknowledge that, to the extent Plaintiffs are challenging a class deviation that has legal effect on third parties, that deviation would be final agency action. Changes to existing contracts and any enforcement actions to enforce those terms, however, would be Tucker Act challenges because they would be "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). This court thus lacks jurisdiction over any such claims.

Second, Plaintiffs suggest—in a sentence—that class deviations are improper to the extent that they are coordinated among different agencies. *See* Pls.' Br. at 35. Even assuming this argument is properly presented, it fails. Section 1.402 of the FAR allows for agency-wide deviations "when necessary to meet the specific needs and requirements of each agency." 48 C.F.R. § 1.402. But the Guidance provides for agency specific customization as appropriate. *See* Guidance at 3–4. Plaintiffs offer no support for the proposition that deviations cannot be centrally motivated—particularly where, as here, that central motivation came from the President—nor that they cannot be used as interim measures to be supplemented by permanent changes to the FAR. Indeed, the FAR itself contemplates amendment to the FAR if a deviation may need to be permanent, as is proposed here. *See* 48 C.F.R. § 1.404 ("When an agency knows that it will require a class deviation on a permanent basis, it should propose a FAR revision, if appropriate.").

## V. Plaintiffs' Arbitrary and Capricious Claim Should Be Dismissed for Failure to State a Claim.

Count II of the Complaint argues that challenged actions are arbitrary and capricious. *See* Compl. ¶¶ 103–18. Even assuming these actions are final agency action, *but see* Section II.D, these allegations fail to state a claim and should be dismissed under Rule 12(b)(6).

Plaintiffs first argue that the challenged actions are arbitrary and capricious because the

relevant terms in the Guidance are unclear and undefined. Compl. ¶¶ 103–09. They are neither. For example, Plaintiffs say that "racially discriminatory DEI activities" lacks clarity. *Id.* ¶¶ 103–04. But the term *is* defined—it is "disparate treatment based on race or ethnicity," Guidance at 7, which, for the reasons discussed above, is a term of art that means "intentional discrimination," and has for generations. Similarly, "program participation," Compl. ¶ 103, "means membership or participation in, or access or admission to: training, mentoring, or leadership development programs; educational opportunities; clubs; associations; or similar opportunities that are sponsored or established by the contractor or subcontractor," Guidance at 7. Federal contractors cannot intentionally discriminate based on race or ethnicity with respect to such programs, *i.e.*, they cannot treat a "particular person less favorably than others" with respect to such membership or programs based on their race or ethnicity. *See, e.g.*, *Ricci*, 557 U.S. at 577. Plaintiffs fail to plead facts showing how these terms are, in fact, unclear, and most of their allegations in Count II are premised on this misunderstanding. *See* Compl. ¶¶ 105–09. When the misunderstanding is corrected, the allegations must fail.

Second, Plaintiffs claim that the actions are not supported by any "factual basis, evidence, or analysis." Compl. ¶ 110. But their concern goes solely to Section 1 of the Executive Order (not challenged here), rather than the operative provisions of the Guidance—which prohibit contractors from intentionally discriminating on the basis of race or ethnicity. In light of Plaintiffs' own statements, *see* Pls.' Br. at 9, it is not plausible to conclude that additional evidence or analysis that intentional discrimination based on race is worth pursuing is necessary. *See, e.g.*, *Teamsters*, 431 U.S. at 335 n.15 ("[D]isparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.").

Third, Plaintiffs assert that the challenged actions violate the "change in position" doctrine,

Compl. ¶¶ 111–15, which requires an agency to "provide a reasoned explanation for the change, display awareness that [they are] changing position, and consider serious reliance interests." *Food & Drug Admin. v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025). But, as discussed above, intentional discrimination based on race or ethnicity in federal contracting was prohibited before the Guidance, and it is prohibited after the Guidance. Plaintiffs do not plausibly identify what "serious reliance interests" are at stake when the basic rules remain the same. Nor do they contend that their ability to intentionally discriminate based on race or ethnicity is a legitimate reliance interest.

