**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

STATE OF MARYLAND, et al.

Plaintiffs

v.

PETE HEGSETH, Secretary of Defense, et al

Defendants.

Case No: 1:26-cv-02322-MJM

**DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION TO DISMISS OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

I. There Is No Reasonable Dispute that the Challenged Conditions Cover Only Intentional Discrimination Based on Race or Ethnicity. ....................................... 2

II. This Court Lacks Jurisdiction. ................................................................... 4

A. Plaintiffs Lack Article III Standing. ....................................................... 4

B. Plaintiffs' Paperwork Reduction Act Challenge Is Not Ripe. ..................... 5

C. This Court Lacks Jurisdiction to Address Future Contractual Actions. ...................................................................................... 6

D. The FAR Guidance Is Not Final Agency Action. ..................................... 6

III. Count I of Plaintiffs' Complaint Fails on the Merits, and This Court Should Dismiss It or Enter Summary Judgment in Favor of the Defendants. .................... 8

A. The FAR Council Had Authority to Issue the FAR Guidance. .................. 8

B. The FAR Guidance Accords with All Notice and Comment Requirements. ......................................................................... 9

C. Plaintiffs' Paperwork Reduction Act Arguments Fail Because No Such Requirements Have Been Imposed. ............................................. 10

D. Agencies Are Not Precluded from Coordinating Class Deviations, and Plaintiffs' Derivative Arguments Fail. ...............................................11

IV. Count II Should Be Dismissed for Failure to State a Claim. .............................. 12

V. Plaintiffs Are Not Entitled to the Relief They Seek. .......................................... 14

CONCLUSION ........................................................................................................ 15

# TABLE OF AUTHORITIES

## CASES

*Am. Acad. of Pediatrics v. FDA*,
379 F. Supp. 3d 461 (D. Md. 2019) ........ 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 1, 12

*Bekkam v. U.S. Dep't of Homeland Sec.*,
No. CV GLR-25-3468, 2026 WL 1983144 (D. Md. July 9, 2026) ........ 12

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 7

*Bradford v. U.S. Dep't of Lab.*,
101 F.4th 707 (10th Cir. 2024) ........ 14

*Brnovich v. Biden*,
562 F. Supp. 3d 123 (D. Ariz. 2022), *rev'd sub nom. on other grounds*,
67 F.4th 921 (9th Cir. 2023) ........ 7

*City of Columbus v. Trump*,
453 F. Supp. 3d 770 (D. Md. 2020) ........ 12

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........ 10

*D.A.M. v. Barr*,
486 F. Supp. 3d 404 (D.D.C. 2020) ........ 11

*Dille v. Council of Energy Res. Tribes*,
801 F.2d 373 (10th Cir. 1986) ........ 2

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*,
637 F.3d 259 (4th Cir. 2011) ........ 7

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
575 U.S. 768 (2015) ........ 2

*FCC v. Fox Television Stations*,
556 U.S. 502 (2009) ........ 13

*FDA v. Wages & White Lion Invs., LLC*,
604 U.S. 542 (2025) ........ 13

*Kentucky v. Biden*,
571 F. Supp. 3d 715 (E.D. Ky. 2021), *aff'd as modified*, 57 F.4th 545 (6th Cir. 2023)............ 12

*Laird v. Tatum*,
408 U.S. 1 (1972)............................................................................................................ 5

*Mayes v. Biden*,
67 F.4th 821 (9th Cir. 2023), *vacated as moot* 89 F.4th 1186 (9th Cir. 2023) .......................... 10

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)........................................................................................................ 15

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024).......................................................................................................... 3

*Mullin v. Doe*,
609 U.S. 324 (2026).......................................................................................................... 6

*Nat'l Ass'n of Diversity Officers in Higher Ed. v. Trump*,
167 F.4th 86 (4th Cir. 2026)........................................................................................ 4, 5

*Nat'l Ass'n of Diversity Officers in Higher Ed. v. Trump*,
No. 26-cv-1532-ABA, 2026 WL 3070159 (D. Md. Oct. 14, 2026)..................................*passim*

*Nat'l Min. Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014)......................................................................................8, 11

*Nat'l Urb. League v. Trump*,
783 F. Supp. 3d 61 (D.D.C. 2025) ...................................................................................... 3

*NIH v. Am. Public Health Ass'n*,
145 S. Ct. 2658 (2025)...................................................................................................6, 11

*Palisades Gen. Hosp. Inc v. Leavitt*,
426 F.3d 400 (D.C Cir. 2005)............................................................................................ 15