Fourth, Plaintiffs assert that Defendants have not considered "reasonably obvious alternatives." Compl. ¶¶ 116–17. But this is a doctrine that exists in the context of considering comments during rulemaking; it is not a general requirement that attaches to all final agency actions. *See Nat'l Shooting Sports Found., Inc. v. Jones,* 716 F.3d 200, 215 (D.C. Cir. 2013) ("While an agency must consider and explain its rejection of 'reasonably obvious alternative[s],' it need not consider every alternative proposed nor respond to every comment made." (citation omitted)). hat is especially true here when Defendants could not deviate from the President's directive. *See, e.g.*, *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 731 (10th Cir. 2024) ("to consider and adopt any such alternatives would require DOL to defy an executive order—which would clearly constitute an arbitrary and capricious agency action"); *Sherley v. Sebelius*, 689 F.3d 776, 784–85 (D.C. Cir. 2012) ("NIH may not simply disregard an Executive Order. To the contrary, as an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law. Bound as it is to carry out the President's directives, NIH thus reasonably limited the scope of its Guidelines to implement the Executive Order." (cleaned up)).

Finally, Plaintiffs say that the "*suggestion* that a contractor's refusal to agree to a bilateral modification *may* equate to a failure to meet the agency's needs and therefore *may* justify termination of the contract" is bad faith and thus arbitrary and capricious. Compl. ¶ 118. But a nonbinding suggestion of what may or may not happen determines no legal rights and is not final agency action. *See Bennett*, 520 U.S. at 178–79.

**VI. Plaintiffs' Requested Relief Is Improper.**

Finally, even if there were subject-matter jurisdiction, and even if Plaintiffs had stated a claim, Plaintiffs' requested relief is outside the scope of the APA and thus improper.

First, any relief should be limited to the vacatur of specific final agency actions that concretely injure Plaintiffs, rather than broad vacatur. *See Trump v. CASA*, 606 U.S. 831, 861 (2025). After all, "standing is not dispensed in gross," and "'plaintiffs must demonstrate standing for each claim they press' against each defendant, 'and for each form of relief.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation omitted). That bears emphasis in this context—for every claim, and every form of relief, against every defendant, Plaintiffs must demonstrate standing. But not every Plaintiff has any current or imminent future relationship with every Defendant. For example, Rhode Island identifies four agencies where it is working with or seeking contracts. Jenkins Decl. ¶ 10, ECF No. 87-19. Wisconsin identifies two. Switzer Decl. ¶ 7, ECF No. 87-24. Plaintiffs cannot obtain relief with respect to Defendants who have not injured them.

Second, Plaintiffs cannot enjoin the challenged actions as to third parties, including other third parties that contract with the government. "In order to establish standing to enforce" payment of a government contract, or any other terms, a plaintiff must show that they are party to the contract or an intended third-party beneficiary. *Edwards v. Aurora Loan Servs., LLC*, 791 F. Supp. 2d 144, 150 (D.D.C. 2011); *see also Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, NA*,

747 F.3d 44, 49 (2d Cir. 2014) (holding that plaintiff lacked prudential standing because it could not "enforce the terms of" an agreement "as to which it is neither a party nor a third-party beneficiary"); *Maher v. United States*, 314 F.3d 600, 605 (Fed. Cir. 2002) ("The remaining shareholders [who were nonparties to the contract] did not have standing to sue and were not intended third-party beneficiaries."); *cf. Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479–80 (2006) ("[W]e hold that a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'"). Plaintiffs have not sought to certify a class (and likely could not represent private parties under Rule 23), and they cannot obtain relief that benefits nonparties.

Finally, a permanent injunction is not appropriate. The APA does not provide district courts "jurisdiction to order specific relief." *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005). Rather, "[t]he reviewing court shall hold unlawful and *set aside* agency action . . . found to be arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). Indeed, most of the complaints the Plaintiffs bring are procedural. But if that is the applicable error, the appropriate remedy—at most—is to allow the government to fix the procedural error. *See Chamber of Com. of U.S. v. Napolitano*, 648 F. Supp. 2d 726, 741 (D. Md. 2009) ("[E]ven if the Defendants violated the Procurement Policy Act [i.e., Section 1707], the appropriate remedy would be to stay the applicability date of the Final Rule pending publication of the revised MOU and a 60–day comment period. The Court does not believe it would be appropriate to invalidate the entire Final Rule").

## CONCLUSION

This Court should grant Defendants' motion and dismiss this complaint in its entirety, or in the alternative, grant summary judgment to Defendants on Count I of the Complaint, and deny Plaintiffs' motion for summary judgment.

Dated: September 28, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MARIANNE F. KIES
Assistant Branch Director

*/s/ Joseph E. Borson*
JOSEPH E. BORSON (Va Bar No. 85519)
Assistant Branch Director
Federal Programs Branch
Civil Division
U.S. Department of Justice
Joseph.Borson@usdoj.gov
202-598-5389