*Sherley v. Sebelius*,
689 F.3d 776 (D.C. Cir. 2012)..................................................................................... 13, 14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021)......................................................................................... 15

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)..................................................................................................... 14, 15

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ....................................................................................................... 8

*United States v. Texas*,
599 U.S. 670 (2023)........................................ 15

**STATUTES**

3 U.S.C. § 301........................................ 8

5 U.S.C. § 704........................................ 6, 7

41 U.S.C. § 1302(a)........................................ 9

41 U.S.C. § 1303(d)........................................ 9

41 U.S.C. § 1707........................................ 1

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

48 C.F.R. § 1.402........................................9, 11

Exec. Order 14042, *Ensuring Adequate COVID Safety Protocols for Federal Contractors*,
86 Fed. Reg. 50,985 (Sept. 9, 2021)........................................ 12

Exec. Order 14398, *Addressing DEI Discrimination by Federal Contractors*,
91 Fed. Reg. 16,147 (Mar. 26, 2026)........................................ 2, 3

## INTRODUCTION

Earlier this year, the President issued an Executive Order prohibiting intentional discrimination based on race or ethnicity in federal contracts, and agencies have implemented that Presidential directive. Plaintiffs filed this lawsuit on the theory that the "prescribed contract term [i.e., 'disparate treatment'] is unclear." Compl. ¶ 3. It is not. It means intentional discrimination—a term of art that has long been understood by bench and bar, as Judge Abelson reiterated in a related case just two weeks ago. *Nat'l Ass'n of Diversity Officers in Higher Ed. v. Trump* ("*Diversity Officers II*"), No. 26-cv-1532-ABA, 2026 WL 3070159, at *5 (D. Md. Oct. 14, 2026). Plaintiffs do not contest the applicability or the meaning of "disparate treatment" in their responsive brief. Nor could they. To the extent that Plaintiffs were ever reasonably confused about the meaning of this term, its meaning is now clear beyond peradventure.

The undisputably clear definition of "intentional discrimination" resolves this case. Plaintiffs' theory of Article III injury depends on the proposition that the scope of the contractual language is unclear as a matter of law. It is not. And Plaintiffs vow that they do not engage in intentional discrimination, so they are not injured by the challenged conditions (which align with decades of federal antidiscrimination practice and law). In support of Count I, Plaintiffs contend that the conditions impose a "significant" change in violation of 41 U.S.C. § 1707. But requiring contractors not to engage in intentional discrimination is not a significant change—it has been true for decades. And Plaintiffs' arbitrary and capricious claim in Count II is premised on the idea that the challenged conditions represent a significant change requiring significant consideration of reliance interests. Again, when looking at the actual language, it simply is not such a change. Count II should also be dismissed for failure to state a claim—a standard that applies to Administrative Procedure Act ("APA") claims, like all claims, under *Iqbal*.

Plaintiffs' remaining challenges fail, either for lack of jurisdiction or on the merits. This Court should deny Plaintiffs' motion, grant Defendants' motion, and dismiss this case.

## I. There Is No Reasonable Dispute that the Challenged Conditions Cover Only Intentional Discrimination Based on Race or Ethnicity.

Plaintiffs premised this lawsuit on their theory that Defendants' standard for racial discrimination, as set forth in the Executive Order, is "unclear and does not provide sufficient explanation of what it prohibits." Compl. ¶ 3. This premise is the foundation of their theories of Article III injury and the merits of their claims. But as Defendants explained, the premise is wrong. The applicable standard is intentional discrimination, a term long understood in the case law.

Indeed, less than a month ago, Judge Abelson confirmed in a case challenging identical terms that "[u]nder well-settled federal law, 'disparate treatment' refers to 'intentional discrimination.'" *Diversity Officers II*, 2026 WL 3070159, at *1 (quoting *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015)); *id.* at *6 ("'[D]isparate treatment' has a settled, specific meaning under the law— intentionally treating a person 'less favorably than others because of' a protected trait, . . . —and [E.O. 14,398] must be interpreted in light of that settled meaning." (citations omitted)); *id.* ("Here, 'disparate treatment' defines the phrase 'racially discriminatory DEI activities.' [E.O. 14,398] § 2. The inclusion of the term 'racially discriminatory' confirms that 'disparate treatment' is to be interpreted based upon its established meaning in the context of federal laws that prohibit discrimination on the basis of race.").

In their responsive brief, Plaintiffs do not contend that the terms have any other meaning. Pls.' Resp. Br., ECF No. 110, at 13-14. Instead, they raise three strawman arguments. All fail.

First, Plaintiffs complain that Defendants have not demarcated every possible instance where a federal contractor that is subject to the challenged contractual conditions might not *also* be subject to Title VII. *See id.* at 13. But it is not Defendants' obligation to do Plaintiffs' legal research for them—Indian tribes, for example, are also not subject to Title VII, *see Dille v. Council of Energy Res. Tribes*, 801 F.2d 373, 376 (10th Cir. 1986)—and regardless, that complaint is irrelevant, because the government is clear about the legal standard that actually applies to

contractors: intentional discrimination. Nor, for that matter, do Plaintiffs explain any intentional discrimination that they intend to engage in that the Executive Order would prevent them from doing. *See* Defs.' Br., ECF No. 107, at 17. Second, Plaintiffs assert that the "context in which [the terms] emerged" somehow means that the terms are themselves vague, referring to other Executive Orders and what they describe as the President's rhetoric. Pls.' Resp. Br. at 14. But the "context that surrounds the phrase 'disparate treatment' in [E.O. 14,398] . . . confirms that 'disparate treatment' is to be interpreted based upon its established meaning in the context of federal laws that prohibit discrimination on the basis of race." *Diversity Officers II*, 2026 WL 3070159, at *6. Third, Plaintiffs point to one hearsay example (not even relied on in their summary judgment papers) where one third-party contractor apparently terminated its relationship with one plaintiff based on one conversation with an unknown government employee who apparently "led the prime contractor to believe that it could not work with subcontractors that follow DEI policies of any kind." Pls.' Opp'n Defs. Ext. Mot., at 2, ECF No. 90. One unverified, isolated example across the entire federal government over a period of nearly six months does not show that the challenged terms are legally vague. If anything, it proves the opposite. *See Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 101 (D.D.C. 2025) (explaining that one isolated instance of the misapplication of an Executive Order "hardly shows that the 'unconstitutional applications' of these provisions 'substantially outweigh [their] constitutional ones'" warranting "facial invalidation" (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024) (alteration in original)).

Unable to surmount the clearly established meaning of "disparate treatment" put forward in the FAR Guidance and the associated class deviations (the "Challenged Conditions"), Plaintiffs now change tack altogether, saying that "[t]he Court can resolve the motion without determining whether the Executive Order No. 14398 contract terms are sufficiently clear or delineating their precise meaning." Pls.' Resp. Br. at 14. But as described throughout this brief, their arguments

hinge on the assumption that the terms are vague. Because the terms are, as a matter of law, clear, those arguments—and their claims—fail.

**II. This Court Lacks Jurisdiction.**

**A. Plaintiffs Lack Article III Standing.**

Because Plaintiffs disavow any intent to engage in intentional discrimination, Pls.' Br., ECF No. 87-1, at 8, and thus cannot establish an objective likelihood that the conditions will be enforced against them, this Court lacks jurisdiction over their claims. In response, Plaintiffs point to what they describe as the "materially identical" situation in *National Ass'n of Diversity Officers in Higher Education v. Trump* ("*Diversity Officers I*"), 167 F.4th 86 (4th Cir. 2026). But the situations are not identical, nor is the Fourth Circuit's opinion in that case dispositive in this one.

To begin, *Diversity Officers I* and this case involve materially different Executive Orders—the Order in this case is "narrower," because it forbids only "intentional discrimination." *Diversity Officers II*, 2026 WL 3070159, at *1. And the cases involve different theories of injury. In *Diversity Officers I*, the majority on the Fourth Circuit found standing because Plaintiffs "allege[d] that they 'may have to abandon their lawful efforts and speech related to diversity, equity, inclusion, and accessibility, or else lose federal funds." *Diversity Officers I*, 167 F.4th at 98; *see also id.* (stating that plaintiffs would have to "face the forced choice" to "change their programming to enable them to make the certification; make the certification without changes and risk a false certification; or give up federal funds and contracts.") (citation omitted); *id.* ("At the very least, plaintiffs 'are forced to do something they otherwise would not need to do'—affirmatively certify that their DEI programming complies with federal antidiscrimination law."). Courts in this district have understood the Fourth Circuit's decision the same way. *See Diversity Officers II*, 2026 WL 3070159, at *4 n.3 ("[In *Diversity Officers I*] the Fourth Circuit held that NADOHE and AAUP had organizational and associational standing to challenge the earlier Certification Provision because the provision forced them and their members to choose between altering their activities,

risking consequences under the certification, or forgoing federal funds or contracts."). The purported "forced choice" required altered activities in *Diversity Officers I* is absent here. Rather, the only obligation imposed by the contractual language in this case is not to intentionally discriminate, and "'existing federal law already demands' that federal contractors not engage in intentional discrimination." *Diversity Officers II*, 2026 WL 3070159, at *1 (quoting *Diversity Officers I*, 167 F.4th at 104). Nor do Plaintiffs explain how the obligation to certify that they do not do something that they agree they do not do constitutes a cognizable Article III injury.

To the extent that Plaintiffs premise Article III injury on their subjective fears that the substantive contractual terms are unclear,[1] Plaintiffs fare no better. The terms are objectively clear, *see supra* Section I; *Diversity Officers II*, 2026 WL 3070159, at *5, so their subjective concerns cannot justify standing, *see Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). Plaintiffs claim that *Laird* and its progeny do not apply, because that doctrine only applies to the "threatened enforcement of the law." Pls.' Resp. Br. at 16 (emphasis omitted). But "threatened enforcement" is exactly what Plaintiffs claim is harming them: i.e., the uncertainty of the contractual terms creates the possibility that those terms will be enforced against them. Here, based on Plaintiffs' own statements that they do not intentionally discriminate, there is no objectively likely possibility of that.

**B. Plaintiffs' Paperwork Reduction Act Challenge Is Not Ripe.**

Plaintiffs' PRA challenge is not ripe because no obligations have yet been imposed on Plaintiffs—and indeed, no obligations may ever be imposed. *See* Defs.' Br. at 19 (the information collection requires additional steps to become effective). Plaintiffs' response is that the "[c]ontracting agencies have already put the requirements into place." Pls.' Resp. Br. at 27. But

---

[1] *See, e.g.*, Decl. of Jeni Kitchell (California) ¶ 21, ECF No. 87-5 ("This definition is too vague and ambiguous to provide clarity to the CSU regarding how it is expected to comply"); Decl. of Emma Cimino (Connecticut) ¶ 18, ECF No. 87-7 (expressing "concern[] that the contract terms . . . . will lead to significant uncertainty"); Decl. of Dr. Paul Ellinger (Illinois) ¶ 18, ECF No. 87-10 (similar); Decl. of LeAnn Behrens (New Mexico) ¶ 12, ECF No. 87-17 (similar).

they haven't—by their terms, the requirements do not yet apply. The claims are not ripe and voluntary actions by Plaintiffs cannot manufacture standing.

**C. This Court Lacks Jurisdiction to Address Future Contractual Actions.**

Defendants previously explained that "[t]o the extent [Plaintiffs'] claims encompass future contractual actions (including enforcement or termination actions pursuant to specific contract terms)" this Court lacks jurisdiction over such future actions. Defs.' Br. at 19. Plaintiffs assert that they "have not sought enforcement of contract rights or challenged any past contract termination," Pls.' Resp. Br. at 19. But to the extent that their proposed injunction also purports to enjoin *future* termination or enforcement actions—and their drafting remains notably imprecise on this point, *see* Proposed Order, ECF No. 87-25—this Court lacks jurisdiction to enter such an order. Such a claim would be essentially a preemptive contract dispute, which belongs elsewhere. *See, e.g.*, *NIH v. Am. Public Health Ass'n*, 145 S. Ct. 2658 (2025).

**D. The FAR Guidance Is Not Final Agency Action.**

The FAR Guidance is not final agency action. Plaintiffs' arguments to the contrary fail.

*First*, Plaintiffs now heavily rely on the argument that the FAR Guidance is reviewable because it is "'preliminary, procedural, or intermediate agency action'" preceding a 'final agency action.'" Pls.' Resp. Br. at 20 (citing 5 U.S.C. § 704). But this reference to Section 704 of the APA—confined to a single sentence in their opening brief—does not apply here. That provision stands for the routine proposition that "[i]n APA cases, an agency's subsidiary decisions merge into the final agency action, which is then subject to review." *Mullin v. Doe*, 609 U.S. 324, 344 (2026). If there was an error at the notice of proposed rulemaking stage, for example, that error can be reviewed once there is a final rule. But here, Plaintiffs are *not* challenging an earlier action by one agency that directly led to a final agency action by that same agency—but a separate action by a

separate federal entity, the FAR Guidance issued by the FAR Council. That is not a proper challenge, and Plaintiffs offer no authority that section 704 sweeps so expansively here.

*Second*, Plaintiffs say that the FAR Guidance is "the FAR Council's final word on how agencies should proceed for the present." Pls.' Resp. Br. at 20. Plaintiffs note that even interim actions can be final agency action if they have present legal effect. *Id.* But the FAR Guidance does not have present legal effect. Indeed, it is not "binding of its own force," but merely "encourage[s] agencies to use their own independent authorities to deviate from the FAR." *Brnovich v. Biden*, 562 F. Supp. 3d 123, 160 (D. Ariz. 2022), *rev'd sub nom. on other grounds*, 67 F.4th 921 (9th Cir. 2023). Internal executive branch direction that itself imposes no legal requirements on a third-party is not reviewable final agency action.

*Third*, Plaintiffs state that the FAR Guidance is final agency action "because other agencies incorporated the FAR Council guidance by reference into their own policies." Pls.' Resp. Br. at 21. But it would be a separate agency action incorporating the Guidance that would make that *second* action final agency action. Plaintiffs cite *Bennett v. Spear*, 520 U.S. 154 (1997) for the proposition that a second agency according "virtually determinative effect" to a first agency decision transforms that first decision into final agency action. Pls.' Resp. Br. at 21-22. That is not *Bennett*'s holding: there, the challenged action (in that case, a Biological Opinion) "alter[ed] the legal regime to which the action agency is subject, authorizing [the agency] to take the endangered species if (but only if) it complies with the prescribed conditions." *Bennett*, 520 U.S. at 178. The issue there was not that the Biological Opinion was "incorporated by reference," a term not used by the Supreme Court, but that it legally authorized agency action that would not otherwise be available. *See Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 637 F.3d 259, 261-62 (4th Cir. 2011) (noting legal consequences caused by Biological Opinion). Here, the FAR Guidance does not unlock legal options otherwise unavailable to the agencies, so it is not itself final agency action.

*Fourth*, Plaintiffs assert that the FAR Guidance is final agency action because it imposed requirements beyond those put in place by the Order. Pls.' Resp. Br. at 22-23. But the FAR Guidance does not impose "legally binding obligations or prohibitions on regulated parties." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014); *see also id.* at 252 ("The most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities."); *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 495 (D. Md. 2019) (same). The requirements that Plaintiffs identify—(i) a requirement to submit proposed deviations to the FAR Council, (ii) a deadline by which the agencies should "make every effort to bilaterally modify existing contracts," FAR Guidance at 2, and (iii) guidance regarding micro-purchase thresholds or performance outside the United States—do not bind the regulated parties. Pls.' Resp. Br. at 22-23. These provisions provide direction within the Executive Branch. Such direction does not itself have legal effect on regulated entities, so it is not itself final agency action.

## III. Count I of Plaintiffs' Complaint Fails on the Merits, and This Court Should Dismiss It or Enter Summary Judgment in Favor of the Defendants.

### A. The FAR Council Had Authority to Issue the FAR Guidance.

The FAR Council had authority to issue the FAR Guidance. The authority issue is simple: the President explicitly directed the FAR Council to issue the FAR Guidance and the President has the power to direct and supervise his subordinate employees in the Executive Branch. *See, e.g.*, *Trump v. Slaughter*, 146 S. Ct. 2283, 2293 (2026).[2] The Guidance's limited independent effects—if any, and only on other Executive Branch agencies—accords with that principle.

That resolves this question. But Plaintiffs nonetheless say that the FAR Council is precluded by statute from issuing the Guidance. They are mistaken. Congress gave the FAR

[2] To the extent Plaintiffs say this designation must be in writing and published in the Federal Register, *see* Pls.' Resp. Br. at 24-25 (citing 3 U.S.C. § 301), the Executive Order was.

Council broad authorities, including the ability to "manage, coordinate, control, and monitor the maintenance of, issuance of, and changes in, the Federal Acquisition Regulation." 41 U.S.C. § 1303(d). The Guidance *is* part of the process of coordinating changes to the FAR—and Plaintiffs' arguments that a deviation fundamentally differs from the FAR cannot be squared with the fact that the authority to issue such deviations comes from the FAR itself. 48 C.F.R. § 1.402.

Ultimately, Plaintiffs' "authority" argument is a red herring. The FAR Council is not relying on its independent authorities to bind the public—as it would if it modified the FAR. Instead, the FAR Council is acting as an entity advising the President, pursuant to his explicit direction, and providing internal guidance for other agencies. The President has the constitutional authority to use his subordinates for that purpose. And Congress explicitly contemplated that the FAR Council would have broader roles than just its formal independent authorities. Congress established it "to assist in the direction and coordination of Government-wide procurement policy and Government-wide procurement regulatory activities in the Federal Government." 41 U.S.C. § 1302(a). Plaintiffs never contest that the challenged activities are consistent with that mandate.

**B. The FAR Guidance Accords with All Notice and Comment Requirements.**

The FAR Guidance imposes only the requirement that contractors do not intentionally discriminate based on race or ethnicity. Plaintiffs do not dispute this. *See supra*. Nor do they contend that this prohibition on intentional discrimination is a new requirement. It is not. Section 1707 only applies to "significant" changes, and reinforcing existing contractor requirements is not a significant change. *See* Defs.' Br. at 29-30. Plaintiffs' only response to this is to say that the contract terms "apply to small employers who are not covered by Title VII," Pls.' Resp. Br. at 26, but *Plaintiffs* are not small employers. They lack third-party standing to sue on behalf of those employers. Defs.' Br. at 36-37. And those small employers have long been subject to the requirement not to intentionally discriminate based on race or ethnicity. *Id.* at 30. If Plaintiffs have taken "time-consuming and expensive efforts to comply" with the conditions, Pls.' Resp. Br. at 26

that appears to be based on their own subjective fears, not the objective features of the requirements themselves. This is self-inflicted injury. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013). To the extent Plaintiffs are concerned with paperwork requirements, Pls.' Resp. Br. at 26, those do not yet have mandatory effect. And the fact that the changes are not "significant" is dispositive of Plaintiffs' arguments even if class deviations are subject to Section 1707.

Nor does the FAR Guidance constitute a "procurement policy, regulation, procedure, or form" subject to Section 1707 at all. That requirement applies only to the extent the guidance is "binding of its own force" or "standalone legal force." *Mayes v. Biden*, 67 F.4th 821, 944 (9th Cir. 2023)*, vacated as moot* 89 F.4th 1186 (9th Cir. 2023). Plaintiffs ignore this requirement in their papers. Pls.' Resp. Br. at 26. Finally, the fact that the Council intends to conduct rulemaking under Section 1707 as to an actual amendment to the FAR (which will itself have legal effect) does not itself constitute a concession that such rulemaking is legally required for a guidance document that applies only to other agencies. *Contra id.* at 27.

### C. Plaintiffs' Paperwork Reduction Act Arguments Fail Because No Such Requirements Have Been Imposed.

The FAR Guidance explicitly states that the FAR Council is "seeking clearance from [OMB] under the Paperwork Reduction Act of 1995 . . . for the information collections related to the guidance." FAR Guidance at 3. Only "[o]nce OMB approves the information collection under the PRA [will] agencies be expected to enforce full compliance with these requirements." *Id.* In short, the FAR Guidance does *not* itself impose any binding recordkeeping and reporting requirements at this time—and will not unless and until it receives PRA clearance.

Plaintiffs claim that "defendants assert they are free to impose binding recordkeeping and reporting requirements without following the Paperwork Reduction Act so long as they comply with the Act sometimes in the future." Pls.' Resp. Br. at 27. This misses the point: Defendants have imposed no "binding" obligations. Plaintiffs do not have any "obligation to comply with the terms"

yet. There is thus no final agency action—because there is no "legal effect" on regulated entities, *Nat'l Min. Ass'n*, 758 F.3d at 252—and no substantive violation.

**D. Agencies Are Not Precluded from Coordinating Class Deviations, and Plaintiffs' Derivative Arguments Fail.**

Plaintiffs' class-deviation specific arguments—which both parties agree are largely derivative of the FAR Guidance arguments, Pls.' Resp. Br. at 29-30—similarly fail. At the outset, Plaintiffs say that the class deviations should *per se* be vacated "simply because they were rooted in the unlawful FAR Council memorandum." *Id.* at 29. This is wrong. As Justice Barrett noted in her controlling concurrence in *NIH*, even if two different agency actions are linked, "vacating the guidance does not necessarily void decisions made under it." *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring) (citing *D.A.M. v. Barr*, 486 F. Supp. 3d 404, 415 (D.D.C. 2020)). The case on which Justice Barrett relied noted that "vacatur does not necessarily 'eras[e] from legal existence all *past* adjudications under the vacated rule.'" *Id.* (alterations original). Indeed, as that court noted, an "order vacating the [ban] means that the government cannot issue any more orders of removal under that rule, but it does not mean that petitioners' removal orders (along with thousands of others) were automatically extinguished by operation of his judgment." *D.A.M.*, 486 F. Supp. 3d at 416. There is no "automatic" vacatur of the class deviations; they rise or fall on their own terms.

Nor is there any restriction on class deviations being centrally motivated. The FAR itself expansively authorizes deviations for all subjects, except for certain cost accounting topics not relevant here. *See* 48 C.F.R. § 1.402 ("Unless precluded by law, executive order, or regulation, deviations from the FAR may be granted as specified in this subpart when necessary to meet the specific needs and requirements of the agency."). Here, the FAR Guidance authorized agency-by-agency specific customization. Moreover, the FAR contemplates that deviations can be centrally controlled, which is why the President may preclude them by "executive order." *Id.* Finally, under Plaintiffs' theory, the President would be incapable of centrally coordinating deviations among

different agencies in the event of a national crisis, such as a global pandemic. That is neither the law nor historical practice. *See*, *e.g.*, *Kentucky v. Biden*, 571 F. Supp. 3d 715, 720 (E.D. Ky. 2021), *aff'd as modified*, 57 F.4th 545 (6th Cir. 2023) (affirming similar COVID-related FAR Guidance); E.O. No. 14042, 86 Fed. Reg. 50,985 (Sept. 9, 2021). Ultimately, Plaintiffs attempt to read in a restriction of intra-governmental coordination that does not exist in the text of the FAR or the relevant statutes, and that is inconsistent with the President's general supervisory powers over the Executive Branch and his ability to direct his subordinates to take actions consistent with the law.

## IV. Count II Should Be Dismissed for Failure to State a Claim.

Plaintiffs' arbitrary and capricious count should be dismissed under Rule 12(b)(6) for failure to state a claim as a matter of law. To begin, Plaintiffs first urge deferral of resolution of Count II because Defendants have not yet produced administrative records. *See* Pls.' Resp. Br. at 34. But APA claims, like all claims, are subject to Rule 12's plausibility standard. *See Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("[o]ur decision in *Twombly* expounded the pleading standard for 'all civil actions'" (citation omitted)); *Bekkam v. U.S. Dep't of Homeland Sec.*, 2026 WL 1983144, at *6 (D. Md. July 9, 2026) (dismissing APA claim under Rule 12(b)(6). Plaintiffs' allegations in Count II do not plausibly entitle them to relief, and there is no reason to defer that conclusion.[3]

*First*, Plaintiffs say that the relevant terms in the Guidance are unclear and undefined. As discussed, they are not—and as Judge Abelson recently concluded, based on "the Court's reading of the text and context." *Diversity Officers II*, 2026 WL 3070159, at *6. This is a pure legal question—suitable for resolution under Rule 12. *Contra* Pls.' Resp. Br. at 35.

---

[3] Plaintiffs say that "Judges of this Court have repeatedly held that it is usually error to dismiss such a claim without reviewing the agency record." Pls.' Resp. Br. at 34. None of the three cases cited hold that it would be "error"; at most, they indicate that the court "declines" to rule on such claims. *See, e.g.*, *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 796 (D. Md. 2020). Nor did the cited cases applied the *Iqbal* standard to the arbitrary and capricious claim at issue.

*Second*, the challenged actions are implementing the President's Executive Order—which does include analysis on its rationales—and which is not challenged here. *See* Compl. ¶ 110. Relying on those (unchallenged) findings and analyses would not be arbitrary and capricious. *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784-85 (D.C. Cir. 2012) ("NIH may not simply disregard an Executive Order. To the contrary, as an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."). Nor do Plaintiffs plead facts showing that the Government's factual basis for concluding it is "laudable," Pls.' Resp. Br. at 35, to prohibit intentional discrimination based on race is wrong.

*Third*, Defendants have not plausibly violated the "change in position" doctrine. Plaintiffs say that this doctrine requires the "defendant agencies to justify the changes made to agency policy." *Id.* at 36. There is no special "justification" requirement: rather, the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). Here, the government clearly "display[s] awareness that they are changing position," *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025)—as Plaintiffs note, the government affirmatively revoked one Executive Order and replaced it with another. It explained why. *See* Executive Order § 1. And given that the requirements are only to not intentionally discriminate—the same standard applicable in antidiscrimination law generally and under the previous regime specifically—Plaintiffs do not plead any non-conclusory allegations of reliance interests, let alone "significant," "serious," or "legitimate" ones. *See* Compl. ¶ 115; *Wages & White Lion Invs.*, 604 U.S. at 585 (need only address "legitimate" or "serious reliance interest[s]" (cleaned up)).

*Fourth*, Plaintiffs say that the Government violated the APA's purported requirement to consider "reasonably obvious alternatives." Pls.' Resp. Br. at 36. Even assuming that doctrine applies here, Plaintiffs do not plead plausible facts showing it has been violated. Plaintiffs identify

only two such "alternatives." They initially say that the "obvious alternative would have been to retain or reinstate the prior regime of Executive Order No. 11246." Compl. ¶ 116. But retaining that regime was not an option because that Executive Order was rescinded. "[T]o consider and adopt any such alternatives would require [the agencies] to defy an executive order—which would clearly constitute an arbitrary and capricious agency action." *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 731 (10th Cir. 2024); *Sherley*, 689 F.3d at 784-85. Plaintiffs also say that Defendants could have "adopt[ed] requirements that clearly track existing laws against racial discrimination." Compl. ¶ 117. But that is exactly what the government did. *Supra* section I. Since neither of these identified alternatives plausibly violates the APA, this element of the Complaint must be dismissed.

*Finally*, Plaintiffs continue to attack what they characterize in their Complaint as a "suggestion that a contractor's refusal to agree to a bilateral modification may equate to a failure to meet the agency's needs and therefore may justify termination of the contract" as arbitrary and capricious. Compl. ¶ 118. They say that it is a "directive [that] amounts to a rule that governs how contracting officers perform their work," and thus final agency action. Pls.' Resp. Br. at 37. It is not. Rather, the statement doesn't govern anything—it is a non-binding statement of discretionary factors that may or may not be applied. It itself has no legal effect on anyone. *Contra id.* at 37.

## V. Plaintiffs Are Not Entitled to the Relief They Seek.

Equity forbids "injunctions [that] are broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). Here, Plaintiffs freely acknowledge that the scope of relief they seek is far broader than necessary to resolve any injury. This is true both horizontally (i.e., individual plaintiff states are seeking relief as to defendants that do not injure them) and vertically (i.e., plaintiffs are seeking relief on behalf of absent third-parties). *See* Defs.' Br. at 36-37. Even if this Court finds any violation, it should vacate only those specific final agency actions that concretely injure *Plaintiffs*. That is so because the

APA's use of the phrase "set aside" is an instruction to disregard unlawful agency action in the course of judicial review, not an authorization to universally vacate agency actions. *See United States v. Texas*, 599 U.S. 670, 693-704 (2023) (Gorsuch, J., concurring in the judgment). And while the Supreme Court may have reserved decision on this issue for now, *see CASA*, 606 U.S. at 847 n.10, the reasoning of *CASA*, and of basic principles of Article III jurisdiction and of the scope of equitable relief, counsel in favor of limiting vacatur only to the parties. (And, in all events, it is undisputed that any injunctive relief must be party-specific, *see* Pls.' Resp. Br. at 33.)

Nor is an injunction proper. Plaintiffs now say that they are "not seeking to enforce contract terms" but rather are "seeking relief to prevent application of unlawfully adopted policies." *Id*. But the policy Plaintiffs are seeking to enjoin is one that modifies contract terms. Therefore, their proposed injunction would appear to either (i) require a district court to enjoin enforcement of existing contractual language, which it lacks jurisdiction to do under the Tucker Act, *see* Defs. Br. at 19-20; to (ii) preclude the agencies from re-introducing those terms upon remand, which contradicts *Palisades General Hospital Inc v. Leavitt*, 426 F.3d 400, 403 (D.C Cir. 2005), even under Plaintiffs' view, *see* Pls.' Resp. Br. at 32, (iii) or t redundant with their proposed vacatur, which is itself improper, *see Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (injunction should not be applied if it has no "meaningful practical effect independent of vacatur"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1054 (D.C. Cir. 2021). Moreover, because most of Plaintiffs' complaints are procedural and curable, the appropriate remedy is to allow the government to fix any error without precluding its ability to move forward in the future. *See* Defs.' Br. at 37. At a minimum, any such injunction could not extend beyond remedying Plaintiffs' specific injuries.

## CONCLUSION

This Court should grant Defendants' dispositive motion.

Dated: October 27, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MARIANNE F. KIES
Assistant Branch Director

*/s/ Joseph E. Borson*
JOSEPH E. BORSON (Va Bar No. 85519)
Assistant Branch Director
Federal Programs Branch
Civil Division
U.S. Department of Justice
Joseph.Borson@usdoj.gov
202-598-5389